## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ADRIENNE J. LAWRENCE,

                     Plaintiff,

        -against-

ESPN, INC., MARGARET GREEN, in her
individual and professional capacities, DONNA
HRICISKO, in her individual and professional
capacities, ROBERT GALLO, in his individual
and professional capacities, and JOHN
OBRINGER, in his individual and professional
capacities,

                     Defendants.

Case No.:

## <u>VERIFIED COMPLAINT</u>

**LACHTMAN COHEN P.C.**
Brian S. Cohen, Esq.
Bar No.: CT18878
500 West Putnam Avenue, Suite 400
Greenwich, CT 06830
Telephone: (203) 404-4960
Email: bcohen@lcpclaw.com

**YANKWITT LLP**
Russell M. Yankwitt, Esq.
Bar No.: CT29945
140 Grand Street, Suite 705
White Plains, NY 10601
Telephone: (914) 686-1500
Email: russell@yankwitt.com

        -and-

15 West 47th Street, Suite 1009
New York, NY 10036
Telephone: (646) 838-0275

***Attorneys for Plaintiff***

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BASIS OF THE ALLEGATIONS ………………………………………………..7

JURISDICTION AND VENUE ......................................................................... 8

PARTIES ............................................................................................................ 8

ADMINISTRATIVE REMEDIES ..................................................................... 9

CONFIDENTIAL WITNESSES ........................................................................ 9

FACTUAL ALLEGATIONS .............................................................................. 10

I.    MISOGYNY IS DEEPLY WOVEN INTO THE FABRIC OF
      ESPN'S CULTURE …………………...........................................................10

      A.    ESPN Enjoys a Long History of Sexually Harassing and Mistreating
            Women That is Well Documented and Incontrovertible ......................... 10

      B.    ESPN's Culture Hasn't Changed in Two Decades As the Company
            Continues to Sexualize Its Female Employees ........................................ 15

      C.    Watching Porn Remains a Favorite Pastime at ESPN ............................. 16

      D.    Men Continue to Make Offensive Remarks To and About Women, And
            High-Profile Women At ESPN Are Not Exempt ...................................... 17

      E.    Men at ESPN Use Predatory Tactics Like Sexual Grooming …………...19

      F.    Retaliating Against Women Is Protocol at ESPN ..................................... 20

      G.    ESPN Has a Long History of Mistreating Pregnant Women.................... 22

      H.    Other Examples of ESPN Subjugating Women........................................ 25

II.   MS. LAWRENCE WAS SEXUALLY HARASSED AND SUBJECTED
      TO A HOSTILE WORK ENVIRONMENT AT ESPN …………………....……27

      A.    Ms. Lawrence is an Accomplished and Well-Rounded Individual ......... 27

      B.    Ms. Lawrence Left Her Legal Career to Join ESPN's
            Fellowship Retention Program ................................................................ 28

      C.    Ms. Lawrence Was a Resource For Her Colleagues …………………….30

D.      Like the Other Women Before Her, Ms. Lawrence Was a Victim of Sexual Harassment and ESPN's Hostile Work Environment.................31

      1.      Men Preyed on Ms. Lawrence Under the Guise of Being Collegial or Providing Mentorship .................................... 32

      2.      Men Demeaned Ms. Lawrence By Giving Her "Elevator Eyes" at ESPN ............................................................. 34

      3.      In Ms. Lawrence's Presence, Producer Adam Strain and Ms. Lawrence's Co-Fellow Treavor Scales Opine About What Rihanna "Tastes Like" ....................................... 35

      4.      Longtime Senior Anchor John Buccigross Lures Ms. Lawrence With Promise of Mentorship Intending to Groom Her for a Sexual Relationship .......................................... 35

III.    ESPN RETALIATES AGAINST MS. LAWRENCE ..............................54

A.      ESPN Denies Her the Derrick Rose Trial Assignment ........................... 54

B.      ESPN Reduces Ms. Lawrence's Shifts ................................................... 55

C.      ESPN.com Editor Jason Schwartz Refuses to Publish Ms. Lawrence's Articles ................................................... 55

D.      Ms. Lawrence's Sports Knowledge is Randomly Questioned .................57

E.      EVP Dave Roberts Limits Ms. Lawrence's Opportunities in Radio........58

F.      Ms. Lawrence's Legal Analysis Was Further Discouraged ..................... 58

G.      ESPN Refuses to Consider Ms. Lawrence for Employment ................... 61

H.      ESPN Falsely Tells Ms. Lawrence That Her Position Was Eliminated ...................................................................................... 63

I.      Additional Efforts to Retaliate Against Ms. Lawrence ........................... 66

J.      ESPN Hired Ms. Lawrence's Co-Fellow, Treavor Scales ...................... 67

K.      ESPN Continues Hiring, Including Less Experienced Broadcasters ........ 68

L.      ESPN Knew About the Layoffs Well in Advance of Hiring and Intending to Retain Ms. Lawrence .................................................... 68

IV.    ESPN DEFAMES MS. LAWRENCE IN THE MEDIA ............................69

    A.     ESPN Falsifies Text Messages Between Ms. Lawrence and Buccigross, Publishing Them to Portray Her in a False Light ..................................... 69

    B.     ESPN Uses Bots and Fake Accounts on Social Media to Incite and Promote Hatred Toward Ms. Lawrence and Support for Buccigross ....... 70

FIRST CAUSE OF ACTION ......................................................................... 74

SECOND CAUSE OF ACTION ..................................................................... 75

THIRD CAUSE OF ACTION ......................................................................... 76

FOURTH CAUSE OF ACTION ...................................................................... 77

FIFTH CAUSE OF ACTION .......................................................................... 78

SIXTH CAUSE OF ACTION .......................................................................... 79

SEVENTH CAUSE OF ACTION .................................................................... 80

EIGHTH CAUSE OF ACTION ....................................................................... 81

NINTH CAUSE OF ACTION ……………………………………………………..82

PRAYER FOR RELIEF ................................................................................ 83

DEMAND FOR TRIAL BY JURY ................................................................. 84

Plaintiff Adrienne Lawrence ("Ms. Lawrence" or "Plaintiff"), by and through her undersigned counsel, Lachtman Cohen P.C. and Yankwitt LLP, brings this action against defendants ESPN, Inc. ("ESPN" or "Company"), Margaret Green ("Green"), Robert Gallo ("Gallo"), John Obringer ("Obringer"), and Donna Hricisko ("Hricisko"), and alleges as follows:

## INTRODUCTION

*"[W]hile misogyny may be perpetuated mostly by men,*
*it is enabled by both men and women in society who embrace gender inequality*
*– or simply let it go unnoticed."*

*– Kareem Abdul-Jabbar*

1.      ESPN is, and always has been, a company rife with misogyny.

2.      Talented and ambitious women come to work for the "Worldwide Leader in Sports" with lofty career goals just like their male counterparts. But *unlike* their male counterparts, women are humiliated, degraded, and forced to navigate a misogynistic and predatory culture.

3.      At ESPN, male executives and talent keep "scorecards" naming female colleagues they are targeting for sex. Men openly watch porn on their computers without a care and make repulsive comments *about* women *in front of* women, like when they discuss the women in the office "they want to fuck" or when *SportsCenter* producer Adam Strain and Ms. Lawrence's co-fellow, Treavor Scales, openly wondered, *in Ms. Lawrence's presence*, what popstar Rihanna must "taste like," concluding that she "must taste good," and then howling with excitement while Ms. Lawrence sat in disgust before being forced to leave the room.

4.      And instead of protecting the women at ESPN, the Company's security guards make a sport of stalking high-profile female talent around campus because they like to "check out her ass" and tell degrading tales about seeing their "pussy." *This … is E-S-P-N.*

5.      But this has *always* been ESPN, as misogyny has permeated the atmosphere since the Company's inception. To this day, men think nothing of slowly ogling women up and down in a sexualized manner, texting women half-naked pictures of themselves, or offering mentorship and opportunities for growth but only in exchange for romantic encounters.

6.      In August 2015, Adrienne Lawrence left a successful legal career to join ESPN through its competitive "ESPN the Fellowship" program ("Fellowship"), described as "a recruiting initiative designed to be proactive in the hiring and retaining of diverse candidates."[1] But Ms. Lawrence, filled with optimism and excitement about her burgeoning new career field, had no clue that as soon as she arrived in Bristol, she would merely be "fresh meat."

7.      Ms. Lawrence worked tirelessly, excelling at each opportunity afforded to her in Digital Media, Radio, International/Deportes and Studio Production. She distinguished herself as both an on-air talent and legal analyst, receiving high praise for her performances in each of her rotations. In fact, as reported in an October 27, 2016 article on ESPNFrontRow.com entitled *ESPN The Fellowship Recipient Lawrence Making Impact on SportsCenter, News Platforms*, Ms. Lawrence "came to ESPN in August 2015 ***with a <u>unique skillset</u> and <u>her presence has had a positive and unplanned impact</u> on SportsCenter and other ESPN news platforms*."[2]

8.      Ms. Lawrence also met with then-ESPN President John Skipper to discuss her specialized background and interest in providing legal analysis for ESPN. Skipper asked if she would stay long-term and she answered in the affirmative and advised that she bought and renovated a home in West Hartford for that reason, as the Fellowship was marketed as a "retention"

---

[1] <u>ESPN Press Release</u>, Nov. 19, 2015.

[2]      <u>https://www.espnfrontrow.com/2016/10/espn-fellowship-recipient-lawrence-making-impact-sportscenter-news-platforms/</u> (emphasis added).

program. Skipper asked her to email him some of her written and on-air work, and after she did, he advised that he spoke with Vice President of Talent Rob Savinelli and would support her career at ESPN. By every objective measure, Ms. Lawrence's future at ESPN looked bright.

9.      Ms. Lawrence had every reasonable expectation that she would be given an offer of full-time employment following her successful completion of the Fellowship based on her merits. But instead, ESPN denied Ms. Lawrence important opportunities for professional development and fired her in retaliation for complaining to supervisors and the Human Resources Department ("HR") about sexual harassment and HR's condonation and ratification of discriminatory behavior – acts and omissions that expose powerless women to abuse because they enable the men who engage in such misconduct to do so without fear of punishment.

10.     Throughout her tenure at ESPN, Ms. Lawrence was forced to work in a hostile environment where she was subjected to misogynistic treatment by multiple male colleagues, many of whom ostracized her after she objected to their sexual objectification of her and other women. Like all other women at ESPN, Ms. Lawrence was expected to tolerate the predatory culture without protest and forced to go along to get along. But she could no longer do so after becoming the object of longtime *SportsCenter* anchor John Buccigross's unwelcome advances.

11.     After reaching out to her with the promise of mentorship, Buccigross exploited his position of authority over her by calling her "doll" and coercing her to join him for dinner given his limited availability. Then Buccigross conned Ms. Lawrence into visiting his home under the pretext of his seeking advice about the "charitable" side-business he operates there and suggestions on home renovations. After Ms. Lawrence made clear to the 52-year-old senior anchor that she was not remotely interested in him romantically and saw him only as a mentor, he tried to groom her further by garnering sympathy by divulging his history as an alleged sexual assault victim, a

disclosure he claimed to never have told anyone ever before, making her feel obligated to handle him with care and fearful of the consequences if she did not. Once she felt compelled to be kind, Buccigross next stalked Ms. Lawrence on social media and sent her unwelcome, inappropriate text messages with half-naked photos of himself, saying "I'm a white boy and I'm jacked," commenting on her "#longlegs," and calling her "pretty face," "dollface," and more.

12.     Buccigross's communications with Ms. Lawrence were not random. He was exacting calculated predatory grooming tactics, from testing her boundaries by calling her "doll" before even having met her to sending unsolicited half-naked photos to test how she would respond to his attempt to sexualize the relationship. When Buccigross sensed Ms. Lawrence's unwillingness to engage and abrupt withdrawal from conversation, he would later return with mentorship advice, knowing that was what Ms. Lawrence sought. The seasoned anchor took advantage of the fact that Ms. Lawrence, who was new to New England and to sports broadcast, was in a position where she could not be impolite without suffering professional consequences. It was a predatory dance and a predator's dream. He was following the "ESPN Predators' Playbook."

13.     While Ms. Lawrence tactfully rejected Buccigross's advances, he "marked his territory," a common practice by men at ESPN, by spreading a bogus rumor that they were intimate, falsely suggesting that she was "sleeping her way to the top" and that her advancement was based on a sexual relationship with a senior anchor rather than her stellar performance.

14.     Unwilling to stand by in silence, Ms. Lawrence reported Buccigross's misconduct to her supervisors and HR. But instead of investigating the matter, HR colluded with Buccigross to cover up his misconduct and insisted that he was harmless and that her concerns were not to be taken seriously. Ms. Lawrence complained that Buccigross's misconduct was harming her professionally and pressed HR to investigate and institute appropriate remedial measures. Instead,

HR's response was that he was a "good guy" and to "give him a chance," and that he had been involved in a similar rumor the year before with a married woman whose husband got involved.

15. On Buccigross's word alone, HR concluded that he saw Ms. Lawrence only as a "mentee" and was not trying to make any sexual advances toward her. Ms. Lawrence was baffled by this, citing to and thoroughly describing the text messages and photos Buccigross had sent her. Still, HR maintained that it was purely "mentorship" and told Ms. Lawrence to "get used to it."

16. And when Ms. Lawrence later complained to her direct supervisor about HR's mishandling of her complaint, she was warned to "let it go" or, like other squeaky wheels who came before her, it would end her career. In the process, ESPN sent a loud message: complaining about men who engage in unlawful and discriminatory conduct is a one-way ticket out of ESPN.

17. And that is exactly what happened. ESPN reinforced its longstanding practice of retaliating against women and did not renew Ms. Lawrence's contract or consider her for any employment opportunities *whatsoever*. In sharp contrast, ESPN rewarded its male employees by hiring Ms. Lawrence's co-Fellow Treavor Scales (*see supra* re: Rihanna) and giving Buccigross a five-year extension. When Ms. Lawrence expressed concern that this was retaliation for her complaints, ESPN further retaliated in numerous ways, including falsely claiming that it had eliminated the legal analyst position and then that her anchoring position had been eliminated.

18. Tales of ESPN's abhorrent behavior are legion and date back to the 1980's. But instead of learning from the past and evolving for the better, ESPN remains steeped in its sordid history. On December 14, 2017, reporter Jenn Abelson ("Abelson") of the BOSTON GLOBE reported Ms. Lawrence's and several other women's accounts of ESPN's misogynistic culture ("Globe Report").[3] That evening, ESPN attacked only Ms. Lawrence by: (i) releasing forged texts to make

---

[3] Jenn Abelson, *At ESPN, the problems for women run deep*, BOSTON GLOBE, Dec. 14, 2017 (emphasis added).

it falsely appear that *she* stalked Buccigross; and (ii) using bots and fake social media accounts to defame her and fuel negative sentiment against her online while dummy accounts feigned support for Buccigross. As a result, Ms. Lawrence received, and continues to receive, threats and attacks.

19.     The next day, the Globe Report revealed the truth by publishing the actual texts between Ms. Lawrence and Buccigross. CNN, YAHOO SPORTS and AWFUL ANNOUNCING also published pieces addressing the discrepancy between the texts. But the damage was done, as ESPN had tarnished Ms. Lawrence's good reputation in retaliation for revealing the truth about the Company's unlawful, relentless and discriminatory mistreatment of women.

20.     In response to the Globe Report, Abelson received emails from current and former female ESPN employees expressing their gratitude for bringing these issues to light, including:

- "Everything in your article about ESPN is true. I've worked on both the ESPN Inc. side of the business and in production. Everything you wrote goes beyond just the on-air anchors, too. I love what I do, but it's a battle every single day – on so many levels – and it's exhausting and defeating. Thank you for bringing this to light – I want the culture here to get better, and this is unfortunately the only way it will."

- "As a female editor who works at ESPN thank you for shedding light on this. All this. My fears and concerns that I've buried inside for so long feel validated. It means more to me than you know. Thank you from the bottom of my heart."

- "I just read your article on ESPN and as somebody who used to work there, I wanted to tell you that I thought you did a really good job. While minuscule in comparison, I experienced some things during my time there … so I wanted to say thank you for speaking out on behalf of the women who have had to endure it."

21.     In the Globe Report, Abelson noted that: (i) "[m]any people who described concerns with the atmosphere at ESPN declined to speak on the record because they feared losing their jobs or being blackballed from other sports outlets who do business with ESPN"; and (ii)

"[s]ome were reluctant to identify the alleged harassers because they worried it would out their own identities and subject them to retaliation."[4]

22.     Likewise, according to Michael Freeman, the author of *ESPN: The Uncensored History*, ESPN privately threatened then-current and former employees with retaliation if they spoke to him about being sexually harassed.[5]

23.     Indeed, the culture of silence surrounding ESPN's culture of misogyny is great – and intentionally orchestrated. In addition to the threat of not only banning employees who complain about harassment from working for the Company, ESPN also ensures they are placed on the dreaded "no-hire" list for ESPN's parent company, The Walt Disney Company ("Disney"), thereby preventing these individuals from also working for ESPN's sister company, ABC, Inc.

24.     There is no question that the impact of Ms. Lawrence's claims extend far beyond this litigation. Failing to hold ESPN accountable would set a dangerous precedent that will signal to ESPN and other powerful brands in sports and in media that "anything goes" and that they are free to run amok, marginalize and degrade women, and defy federal and state anti-discrimination laws. This Court should not condone such a result.

### BASIS OF THE ALLEGATIONS

25.     Ms. Lawrence makes the allegations herein upon information and belief, except as to those allegations concerning Ms. Lawrence and others, which are alleged upon personal knowledge. Ms. Lawrence's information and belief is based upon, among other things, the investigation conducted by Ms. Lawrence and her attorneys regarding Defendants, including, without limitation: (a) interviews with and statements by current and former ESPN employees; (b)

---

[4] Abelson, BOSTON GLOBE, Dec. 14, 2017.

[5] Michael Freeman, *ESPN: The Uncensored History* at p. 280 (Taylor Trade Pub'g 2001).

review and analysis of press releases, public statements, news articles and other publications concerning ESPN and its current and former employees; (c) review and analysis of lawsuits filed against ESPN; and (d) other publicly available information concerning Defendants.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

27.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because ESPN maintains its principal executive offices, and a substantial part of the acts or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

28.     Plaintiff is an individual residing in Los Angeles, California, however, from August 2015 through August 2017, she resided in central Connecticut.

29.     Defendant ESPN is a Delaware corporation with its principal executive offices located at ESPN Plaza, Bristol, CT 06010. ESPN employs roughly 8,000 people worldwide.

30.     Defendant Margaret "Meg" Green resides in West Hartford, Connecticut. She has worked for ESPN for over twenty-five years and is currently the Senior Director, Talent Recruitment & Negotiation. In this capacity, she supervises employees, and at all relevant times, Green supervised Ms. Lawrence.

31.     Defendant Robert "Rob" Gallo resides in West Hartford, Connecticut. He has worked for ESPN for over seven years and is currently the Senior Director of Employee Relations. In this capacity, he supervises employees.

32.     Defendant John "Jack" Obringer resides in Fairfield, Connecticut. He has worked for ESPN for over seventeen years and is currently the Senior Coordinating Producer, Studio Production. In this capacity, he supervises employees.

33.     Defendant Donna Hricisko resides in Waterbury, Connecticut. She has worked for ESPN for thirty-five years in HR and was its Director of Employee Relations until March 31, 2017. In that capacity, she supervised employees.

### ADMINISTRATIVE REMEDIES

34.     On August 18, 2017, Ms. Lawrence filed a complaint against ESPN with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO").[6]

35.     On December 5, 2017, the CHRO issued a Release of Jurisdiction, a copy of which is attached hereto as Exhibit A, bearing CHRO Docket No. 1830078 and Equal Employment Opportunity Commission ("EEOC") Docket No. 16A-2017-01577.

36.     On January 29, 2018, the EEOC issued Ms. Lawrence a Right to Sue Letter, a copy of which is attached hereto as Exhibit B.

37.     Thus, Ms. Lawrence has exhausted her administrative remedies and is now proceeding in the appropriate forum.

### CONFIDENTIAL WITNESSES

38.     Current and former ESPN employees have provided Plaintiff and her attorneys with information concerning ESPN's hostile work environment and mistreatment of women. These witnesses gave information on a confidential basis for fear of retaliation by ESPN or being blacklisted in the sports media market, and each is designated as "CW__."

---

[6] The CHRO is a federally recognized Fair Employment Practice Agency, and, pursuant to its Worksharing Agreement with the EEOC, Lawrence's CHRO complaint was automatically dual-filed with the EEOC.

39.     CW1, a Caucasian male, worked in ESPN's Security Department on its main campus in Bristol from 2011 through 2017. He described the misogynistic culture and sexual harassment that he witnessed and about which he complained to HR. He was then fired without explanation, despite having won awards of recognition from ESPN's parent company, Disney.

40.     CW2, a Caucasian male, worked at ESPN from 2000 through 2016 on its main campus in Bristol including Corporate Communications and Production. CW2 provided information concerning "score cards" kept by executives, information concerning sexual grooming and predatory tactics, and information concerning ESPN's misogynistic culture and mistreatment of women. CW2 left the Company because he was disgusted with the hostile environment.

41.     CW3, an African-American female, is an ESPN production assistant. CW3 provided information about reporting a serial sexual harasser and being retaliated against for it.

42.     CW4, an African-American female, is a studio director and has been working for ESPN in studio production for well over ten years. CW4 provided information concerning ESPN's misogynistic culture and disparate treatment of women and pregnant women.

## FACTUAL ALLEGATIONS

## I.      MISOGYNY IS DEEPLY WOVEN INTO THE FABRIC OF ESPN'S CULTURE

### A.      ESPN Enjoys a Long History of Sexually Harassing and Mistreating Women That is Well Documented and Incontrovertible

43.     Since its founding in 1979, ESPN's leadership has been aware of the widespread sexual harassment and "frat house" culture that has permeated the Company across all departments and made its work environment highly toxic, harmful, and demoralizing for women.

44.     For example, during at least the 1980s, ESPN kept a New York City apartment for staffers that, as admitted by Bill Grimes, ESPN's President and CEO from 1981 to 1988, the Company knew was "out of control":

I remember [an ESPN exec] coming in and saying, 'We gotta get rid of this apartment … because the mail boys got a couple of our secretaries hooking over there.' Hooking! That's what he said ... 'They're making money after work when no one's there. It's getting out of control.'[7]

45.    According to Grace Gallo, an ESPN assistant in the late 80s and early 90s:

I think the majority of women I would talk to would complain mostly about not being treated equally to their counterparts. A female producer would maybe not get an assignment that a male producer would get, that kind of thing. ***But it was a rough environment for women, I will say that … There were a lot of testosterone tantrums that women had to witness.***[8]

46.    A lot of testosterone, indeed. According to former ESPN reporter Sal Marchiano:

There was a lusty sex life there. There was screwing in the hallways. Okay, maybe not in the hallways, but there were a couple of stairwell stories ... There were drugs in the building, that I knew. There was one guy who dealt pot.[9]

47.    On her first day with the Company, former ESPN Anchor Karie Ross looked up from her desk and saw the monitor above her head tuned to the Playboy Channel while 12 to 15 guys watched to see how she would react.[10] Ross also confirmed that men offered women editing-room time for "dates" and allegedly groped and cajoled the women relentlessly.[11]

48.    One day in March 1989, Ross decided to speak out about the Company's mistreatment of women in front of nearly all ESPN personnel:

There were no women around in upper management for us to talk to. No one was going to talk to an upper-management male because then ***they'd be the female that was causing trouble***. Finally I decided the only way to get my point across was to stand up in front of the whole place. I wasn't thinking, 'Okay, I'm going to shake

---

[7] James Andrew Miller & Tom Shales, *Those Guys Have All the Fun: Inside the World of ESPN* at p. 96 (Little, Brown and Company May 24, 2011) (emphasis added).

[8] *Id.* at p. 181 (emphasis added).

[9] *Id.* at p. 98.

[10] *Id.* at p. 180.

[11] Miller & Shales at 183.

this earth and bring this company to its knees.' My only point was to tell these guys to quit harassing these poor girls.

There was a company meeting in what we called the cafeteria, and I don't know exactly how many people were there that day, but maybe it was 200 or 250. It was a lot. It was practically the whole building. I was so nervous. I remember shaking. I'd never done a live shot or TV show where I was shaking that badly. I stood up and said, *'Look, this behavior has got to stop. This is crazy. You guys can't be doing this. Guys, you must stop sexually harassing these women. Don't be trading edit time for a date. Quit making all the lewd comments. Just let us work in peace.' And then I said, 'I know it's illegal.'* My voice was shaking as I spoke. After I finished, you could hear a pin drop.

Immediately afterward, I got called in to the office; it was [ESPN Executive Vice President] John Walsh and I can't remember who else. He was very concerned and said, 'Okay, Karie, what's going on?' I told him I wasn't going to name names, but that he had to do something at this point. And he said, 'Okay, we'll handle it.' Later, they brought us all in to a meeting and we were supposed to tell our stories. But a lot of the women were uncomfortable telling their stories in front of these management people – I think there was one man and a woman from marketing. I actually told the man that I'd feel a lot more comfortable if he left the room, which he then did, and some of the women started talking a bit.

*Once the cafeteria speech was made, I received a lot of letters from the girls saying, 'Thank you so much for standing up. We could have never done that on our own.'*[12]

49.     But when women stand up for themselves, no good deed goes unpunished. ESPN retaliated against Ross by removing her from *SportsCenter*, demoting her to the 2:00 a.m. show, reassigning her to the then-less popular *College GameDay* where her face was never shown, and then not renewing her contract despite the fact that, *before* the cafeteria speech, Chairman Steve Borenstein told her they wanted to renew her contract.[13] As Ross later recounted:

There were some very horrible times there. It was a very, very hard time for me …. I was shocked when I read the book. I thought it (the sexual harassment) would end after I left there, *but it just got worse*.[14]

---

[12] *Id.* at p. 183-84 (emphasis added).

[13] *Id.* at p. 189.

[14] John Rohde, *South Florida cottons to Ross' spunk Ex-TV reporter is full-time mom with fond memories of Oklahoma*, NEWSOK (Aug. 12, 2001).

50.     In the early 1990s, not long after Ross's departure, a number of sexual harassment complaints were filed against star announcer Mike Tirico:

> They said **Tirico never took 'no,' or even 'leave me alone,' for an answer**, and that some of his flirtations got way out of line …. One woman told of being approached by Tirico at a 1992 staff party with the come-on, 'You are the most beautiful person I've ever seen.' **Even though firmly rebuffed, Tirico would not relent, and reportedly followed the woman to her car when she left the party, then reached in through the car window and thrust his hand between her legs as she attempted to start the engine.**

> **Such incidents were hushed up at the time by the old-boy network**, but Tirico got the equivalent of counseling from executives who more than once took him to lunch because they hated to see such a bright talent self-destruct – and because he seemed unable to handle his own urges. They also met with Tirico's aggrieved wife, Debbie. Finally, though Tirico insisted the charges were based solely on 'misunderstandings,' management had to take some kind of action: Tirico was suspended for three months without pay ….

> Some said the punishment was too harsh, others found it almost laughably insufficient. But at least management had acknowledged they had a problem, and although it would be overstating to say the floodgates flew open, there subsequently were enough sexual harassment charges to keep executives busy – in fact, to become a major drain on their time. A concerted attempt was made to keep the problems in-house, as when one of the managers in the radio division was charged with sending obscene e-mails to a female employee.

> [T]he human resources people became inundated and outside counseling was brought in to help deal with the ongoing problem – **_a problem that would, indeed, continue into the next millennium_**, with some lurid cases becoming nationally notorious and helping earn ESPN a reputation as a nest of 'horndogs' who had all the self-control of the fraternity brothers in Animal House.[15]

51.     As producer Julie Anderson said, "[n]obody was being reprimanded":

> With Tirico it was obvious that they had to do something, so he was suspended, but then **he came back and nothing changed**. And then he got all these really big assignments, including _Monday Night Football._ I was mad that they didn't do anything to him. He was very flirty – and he was married – and he used to say things like 'So when are you going to marry me? When are we going to get married?'

---

[15] Miller & Shales at p. 242 (emphasis added).

They didn't do anything about it. *Why* didn't they do anything about it? And it sucked. I would just laugh it off. I didn't really work with him.[16]

52.     Despite Tirico's suspension, "[n]o fewer than fifty cases of sexual harassment were reported by women on the staff to ESPN management through the first half of the 1990s."[17] When Tirico's contract expired in the Summer of 2016, ESPN gave him a warm sendoff.

53.     ESPN caters to serial harassers and CW3 knows this well. "*I was the third girl. I was the third to be harassed,*" the current production assistant said about the supervisor who sexually harassed her and who remains employed by the Company.

54.     Further, as noted by Andy Brilliant, ESPN's General Counsel and Executive Vice President from January 1980 to July 1996:

> The company would have Christmas parties up at some horrible place in Bristol. A couple of them were drunken orgies ... It became like a big frat party. There were a lot of drugs being done in the bathroom. There was quite a bit of screwing going on afterward, a lot of it extramarital ….[18]

55.     Steve Borenstein, ESPN's Chairman from January 1980 to January 2000, attributed the Company's sexual harassment to its remote location in Bristol:

> I think part of the sexual harassment stuff was location. It's one hundred miles from real civilization, and you got the kind of testosterone, jock mentality, frat house approach that's pretty much a recipe for stupid decisions being made.[19]

56.     Unfortunately, after nearly two decades, nothing has changed since Borenstein left Bristol.

---

[16] *Id.* at 242-43 (emphasis added).

[17] *Id.* at p. 241.

[18] *Id.* at p. 97.

[19] Miller & Shales at p. 188.

**B.    ESPN's Culture Hasn't Changed in Two Decades as the Company Continues to Sexualize its Female Employees**

57.     To this day, male employees continue to demean their female colleagues without consequence. On December 14, 2017, Abelson reported the following in the Globe Report:

> 'It's like cutting your arm in an ocean full of sharks,' said one ***current*** employee, who said she has received unwanted physical contact from one colleague and listened to another ***rate women on a score of one to ten***. 'The second new blood is in the water, they start circling.'

58.     Drawing from her decade of experience at the Company, CW4, also a current employee, agreed with this assessment of how men treat women at ESPN:

> When you first come in, you're first out of college, ***they call you a piece of <u>meat</u>***. It's like, you're a newbie, everyone's interested, people are always asking about you and making statements about how you look, asking if you want to go out.

59.     CW2, who spent 16 years working in various areas of ESPN's Bristol campus, echoed this exact sentiment, stating that when women arrive they are considered "fresh meat."

60.     Just like the early days. As former anchor Karie Ross stated in the speech she gave in ESPN's cafeteria 29 years ago this month:

> Men are acting like animals. When a woman walks into the building, it's like, ***'fresh <u>meat</u>.'*** It's so unprofessional, and it is criminal ….[20]

61.     According to CW2, who worked at ESPN from 2000 through 2016, there were male executives keeping **"SCORECARDS"** naming women at the Company they were targeting for sex (*see supra* at ¶ 3), and men openly bragged about their office conquests.

62.     And "the more unattainable you seem the more they want you," said CW2.  If a woman was in a relationship or married to a man at ESPN, other men would hit on her relentlessly,

---

[20] Freeman at p. 140.

pursuing her for sport as if she were a toy. "If you're a female the talent all knew your name immediately" but "if you were a guy, you were basically no different than a set chair."

63.     CW2 also said that anytime a "remotely attractive woman" was in a conference room or boardroom trying to present information, the men assessed her physically amongst themselves and sometimes openly – just like the early days at ESPN. According to a former employee who worked in production in the mid-1990s:

> Men look you up and down, staring at you. There was one manager who, when he spoke to you, would look you up and down and stop at your breasts and then your pelvic area. Back and forth, back and forth. All those things happened all the time, including getting grabbed on the ass.[21]

64.     In addition, it is a common practice for men in ESPN's Security Department to wear sunglasses at the security posts, so they can gawk at female employees without detection. When CW1 started in 2011, he was told to "get some sunglasses and wait for summertime because it's amazing." The security posts at the gated entry points are elevated, so when female employees drive through with their IDs, guards "can look down and see their legs, and in some cases, more than just their legs." CW1 said that "summertime was popular for the guys because the interns were around" and "coworkers enjoy seeing younger girls in short skirts."

### C.     Watching Porn Remains a Favorite Pastime at ESPN

65.     Nothing has changed at ESPN since the days when men enjoyed watching the Playboy Channel at work in front of their female colleagues. *See supra* at ¶ 47.

66.     For example, in the Security Department, men openly watch porn on company-issued computers in the workplace. After objecting to the showing of porn at ESPN, CW1 was told to keep quiet because "if it isn't hurting [him], there's no reason to bring it up."

---

[21] *Id.* at p. 10.

67.     On another occasion, CW1 and a male colleague were working at the North Gate security entrance on the Bristol main campus. The colleague showed CW1 a video on his phone of a female employee at ESPN with whom he had been romantically involved. The colleague and the woman had been FaceTiming but she did not know that he was recording it. "She was completely nude and pleasuring herself," said CW1. And when the colleague showed CW1 the video, he was standing by the window where it was easy for others at ESPN to see the video.

**D.     Men Continue to Make Offensive Remarks To and About Women, And High-Profile Women at ESPN Are Not Exempt**

68.     In 2015, ESPN settled a lawsuit brought by Sue Baumann, a former makeup artist for legendary ESPN broadcaster Chris Berman ("Berman"), after she contended that she received inappropriate comments and text messages from Berman.[22]

69.     In early 2016, ESPN's *The Undefeated* personality Jemele Hill received a threatening and racially disparaging voicemail from Berman on her ESPN phone line. After Hill notified executive Marcia Keegan (who oversaw Hill's show *His & Hers* at the time and had been a senior director in HR) about the matter and forwarded the voicemail to her, nothing was done. Despite his continued and repeated misconduct toward women, Berman remains a celebrated and welcome ESPN employee.

70.     Notably, when asked about former ESPN Anchor Karie Ross's cafeteria speech (*see supra* at ¶¶ 47-49), Berman said:

> I was not at the cafeteria meeting, but Karie was right, I'm sure of that. ***I liked her. She was a great-looking woman; still is, the last time I saw her.***[23]

---

[22] *See* Matt Bonesteel, *ESPN reportedly settles sexual harassment complaint involving Chris Berman*, THE WASHINGTON POST, Nov. 10, 2015.

[23] Miller & Shales at p. 186 (emphasis added).

71.    Moreover, in the Security Department's command center, men comment about going to strip clubs in front of female colleagues, including one who has seniority over them. CW1 spoke with this colleague about these issues and she told him that she continued to report these "immature and gross comments" to HR but "HR doesn't want to do anything about it."

72.    As if it were sport, men at ESPN often ogle their female colleagues at the shared fitness center. CW1 recalls how, while on campus, a male colleague described in detail an outfit a female employee was wearing at the fitness center, describing how he could see her "pussy lips."

73.    In addition, a female production assistant told CW1 that male colleagues in her department stated in her presence that "they want to fuck other women in the office."

74.    Similarly, according to CW4, the following happens in front of her and other women "as if guys are in a locker room":

> In the control room, which is where we do our shows, I'm always appalled at the comments that are made about women. This has been going on since I got into studio directing. *'Oh, look at those legs,'* or *'Oh, she's hot,'* or *'Look at this video.'* I'm constantly saying, *'You can't be saying this,'* or, '*Hello, I am a female, do you see me standing here?'* That is the culture of my department when you're in the control room. Almost as if they feel that's normal talk.

75.    CW4 also said that "the most appalling one" was when "one of the guys in our control room said, ***'Oh wow, do you see her? I'd like to hit that!'***"

76.    According to CW1, males openly talk about female on-air talent, specifically "who they would love to have sex with and what not, and they would speak in detail about it, sometimes in front of the supervisor." No action would be taken to address the demeaning talk.

77.    For example, during the ESPN new employee training, after current WNBA star, then-ESPN intern, Skylar Diggins-Smith had taken her new employee ID photo, CW1 observed a male colleague comment about how "hot" he thought she was and how much "he wanted to give

her some" – all in front of the First Shift manager at the time who joined in laughing before stating

that he has "to watch it because he has a daughter her age." At the time, Diggins-Smith was 21.

78.     CW1 also recalls how one of his supervisors in the Security Department would pay

an inordinate amount of attention to female employees, going as far as to follow attractive women

around ESPN's campus. For example, CW1's colleagues often said that they like to follow *First*

*Take* host Molly Qerim because "they loved looking at her ass as she walked."

79.     According to CW1, a male security guard who still works at ESPN graphically told

his colleagues on more than one occasion that highly accomplished and esteemed *SportsCenter*

anchor Hannah Storm sat on the ESPN shuttle with her skirt on, her legs spread and her ID dangling

"in front of her pussy."

80.     These are just some examples of the repulsive and demeaning comments made

about high-profile women at ESPN by the employees ***who are responsible for protecting them***.

**E.      Men at ESPN Use Predatory Tactics Like Sexual Grooming**

81.     In addition to overtly sexualizing women, according to CW2, men at ESPN often

use the predatory tactic of "grooming" to coerce their female colleagues into sexual relationships.

82.     Grooming is a manipulative tactic that typically involves targeting a vulnerable

victim, gaining private access to the victim, gaining the victim's trust, desensitizing the victim to

sexualization through testing and gradually increasing the sexualization of the relationship.[24]

83.     Given the nature of the isolated environment on the Bristol campus in rural

Connecticut, "fresh meat" becomes an easy target to sexual predators especially when the young

women are not from the local area, are straight out of college and/or new to sports broadcasting.

---

[24] *See, e.g.,* Georgia M. Winters & Elizabeth L. Jeglic (2016) Stages of Sexual Grooming, Journal of Deviant
Behavior, 38:6, 724-733.

84.     CW2, who worked out of the Bristol campus for 16 years, described how predatory men at ESPN would work to break down his female colleagues: The man, who was generally in a position of seniority or status, would: (i) reach out to her under professional pretenses and insist that they meet outside the workplace to discuss professional opportunities; (ii) steer the conversation into topics about their personal lives; (iii) ramp up the communications via text message; and (iv) repeatedly hit on her by issuing everything from subtle to overt compliments and sexual comments interwoven in conversations about work-related topics, with the ultimate goal of wearing her down into a sexual relationship. It's the ESPN Predators' Playbook.

85.     CW2 said the Company intentionally does not protect women but has an internal practice of exposing them to sexual predators. ESPN has "cultivated and bread this culture of lawlessness and total disrespect" toward women, he said. According to CW2, HR – including Paul Richardson, a Senior Vice President and member of the Board of Directors who leads HR – refuses to stop it as "these predatory men hit on members of their own staff," saying "you have nothing to worry about … I'm in charge," and the "senior leadership will just look the other way."

**F.     Retaliating Against Women is Protocol at ESPN**

86.     In addition to threatening employees who speak publicly about being sexually harassed, ESPN leverages its domination of the sports media market to retaliate against people who complain about sexual misconduct and discrimination, making an example out of them.[25]

87.     In 1993, ESPN executive secretary Elaine Truskoski sued the Company for retaliation when she was fired after complaining about the Company's pay system. Truskoski prevailed, was reinstated, and awarded damages.[26]

---

[25] Freeman at p. 280.

[26] Freeman at p. 233-34.

88.     In 1998, ESPN sales executive Linda Whitehead sued for retaliation, which included allegations that the Company forged documents to portray her as a poor worker after she complained to her supervisor about discrimination against women. The lawsuit settled quickly.[27]

89.     Further, after CW3 complained about sexual harassment to HR, she was given a job in the *same office* working for the *same people*, but they refused to give her assignments:

> *I just got my first bad rating with the company behind all this*. I am so proud you [Lawrence] spoke out. No one I've met thought I had anything worth exploring, so I'm stuck in between biting the bullet and accepting my fate or riding it out and trying to stay with the company. *I've been blackballed.*
>
> I'm probably going to have to leave the industry. People that I don't know, know that I filed a claim because *my harasser's first order of business after I filed was to tell everyone that I'm accusing him of harassment because I 'don't do any work.'* People think I did it out of spite, but *I was the third girl*. *I was the third to be harassed.* It's amazing. …

90.     CW4 often complained to HR about not being promoted, even though she deserved it: "[A]ll of my male counterparts were getting promoted. *I was training these people and they were getting promotions, but I was not.*"

91.     According to CW4, she complained about this to Defendant Hriscko, who claimed to be "looking into it" but continually said "it's going to take time."

92.     Retaliation was not just reserved for full-time employees – ESPN gladly doled it out to interns as well. On or around June 22, 2017, a summer intern ("Intern") expressed concern to Ms. Lawrence that she was being retaliated against for complaining about the bed bug infestation in their ESPN-sponsored apartments. She and the others had been showering at the ESPN gym and some sleeping in their cars. Intern said she would awake to find blood in her sheets from bed bug bites. After Intern repeatedly insisted that ESPN take action, management pulled her out of her

---

[27] *Id.* at p. 233.

assignments and claimed that she received a complaint because of the shirt she was wearing. Like many other colleagues, Intern was wearing an ESPN-branded T-shirt that she had bought from the Company store on campus because her clothes had been contaminated. Intern then received poor assignments as punishment for speaking up and, thereafter, she knew not to complain about the supervisor who would hug her for too long and put his arm around her and the other girls.

### G.    ESPN Has a Long History of Mistreating Pregnant Women

93.    As articulated by Michael Freeman in *ESPN: The Uncensored History*, "[t]he at times oppressively sexist Bristol newsroom didn't know what to do with a pregnant employee ...."[28] Freeman reported the following about producer Martha Walker who, during the 1990s, was enduring a difficult pregnancy:

> One high-profile anchor called her "Fatso" and a top executive wondered "Who's the father?" It was the same later with anchor Linda Cohn, who once told a colleague that after she became pregnant some ESPN men avoided her, as if she were carrying a flu virus. For Walker, though, the trouble was just beginning. A difficult delivery left her bedridden for eleven weeks. That did not stop [scheduling coordinator Julie] Paradis from phoning Walker a short time after she had arrived home from the hospital. ESPN producers and others have a window in which to pick their vacation days and if they do not exercise that option during this time period, they lose their place, falling all the way to the bottom of the priority list. Paradis called Walker and insisted that she pick her days immediately, impervious to Walker's current hardship.[29]

94.    Pathetically, ESPN *still* does not know "what to do with a pregnant employee." As reported on December 14, 2017 in the Globe Report:

> Some women said that the environment at ESPN can be so hostile–and plum positions for female sports journalists so precarious–that **they hid pregnancies and felt pressured to take short maternity leaves in order to protect their positions**.

---

[28] *Id.* at p. 10.

[29] Freeman at p. 10.

One anchor even did her scheduled broadcast while she was having a miscarriage to prove her commitment to her job, according to former employees.[30]

95.     Further, after now-former *SportsCenter* anchor Sara Walsh complained to management and HR about mistreatment by a producer in connection with her miscarriage, ESPN reduced her on-air shifts and, upon further complaint, replaced her with a new anchor in May 2016 then terminated her under the pretext of a layoff in April 2017. As outlined in the Globe Report:

> Shortly after Mike McQuade took over as vice president of SportsCenter in 2014, he questioned Walsh's commitment because she also worked for The Fantasy Show during the football season. Walsh, who had recently signed a multi-year contract and helped host an opening for ESPN's new digital center, was shocked that her new boss was raising concerns, according to three former employees briefed on the matter at the time.

> Walsh was so worried about her job that she decided not to call in sick when she started bleeding from a miscarriage during a work trip to Alabama. Instead, she went to the studio and anchored the show. She described the on-air miscarriage in an Instagram post on Mother's Day this past year, but Walsh told the Globe she could not comment because she is still under contract.

> Former employees said that Walsh was upset that McQuade did not respond to an e-mail she wrote from the hospital about the miscarriage, and she was soon sent back to the same Alabama set where she had miscarried.

> McQuade acknowledged that he "likely" discussed with Walsh her work on the Fantasy Show but said it "should not have given Sara any concern about her job." McQuade said if he failed to respond to Walsh's e-mail about the miscarriage, "it was certainly not done with malicious intent."

> After Walsh raised concerns about her treatment, *she was told the matter had been investigated and was handled properly even though she was never interviewed*, according to the former employees. Shortly after, Walsh was assigned to fewer shows, a move that she viewed as retaliation for speaking up, according to the employees.

> Walsh eventually conceived again and talked to human resources before she went on maternity leave to get assurances her position was safe. But days before she planned to return from maternity leave this past April, ESPN notified her that she was part of the layoffs. McQuade denied any retaliation and said he was not involved in determining who was let go during layoffs.

---

[30] Abelson, BOSTON GLOBE, Dec. 14, 2017 (emphasis added).

Walsh's experience was not isolated, according to other women at ESPN. Anchor Jade McCarthy said she lost on-air opportunities after getting pregnant. McCarthy said she was moved off weekend SportsCenter shows when she returned from her first pregnancy at ESPN and was laid off this past April when she was nearly eight months pregnant. Lindsay Czarniak–one of the few female solo SportsCenter anchors in 2016–said she chose to walk away after the company offered her a different job at a significant pay cut when she returned from maternity leave this year.

In 2005, an employee sued ESPN, claiming she was terminated because she was pregnant. The case was later settled.[31]

96.     CW4, a current employee, was also mistreated by supervisors at ESPN during her pregnancy while male employees with pregnant wives were given privileges:

When I became pregnant in the department, it was so difficult. When you get to the 8 to 9 month mark, you have to go back and forth to the bathroom and take breaks. You can't sit 3 hours straight during a live show.

I had doctor's notes and I said I can't do a 3-hour live show and sit without a break. It didn't make a difference. They didn't change my shift. Yet there were males, the same individuals who were put on the schedule leading up to their wives giving birth, they put them on for "free time," meaning they weren't taping a show, but were only doing prep. I was on the schedule, days when they were free to run if their wives went into labor, but for me, as a female working there, I couldn't get any free time. I could go into labor any minute, but I couldn't get a free day or be put on a taped show when you could get a break, but the men could.

97.     As a result, CW4 said that, when taping a live show, she would try to go to the bathroom quickly. She asked to not be put on a live show, or at least not be on something for that long, but it did not make a difference. Her male counterparts, by contrast, were put on free days or taped shows. CW4 said this happened to all other pregnant employees in the department and she complained about it to her superiors: "I said that I don't feel it's fair that I'm holding this child inside me and I can't get a free day, but all of my male counterparts did."

---

[31] *Id.* (emphasis supplied).

98.     Two months after returning from maternity leave, CW4 had her performance review and was told that she "wasn't focused." She was told that she was "falling behind" and would not get a promotion or raise, even though she was training male employees.

99.     Several female employees currently working at ESPN had complained to Ms. Lawrence about similar mistreatment, being passed over for promotion in favor of a male underling.

## H.     Other Examples of ESPN Subjugating Women

100.     According to Andrea Kremer, an ESPN reporter from 1989 (when, at the age of 30, she became the network's first female correspondent) to 2006:

> Jim Cohen and Bob Eaton, my bosses, took me to some local Italian place, and we're sitting there talking about my work …. [W]e're sitting there and they're basically telling me, 'Look, you're really hard on producers and it's hard to deal with …' After they made their spiel, I said to them, 'Just answer me one question. *Would we be having this conversation if I was a man?' They looked at each other and then said no.* Well, that pretty much told me all I needed to know.[32]

101.     Nothing has changed. Last year, CW4 had a disagreement with her male supervisor about her performance review and after leaving his office, he followed her into the stairwell yelling, "get back over here, this isn't over!" CW4 responded: "You would not do this to a man!" CW4 then went to see HR to complain but was told: "Maybe you just had a hard day, move past it, it's no big deal."

102.     According to CW4:

> The culture in studio directing is male dominated. To have a female, let alone a black female, doing what I was doing, like Super Bowls and the NFL, a lot of the males below me didn't like that, and when I would speak or say anything, it was as if I was an idiot, like I didn't know what I was talking about.

> In studio directing, if you speak up and don't agree with what everyone else is saying, you basically get *blackballed* or pushed aside or stuck on a late-night shift.

---

[32] Miller & Shales at p. 207 (emphasis added).

103.    Moreover, it was an open secret at ESPN that certain female on-air talent provided sexual favors to management in exchange for on-air opportunities – just like the old days when, according to Karie Ross, men offered women editing-room time for dates.[33]

104.    Even when management was not a direct beneficiary, women who made themselves sexually available to the men at ESPN were advanced, as the behavior is encouraged. For example, in March of 2016, an on-air analyst and an on-air host engaged in a sexual affair in one of the ESPN-reserved guest rooms atop the DoubleTree hotel in Bristol. The analyst, who suffers from a blood clotting disorder, began to bleed profusely from the nose during their sexual activities, spraying blood around the hotel room, such that housekeeping contacted law enforcement upon later entering the room for fear that it was a crime scene. ESPN was subsequently contacted and, after identifying the on-air host via the hotel security footage, ESPN quietly disposed of the matter with no negative consequence to any of the parties involved.

105.    ESPN has a history of sordid affairs, although the Company claimed that it would crack down on relationships between on-air talent and staff several years ago.[34] Specifically, in 2013, ESPN settled a lawsuit brought by Brooke Hundley, a then-22 year-old production assistant, arising out of an affair with baseball analyst Steve Phillips, who was 46 and married. Hundley testified that she talked to her supervisor, Joya Caskey, after her first kiss with Phillips in 2009. Hundley said that Caskey told her: *"Get used to it, kid. If I had a dollar for every time I was sexually harassed at ESPN, I would be a millionaire."* Caskey and ESPN HR representative

---

[33] *Id.* at p. 183.

[34] Leonard Greene, *ESPN cracks down after affair reveals culture of sexual harassment*, NEW YORK POST, Jun. 7, 2013; *Former Phillips paramour sues ESPN*, ESPN (AP), Jun. 9, 2010; John Koblin, *The Mostly Sexless Sex Scandal That Shook ESPN*, DEADSPIN, June 6, 2013.

Hriscko remembered the quote differently. Caskey claimed that she said: *"This is television. That's what happens. It goes with the industry."* Hriscko claimed that Caskey told her the quote was: ***"Get used to it. This is the culture of ESPN."***[35]

106. Defendant Hriscko has been a member of HR for 35 of ESPN's 39-year reign, during which she fielded a myriad of sexual harassment complaints and claimed to have conducted investigations concerning these complaints. She has also been involved in a number of the sexual harassment lawsuits against ESPN, yet she remained with the Company and was charged with handling sexual harassment complaints until retiring in May 2017.

## II. MS. LAWRENCE WAS SEXUALLY HARASSED AND SUBJECTED TO A HOSTILE WORK ENVIRONMENT AT ESPN

### A. Ms. Lawrence is an Accomplished and Well-Rounded Individual

107. Ms. Lawrence is an accomplished attorney and has had continued success throughout her career. After skipping a grade, Ms. Lawrence graduated high school at the age of 16, and by 19, she earned a B.S. in Criminal Justice from California State University, Sacramento with honors. By 21, she had obtained an M.A. in Criminal Justice from the John Jay College of Criminal Justice. And by 24, Ms. Lawrence earned a J.D. from The George Washington University Law School before clerking for the Honorable Eric T. Washington, then-Chief Judge of the District of Columbia Court of Appeals. Ms. Lawrence was honored by SUPERLAWYERS MAGAZINE as a Southern California Rising Star in Litigation in 2014, 2015 and 2016.[36]

108. During her education, Ms. Lawrence accepted less than $10,000 in scholarships, opting instead to work full-time in a range of fields over the course of nearly all of her higher

---

[35] *Id.*

[36] Ms. Lawrence had to later relinquish her 2016 award due to the fact that she left private practice for ESPN.

education. In May 2015, while practicing law, she completed the M.A. in Specialized Journalism at the University of Southern California, focusing on multimedia sports journalism.

109.    Over the years, Ms. Lawrence acquired a range of professional experience, including but not limited to lecturing as an adjunct college professor, volunteering as an informal domestic violence/sexual assault counselor, running a candidate's campaign for the Fairfax County School Board, and preparing taxes for the less fortunate as an IRS certified tax preparer.

110.    Ms. Lawrence has always been dedicated to giving back to society by serving on charitable boards and supporting her local community. She works with people living with disabilities and has served as a mentor for women transitioning back into the workplace. In April 2017, Reverend Jesse L. Jackson Sr. and the Rainbow/Push Coalition honored Ms. Lawrence with the Rainbow Sports Life Beyond the Playing Field Award for her civic contributions.

## B.    Ms. Lawrence Left Her Legal Career to Join ESPN's Fellowship Retention Program

111.    In July 2015, Ms. Lawrence was one of two applicants selected out of over 500 candidates for a talent position with ESPN through its "ESPN the Fellowship" program, a "recruiting initiative designed to be proactive in the hiring and retaining of diverse candidates."[37] Ms. Lawrence was the only unanimous selection of the entire Fellowship committee.

112.    ESPN created the Fellowship to recruit and retain on-air talent of diverse backgrounds.[38] Meg Green, Senior Director of Talent Recruitment & Negotiation, stated that the goal was "to successfully find, train and develop the next generation of individuals ... seeking

---

[37] See Andy Hall, *ESPN the Fellowship Recipients Already Contributing at ESPN*, ESPN MEDIAZONE (Nov. 19, 2015) (https://espnmediazone.com/us/press-releases/2015/11/espn-the-fellowship-recipients-already-contributing-at-espn/).

[38] See, e.g., *ESPN Announces ESPN the Fellowship*, UNIVERSITY OF FLORIDA COLLEGE OF JOURNALISM AND COMMUNICATIONS (Apr. 24, 2015), http://my.jou.ufl.edu/students/2015/04/24/espn-announces-espn-the-fellowship.

careers in a sports-media environment" and that the program encouraged mentorship relationships and promised individualized training in a "common-core" of writing, interviewing, anchoring and production. Fellows were scheduled to work in six-month rotations in Digital Media, Radio, International/Deportes, and Studio Production.

113.    With this understanding and with ESPN's knowledge, Ms. Lawrence left her thriving legal career at Greenberg Traurig LLP, a prestigious international law firm where she was earning at a rate of $235,000 per year, and accepted the Fellowship position starting at $75,000 per year. Ms. Lawrence also, with ESPN's knowledge, sold her homes in Los Angeles and the District of Columbia, and purchased and renovated a home in West Hartford. Green actively encouraged Ms. Lawrence throughout her home renovations, asking for progress photos, providing contractor recommendations and giving guidance on state property restoration programs.

114.    At ESPN, Ms. Lawrence quickly distinguished herself as an anchor and created a niche for herself as a legal analyst on sexual assault and domestic violence cases involving athletes and other sports-related legal issues. In addition to her anchoring duties and on her own initiative, Ms. Lawrence wrote articles for ESPN.com, ESPNW, and *The Undefeated*, which led to invitations to appear as a legal analyst on *Outside the Lines*, *His & Hers*, and *SportsCenter*.

115.    Ms. Lawrence also represented ESPN in the community, joining prominent boards in New England and emceeing charitable events. She also helped advance the Company's Young Professionals Group. Ms. Lawrence made these contributions as she rotated through departments, going above and beyond her responsibilities for the betterment of the Company. She consistently received high praise for her work and was recognized as a rising star at ESPN.

### C.      Ms. Lawrence Was a Resource for Her Colleagues

116.     A naturally positive person, Ms. Lawrence treated everyone equally, from now-former President Skipper to Margue, the cleaning woman. She made friends quickly and supported her colleagues' efforts outside ESPN, like when she traveled to support former *SportsCenter* anchor Jaymee Sire, who was a guest chef in the New York City Wine & Food Festival, served as a keynote speaker at ESPN Radio Producer Terrika Foster-Brasby's sorority scholarship event, among other things.

117.     Ms. Lawrence was encouraged to socialize with colleagues and build relationships with them off-campus, and Green praised her for hosting colleagues at her home and arranging for fellow anchors to participate in charity events. Ms. Lawrence hosted gatherings to watch sporting events and to give colleagues who were transplants a place to go during the holidays. She hosted the Digital Department holiday party at her home less than four months after joining the department and hosted Easter dinners, the NBA Finals, the Super Bowl, a Fourth of July BBQ, among other events. Even while retaliating against Ms. Lawrence, on May 2, 2017, Green remarked that she was "always a ray of sunshine" at ESPN.

118.     Given her kind and welcoming demeanor and the breadth of her business, legal and real estate experience, in fall 2015, Ms. Lawrence's colleagues began coming to her for help with a range of matters from payment disputes to child custody battles to purchasing homes to dealing with property following the loss of parents. She provided everything from insight to recommendations to referrals to her ESPN colleagues at every level from executives to makeup artists to fellow anchors, including but not limited to: Chris Duffy, Galen Gordon, Tricia Caliola, Victoria Arlen, Cary Chow, Jaymee Sire, Darren Haynes, Courtney Cook, Noura El-Alami, Dianna Russini, Jade McCarthy, just to name a few.

119.    Ms. Lawrence saw it as a great opportunity to build relationships with colleagues and gather information about her new field of sports broadcast. And when offered, Ms. Lawrence accepted meals from colleagues in exchange for her help because it gave her the opportunity to meet with them and learn more about the sports broadcast business and working at ESPN. On many occasions, Ms. Lawrence was invited to her colleagues' homes for "thank you" dinners.[39]

120.    Ms. Lawrence's colleagues, both men and women, also came to her with concerns about sexual harassment, retaliation and discrimination at ESPN.

### D.    Like the Other Women Before Her, Ms. Lawrence Was a Victim of Sexual Harassment and ESPN's Hostile Work Environment

*"I worked at ESPN in Bristol for 16 years. [Ms. Lawrence is] 100% right about the culture there and women being preyed on." – CW2*

121.    Despite Ms. Lawrence's early success at ESPN and efforts to build relationships, it became clear to her that to advance their careers at ESPN, women were unofficially expected to submit to sexual advances and/or endure sexist treatment. Women at ESPN are to be objects accessible to their male counterparts without objection, which is why pregnancy is problematic.

122.    Notably, when Ms. Lawrence met with ESPN's stylist on September 8, 2016 to assign her on-air wardrobe, the stylist said that any clothes had to be form-fitting and that ESPN would veto anything that did not meet this standard. The stylist told the seamstress to make Ms. Lawrence's dresses tight and, during the fittings, she took photos of Ms. Lawrence wearing tightly fitted dresses and sent the photos to ESPN executives for approval. Male on-air personalities, by contrast, were not subjected to these fitting standards or photographed for management.

---

[39] Even though she left the Company in August 2017, Ms. Lawrence's former colleagues at ESPN still come to her for advice and direction.

123. Despite her glowing job performance, Ms. Lawrence endured an atmosphere that demeaned her and other women on the basis of sex and was subjected to unwelcome sexual advances from senior colleagues. When Ms. Lawrence rejected their advances, they ostracized her. Ms. Lawrence's objections communicated to management that she was unwilling to capitulate to sexual pressure, entertain inappropriate sexual advances, or remain silent about unprofessional behavior in order to advance at ESPN.

124. Though ESPN has been on notice of its hostile work environment for decades, Ms. Lawrence's ordeal proves that ESPN remains very much the same.

### 1. Men Preyed on Ms. Lawrence Under the Guise of Being Collegial or Providing Mentorship

125. On or around January 18, 2016, *SportsCenter* anchor Jonathan Coachman ("Coachman") emailed Ms. Lawrence offering to provide her with mentorship and providing his cellphone number. When he contacted her via text, he quickly turned a professional conversation into a personal matter, asking her about her musical interests. He was employing the ESPN predators' playbook. *See supra* at ¶ 84. Colleagues then cautioned Ms. Lawrence that Coachman was notorious for sexually harassing female employees. After learning that, Ms. Lawrence made an effort to communicate to Coachman that she had a boyfriend, after which she did not hear from him again and he made no offers of mentorship.

126. Coachman's reputation for making unwelcome sexual advances toward women and engaging in other sexually harassing behavior was not a secret. Cary Chow had warned Ms. Lawrence about him when he gave the short list of men at ESPN who were notorious for sexual harassment. Coachman had sent Walsh inappropriate photos of himself and text messages, falsely telling her colleagues that they were romantically involved and that she "wanted" him – another common practice of men at ESPN. *See supra* at ¶ 13. At least one young production assistant

who joined ESPN just out of college had complained to Ms. Lawrence about Coachman making her feel uncomfortable by complimenting her physical appearance and making passes at her.[40]

127.     On March 30, 2016, ESPN host Chris Cotter reached out to Ms. Lawrence via Facebook messenger asking if she wanted to grab dinner. She asked whether he was looking to connect as colleagues or something more, to which he responded "Colleagues." Cotter would later try to kiss Ms. Lawrence, which she rejected. He too was on the list of men Chow had provided and his pursuits of "fresh meat" at ESPN was known to be an open secret.

128.     On December 23, 2016, Ms. Lawrence met *SportsCenter* producer Chika Okafor at a networking event in Hartford and discussed her desire to contribute to *SportsCenter* more using her legal background. Instead of responding to her request, Okafor asked her personal questions and out for drinks before pressuring her to give him her personal phone number. Ms. Lawrence responded that she was not interested in anything romantic and only wanted a professional relationship. Okafor communicated that he was okay with just having a professional relationship with Ms. Lawrence, but she did not believe it based on her prior experiences at ESPN.  He never followed up or asked her to contribute to *SportsCenter*. After that experience, Ms. Lawrence subsequently purchased and began wearing a decoy wedding ring around ESPN's campus, hoping that this would deter her male colleagues from pursuing a sexual relationship with her.

129.     On or around December 1, 2016, shortly before Ms. Lawrence began her six-month rotation in the Radio Department ("Radio"), Executive Vice President of Network Content Dave Roberts ("Roberts") asked Ms. Lawrence to schedule a time with her to discuss professional

---

[40] As explained below, when Ms. Lawrence complained to Jack Obringer, Senior Coordinating Producer, Studio Production of ESPN, Inc. that she was being sexually harassed (by another individual), Obringer guessed that the harasser was "Coachman" and indicated that his inappropriate behavior toward women was well-known to management. Nevertheless, Coachman continued to appear in ESPN commercials and on *SportsCenter* without discipline or accountability until he was quietly dismissed on or around April 26, 2017 via layoff.

opportunities for her in Radio. In their email exchange, Roberts asked her to meet him over that weekend, implying that it would be away from ESPN's campus. At least two other colleagues had previously told her that she would have to meet with him off-campus if she wanted to advance. But Ms. Lawrence would not. She responded to Roberts that she preferred to meet in the office during business hours. In response, Roberts suddenly had availability, telling Ms. Lawrence to stop by his office the next day. When she went to Roberts's office that next day, he was clearly uncomfortable, stuttering, adjusting in his seat, shuffling papers and avoiding eye contact. Without prompting and in a defensive manner, Roberts said that he meets "everyone" away from the ESPN campus.

130.    Following that exchange, Roberts distanced himself from Ms. Lawrence. When Ms. Lawrence emailed him requesting an opportunity to contribute to one of the shows Roberts oversaw, he did not respond. On other occasions, when Ms. Lawrence approached Roberts, he avoided eye contact and rushed away.

### 2.    Men Demeaned Ms. Lawrence By Giving Her "Elevator Eyes"

131.    On or around November 7, 2016, Ms. Lawrence was preparing to leave the makeup room in Building 4 and Bomani Jones, the former co-host of ESPN's *Highly Questionable* who was on campus to fill-in on ESPN2, was seated in the makeup room.

132.    Standing by the door and dressed in a skirt, Ms. Lawrence looked down to change her shoes and looked up to find Jones staring at her legs, ogling her, and intensely giving her "elevator eyes," as he slowly looked her up and down in a sexualized manner, making Ms.

Lawrence feel extremely uncomfortable – another longstanding practice at ESPN. *See supra* at ¶¶ 5, 72.

133.    Now-former *SportsCenter* anchor Todd Grisham also gave Ms. Lawrence elevator eyes once before when they both were working on the ground floor of Building 4, shortly after she had joined the Digital Department in the fall of 2015.

### 3.    In Ms. Lawrence's Presence, Producer Adam Strain and Ms. Lawrence's Co-Fellow Treavor Scales Opine About What Rihanna "Tastes Like"

134.    On or around June 19, 2017, while preparing for *SportsCenter* South Africa in Digital Center 1 with Co-Fellow Treavor Scales, Ms. Lawrence was scrolling down the computer screen when a photo of pop-star Rihanna appeared. Seated next to her and looking over at her screen, *SportsCenter* producer Adam Strain asked, "I wonder what she tastes like?"  He then concluded that she "must taste good."

135.    Scales and Strain laughed and Scales escalated to howling with excitement while Ms. Lawrence sat uncomfortably and awkwardly in silence, forcing her to excuse herself.

### 4.    Longtime Senior Anchor John Buccigross Lures Ms. Lawrence with Promise of Mentorship Intending to Groom Her for a Sexual Relationship

136.    John Buccigross, a 52-year-old senior male anchor at ESPN with a specialty in hockey, is a divorced father of three adult children. Buccigross also owns and operates out of his home a business that sells and raffles off online apparel branded with the phrases "Buccigross Overtime Challenge" and "Cawlidge Hawkey" (collectively, "OTC Business").

137.    In early 2016, Buccigross began following Ms. Lawrence on Twitter. Although she had never met him, she followed him back as a professional courtesy.

138.    On June 3, 2016, the day after Ms. Lawrence's first appearance on *SportsCenter* as a legal analyst, Buccigross contacted her through a Twitter direct message, offering to meet to "talk shop."



139.    Ms. Lawrence gladly accepted as she was working on a hockey article at the time. Ms. Lawrence contacted Buccigross to schedule a meeting. She provided her availability and he suggested they meet for dinner, claiming that he had limited time.

### a.    Mentorship Meeting

140.    On June 29, 2016, Ms. Lawrence met Buccigross for a mentorship dinner at a restaurant in West Hartford. She took it seriously and wanted to convey professionalism, so she wore a suit jacket with her hair tied back. She spoke about her professional background, aspirations, civic work and experience renovating her new home. Buccigross talked about his OTC Business, aspects of his recent divorce, the older home he had purchased in Ellington, Connecticut, and the living situation with his children.

141.     Buccigross acted as though he shared many quirky similarities with Ms. Lawrence from musical tastes to important dates. For instance, Ms. Lawrence commented that her birthday was later in the month on the 23rd of July. Buccigross excitedly claimed that his youngest son's birthday was on the 23rd of July too. Buccigross also claimed to enjoy a number of the same musical artists that Ms. Lawrence liked and to which she was currently listening. Ms. Lawrence had made a habit of posting her musical choices on Twitter but did not think anything of his comments other than that it must have been coincidental.

142.     Buccigross later invited Ms. Lawrence to his home under the pretext of meeting to discuss his OTC Business and renovations to his property. Buccigross offered to provide dinner in exchange, which she accepted in hopes of getting mentorship as she had done with her many other ESPN colleagues.

### b.       Meeting at Buccigross's House

143.     On July 2, 2016, Ms. Lawrence had lunch with Chow in West Hartford and when she mentioned that she was supposed to help Buccigross the next day, Chow warned her that he may try to "make a pass" at her and was known for making sexual advances toward female employees at ESPN. Though Ms. Lawrence did not think Buccigross would be inappropriate given their significant age gap, among other things, she was uncomfortable and told Chow that she wanted to cancel the plans but was concerned that it would be professionally detrimental especially given his seniority. Ms. Lawrence ultimately decided to proceed and directly address with Buccigross the matter Chow raised.

144.     In the early afternoon of July 3, 2016, Ms. Lawrence met with Buccigross at his home. Upon arriving, Ms. Lawrence was cold toward Buccigross, awaiting an opportunity to address with him what Chow had alerted her to the day before. Buccigross showed her around his

property and, though they had just met, he again brought up his divorce and recent division from his family – but this time portrayed himself as despondent, blaming his ex-wife of some 20 years repeatedly for their divorce and venting about how manipulative she was and how victimized he felt. Ms. Lawrence remained focused on the property and kept her distance.

145.     Buccigross then showed Ms. Lawrence his OTC Business, including the hundreds of boxes of inventory in his attic. But he was dismissive of her inquiries about the legal aspects of his OTC Business as it appeared to Ms. Lawrence that the home business, which he claimed was generating hundreds of thousands of dollars, all of which he said he donates to charity, was unregistered, unlicensed and un-permitted. Buccigross appeared to be more bragging than trying to get Ms. Lawrence's help.  She visibly showed that she was not impressed.

146.     At one point, Buccigross tried to offer Ms. Lawrence one of his pink "Cawlidge Hawkey" branded hats as a gift. But, still remaining extremely reserved, intent on addressing his rumored behavior and unwilling to accept any gifts from him, Ms. Lawrence did not move. She blankly stared at him as he held out the hat. After an awkward period of silence, he sat the hat down on the desk and recommended they go to the kitchen.

147.     Buccigross began preparing dinner. Ms. Lawrence sat across the room at the dining table. Her cold demeanor did not change.

148.     As he had done when they met earlier in the week, Buccigross pretended to like everything Ms. Lawrence liked, including things she had never mentioned to him but had recently posted on her social media pages. Taking note of this, Ms. Lawrence finally spoke by asking Buccigross whether he liked the Beatles or the Rolling Stones, knowing that she had not mentioned a preference for either to him nor commented on either band on social media. Buccigross seemed

uncomfortable with the question, and instead of answering it, he asked her which of the two bands she liked. Ms. Lawrence did not respond.

149.    Buccigross then told Ms. Lawrence that he was adopted and spoke ill of his siblings while championing himself as the hero of his family. Ms. Lawrence just listened. Buccigross then veered off into talking about his children and, out of nowhere, revealed that he had a vasectomy. Again, they had just met.

150.    Ms. Lawrence told Buccigross that she had heard about his inappropriate behavior toward women and was only interested in mentorship in sports broadcasting. She said that she did not want to be hit on by him and that he needed to notify her immediately if he was unable to respect her boundaries. Buccigross said he was shocked by what Ms. Lawrence had heard and that he treated women only with respect and was only looking for a mentorship relationship with her.

151.    Ms. Lawrence reiterated her position to Buccigross, and he reaffirmed his stated intent was a mentorship relationship. Ms. Lawrence acknowledged his promise that he would be respectful of her boundaries and would not try to make any sexual advances toward her.

152.    Then, standing in the kitchen, Buccigross suddenly tells Ms. Lawrence that he was sexually assaulted as a child. She was stunned. Ms. Lawrence did not know how what should have been an ice-breaking conversation between two colleagues who had just met once before somehow engendered an extremely personal disclosure – especially for a male of Buccigross's advanced age.

153.    Still in shock, Ms. Lawrence maintained her position at the table and did not move. **She asked Buccigross whether he had ever told anyone before that he had been sexually assaulted. Buccigross responded: "No." She asked: "Not even your wife?" He responded: "No."**

154.    Ms. Lawrence advised Buccigross to seek professional help and then sat quietly while he finished cooking in silence. After making small talk, Ms. Lawrence commented on her allergies and got up to leave. While standing in Buccigross's driveway, Ms. Lawrence reiterated that she was looking for mentorship but, given what he had shared with her, she was willing to be supportive by inviting him to some of the social gatherings she organizes with her ESPN colleagues, but he had to be comfortable with the professional limits Ms. Lawrence had set.

155.    Ms. Lawrence felt uncomfortable with what Buccigross had told her about his alleged sexual assault history, sensing that she needed to be gentle with him while fearing that he may do something to professionally harm her.

### c.    Despite His Repeated Assurances, Buccigross Started Making Sexual Advances Toward Ms. Lawrence and Sending her Inappropriate Text Messages

156.    A few days later, Buccigross reached out to Ms. Lawrence via text message. Given what he claimed to be going through and had shared with her, Ms. Lawrence tried to be positive and uplifting. But she intentionally made an effort to refrain from having any substantive conversations about non-work related matters with Buccigross. Ms. Lawrence communicated with him as she virtually always does with others publicly on social media, using excessive exclamation points and emojis, keeping the exchange positive and lighthearted.

157.    On occasion, Buccigross offered feedback about Ms. Lawrence's on-air performance, gave insight on working with a producer, discussed a hockey article she had written, and offered his office if she needed it. Yet, despite Ms. Lawrence's repeated requests for a mentorship relationship only, and his repeated promises that he would not make sexual advances towards her, over the next several months, Buccigross sent Ms. Lawrence texts with unwanted, suggestive remarks and photographs. For example, Buccigross:

(i)      made remarks about Ms. Lawrence's "pretty face";

(ii)     called Ms. Lawrence "doll" or "dollface" on multiple occasions;

(iii)    sent Ms. Lawrence photographs of *herself* that she had posted on *her* social media with heart-eyed emoji captions, conveying that he was monitoring her online;

(iv)     asked her to send him a picture of herself and then offering to oil himself up like "a flag bearer from Tonga";

(v)      told Ms. Lawrence "I'm a white boy and I'm jacked!"; and

(vi)     sent Ms. Lawrence shirtless photographs of himself.

158.    Buccigross would send inappropriate photos to her out of nowhere. For example, on August 9, 2016, she messaged him to find out his availability as she was planning to have a gathering with her coworkers to celebrate her one-year anniversary at ESPN. Without warning, Buccigross suddenly sends Ms. Lawrence an unsolicited shirtless photo of himself. (**Screenshot A**.) Buccigross was testing Ms. Lawrence, attempting to sexualize what was supposed to be a mentorship relationship. This is a stage typical of predatory sexual grooming.

159.    Further, on one occasion, Ms. Lawrence offered her condolences for the passing of ESPN anchor John Saunders, to which Buccigross responded: "Thanks, doll. I need a hug." Ms. Lawrence was disturbed by this effort to use a man's death to try to suggest she serve some physical need.

**Screenshot A.**



160.     Ms. Lawrence was taken aback as she neither invited nor welcomed such messages. In the exchange above, Ms. Lawrence, who was young and new to sports broadcast and ESPN as a fellow, attempted to handle these unwelcome comments and photos from the longtime senior *SportsCenter* anchor as tactfully and cordially as possible.

161.    On most occasions, Ms. Lawrence would not respond to Buccigross's inappropriate messages, change the subject, or not react positively, and it was clear that he understood that his conduct was not welcome. For example, on August 28, 2016, Buccigross sent a text to Ms. Lawrence stating that he was going to invite her to the beach and a baseball game, but she did not respond. The next day, Buccigross texted:

> Really bummed I did/said something to turn you off. I'm sorry if I did. I won't bug you anymore. But I'm here if you ever need any support. You're interesting, smart, delightful and pretty. Now decide what to be and go be it. I'm confident you will.

162.    Fearing professional ramifications, on or around September 7, 2016, Ms. Lawrence later reached out to Buccigross to seek mentorship on campus hoping to conclude the interaction on a positive note. Buccigross provided mentorship insight, making Ms. Lawrence feel as if their association had returned to one of mentorship.

163.    Nevertheless, in due time, Buccigross's inappropriate conduct continued. On September 16, 2016, Buccigross sent Ms. Lawrence a photo of *herself* that *she* had posted on *her* social media and that he downloaded for his own personal use. In sending her the photo, he captioned it with emoticons of smiley faces with heart eyes, another attempt to invite a sexual relationship and further confirmation that he was still stalking her online. Again, Ms. Lawrence did not respond, as it again made her extremely uncomfortable and it was clear to her that Buccigross had no intention of respecting her boundaries and being a mentor.

164.    On September 24, 2016, Ms. Lawrence posted a screenshot of a Sufjan Stevens "Chicago" song on Twitter. Within some 20 minutes, Buccigross fires Ms. Lawrence a text message saying: "I can sing every note and every word of Sufjan Stevens 'Chicago'….", only further confirming that this man who was over half-a-century old continued to stalk her online. Once again, he made Ms. Lawrence uncomfortable. Once again, she did not respond.

165.    Shortly thereafter, Buccigross unfollowed Ms. Lawrence on Twitter as punishment for her refusal to respond to his personal text messages offline.

### d.    Buccigross Spreads False Rumors About Ms. Lawrence

166.    On September 19, 2016, ESPN Radio host Ryen Russillo advised Ms. Lawrence that he had been told by several ESPN personalities that she was dating someone at ESPN but he would not identify who she was rumored to be dating. Around this time, she received negative treatment from a number of colleagues, including anchors Matt Barrie, Michael Eaves, Elle Duncan, Antonietta Collins, Alexis Nunes, and Prim Siripipat.

167.    On October 17, 2016, Russillo finally told Ms. Lawrence that she was being isolated and excluded because of reports that she was dating Buccigross. Ms. Lawrence repeatedly and unequivocally denied it, telling Russillo that Buccigross scares her.

168.    This rumor was not only false, it was damaging to Ms. Lawrence's professional reputation because it suggested that Ms. Lawrence was among the class of women who progressed and advanced at ESPN via a sexual relationship with a senior person rather than on stellar performance. Because of this rumor, several colleagues distanced themselves from Ms. Lawrence, foreclosing opportunities to network and advance professionally.

### e.    Ms. Lawrence Reports Buccigross's Misconduct to HR

169.    Ms. Lawrence, who worked tirelessly at ESPN to advance in her career, was deeply disturbed to learn that such a disparaging and professionally detrimental rumor had been circulated. She was also told that males regularly "marked their territory" by spreading rumors about sexual relationships with female employees – *i.e.*, put on "scorecards" (*see supra* at ¶¶ 3, 61), and she was convinced that Buccigross was the source of this rumor.

170.    On October 17, 2016, shortly after speaking with Russillo, Ms. Lawrence went to Obringer's office because she was upset to learn about the false rumor. Initially, Ms. Lawrence did not name Buccigross and said that a *SportsCenter* anchor had offered her mentorship and guidance and she provided him advice on business and real estate matters, but that the anchor had started sending her inappropriate text messages and pictures. She also advised Obringer that she was simply tolerating him while hoping he would eventually respect her boundaries, but he did not. She explained that the anchor was telling colleagues that they were romantically involved after she rejected his sexual advances, as if to mark his territory. Obringer guessed that the harasser was "Coachman." Ms. Lawrence then told Obringer that it was Buccigross. Obringer advised that he had an obligation to report the rumor to other management, but suggested that he did not believe Ms. Lawrence, stating: "[I] don't know the John Buccigross that you know."

171.    The next day, Ms. Lawrence met with HR representative Jason Williams and informed him that Buccigross had sent her unwelcome, inappropriate text messages. She stated that she simply wanted to ensure that it was "on the record" that she and Buccigross were not dating and that the rumor was false. That afternoon, Ms. Lawrence received an email and calendar invitation from Senior HR Specialist Julie Walden to schedule a meeting for October 21, 2016 with Ms. Lawrence and HR Director Donna Hricisko to discuss the issue.

172.    On October 21, 2016, Ms. Lawrence met with Hricisko at her office. She explained that she had tolerated Buccigross's unwelcome behavior because she was afraid that he would defame her to his colleagues and would no longer speak to her in even a professional capacity if she did not do so. She told Hricisko that despite her clear statements to him that she was only interested in mentorship, Buccigross persisted in his quest for a sexual relationship. She also told Hricisko that she believed that Buccigross was the source of the rumor and had told colleagues

that they were dating, describing the text messages and shirtless photos she received, including the sexualized references and emoticons. Hricisko asked Ms. Lawrence about her personal networks in the area and asked her to identify her supervisor. Ms. Lawrence explained that she had moved to Bristol and knew very few people and identified Green as her supervisor. Hricisko assured her that she would contact Buccigross, instruct him not to contact Ms. Lawrence, and interview him in person about whether he was spreading the rumor.

173.    Shortly after meeting with Hricisko that day, Ms. Lawrence requested a meeting with Green. They met around 12:40 p.m. in Green's office and Ms. Lawrence informed her of the situation, conveying the same information that she had conveyed to Hricisko. Green told Ms. Lawrence about other instances of sexual harassment at ESPN, including one in which a male anchor was sharing nude photos of women and video footage of himself having sex with a woman he claimed was an ESPN employee.

174.    At the conclusion of their conversation, Ms. Lawrence asked Green about potential agents, identifying those who had approached Ms. Lawrence. Green told Ms. Lawrence that everyone was especially pleased with her work, that she would receive a contract extension offer from ESPN and that she did not need an agent because it would be a waste of money.

### f.    HR Colludes With Buccigross to Conceal His Misconduct

175.    Over one week later, Hricisko still had not followed up with Ms. Lawrence regarding the meeting Hricisko was supposed to have with Buccigross, despite the fact that he was scheduled to be on-campus for three out of five business days that past week.

176.    On October 28, 2016, Ms. Lawrence posted a photo of herself on Instagram. Buccigross, who did not follow Ms. Lawrence on Instagram, "liked" the photograph, indicating that he was still stalking her online.

177.    On November 2, 2016, after still not hearing from Hricisko, Ms. Lawrence emailed Hricisko to ask if she had interviewed Buccigross. Hricisko replied that their schedules had been conflicting and she was scheduled to speak with Buccigross the next day.

178.    Suddenly, Buccigross sent an email from his ESPN account to Ms. Lawrence on her ESPN account praising her on-air performance: "I don't watch a lot of afternoon TV, but saw some recently and you keep getting better! Keep it up!" This was unusual for several reasons, including but not limited to the fact that: (i) the email came shortly after Hricisko responded to Ms. Lawrence's email stating that she would meet with Buccigross; (ii) Buccigross had already cut ties with Ms. Lawrence after she refused to continue text messaging with him some two weeks before; and (iii) Buccigross had never previously contacted Ms. Lawrence using his ESPN account. It became evident that Buccigross's email was an effort he and Hricisko orchestrated to cover up his sexual harassment of Ms. Lawrence by bolstering his claim that he was just "mentoring" Lawrence, not trying to advance any sexual relationship with her.

179.    Less than an hour after Buccigross's email, Hricisko emailed Ms. Lawrence to ask for her number to speak on November 3, 2016, the day Hricisko was supposed to meet with Buccigross. Ms. Lawrence provided it and also advised that Buccigross attempted to contact her.

180.    Over two weeks after her initial meeting with HR, on November 3, 2016, Ms. Lawrence met with Hricisko in person to discuss her meeting with Buccigross.  Hricisko informed Ms. Lawrence that she only spoke with him by phone rather than meeting him in person as Hricisko insisted she would. Hricisko said she did not meet with Buccigross in person because she did not want *him* to "feel uncomfortable" while waiting for an in-person meeting over the weekend.

181.    In addition to other things, Hricisko then told Ms. Lawrence the following:

- *Buccigross denied telling ESPN employees that they were romantically involved;*

- *Buccigross claimed he thought of Ms. Lawrence solely as a "mentee";*

- *Buccigross said he had no romantic interest in Ms. Lawrence whatsoever;*

- *Hricisko had known Buccigross for 20 years, that he was a "good guy";*

- *Ms. Lawrence should "give [Buccigross] a chance";*

- *Rumors of sexual relationships among ESPN employees were common and Ms. Lawrence should "get used to it"; and*

- *Buccigross was involved in starting a similar rumor of a sexual relationship with a married employee the year before and that the woman's husband got involved.*

182.    Ms. Lawrence was shocked at this blasé and apathetic response to her report of sexual harassment. After the meeting, Ms. Lawrence called Hricisko to confirm everything that Hricisko told her during the meeting and to raise her concern that Hricisko had colluded with Buccigross in responding to her complaint. Ms. Lawrence questioned how Hricisko could credit Buccigross's denials and reach the conclusions she had despite the texts Buccigross had sent her.

183.    The next day, Ms. Lawrence sent Hricisko an email reiterating her concerns about the rumor, expressing dissatisfaction with how she conducted the purported "investigation," and identifying issues with what Hricisko had said in their meeting. Ms. Lawrence explained that the rumor of a sexual relationship with Buccigross was unsettling because it was false, it sexualized her in the workplace, undermined her contributions, and created a "breeding ground for further sexual harassment and disrespectful treatment of me by my colleagues." Ms. Lawrence also said that the meeting "did not leave [her] with the sense that HR's investigation into this matter was taken seriously or fully addressed" and that Hricisko's stated desire to not make Buccigross

uncomfortable "elevates [Hricisko's] regard for his emotional state above [Ms. Lawrence's] and the need to conduct a legitimate investigation."

184.    Regarding Hricisko's personal vouching for Buccigross, Ms. Lawrence said that "neither his professional status nor personal relationship should excuse him or [anyone] from being subject to an adequate investigation of sexual harassment in the workplace." Ms. Lawrence said that it was disheartening to hear Hricisko suggest that Ms. Lawrence should dismiss the matter simply because such allegations are common, noting, "That is not okay."

185.    Ms. Lawrence further stated:

> Not only does this prevalence of professionally destructive and distracting rumors call into question the sufficiency of sexual harassment training at the company but also how claims are handled. As you are well-aware, this is a male-dominated workplace and industry, and allegations such as the one at issue are of the nature that disparage females in the workplace, subsequently hinder their advancement and call into question the legitimacy of said advancement. To be dismissive of such allegations merely furthers the "boys will be boys" culture – the same culture ESPN has spent time heavily condemning recently in sports news.

186.    Finally, in her November 4th email to Hricisko, Ms. Lawrence expressed serious concern that her reporting of sexual harassment would lead to retaliation. She explained that she had left her previous career with the understanding that she would be offered a permanent position at ESPN if her work was satisfactory, and that Hricisko and Ms. Lawrence's superiors had repeatedly praised her performance. Ms. Lawrence said:

> It would be especially unfortunate for me to be deprived of an offer or of opportunities in the future, or to be extended an unacceptable offer or unsatisfactory opportunities, as a result of my reporting this sexual harassment. Moreover, to be treated poorly by my colleagues or peers as a result of my report also would be disappointing.

187.    **Hricisko did not respond, and neither she nor anyone else in management refuted Ms. Lawrence's assertion that ESPN assured her that she would be offered a permanent position if her were work was satisfactory.**

188.    Later that day, Ms. Lawrence received an email from Defendant Gallo, HR Senior Director of Employee Relations, explaining that Hricisko forwarded her email to him and he offered to meet to discuss her concerns. Ms. Lawrence understood that HR's investigation was still underway, but that she was welcome to discuss her concerns with Gallo if she would be willing to trek up campus to have yet another in-person meeting. Ms. Lawrence responded that she had already "spent considerable time earnestly addressing this issue over the last three weeks" and that it had "been a distraction and unnecessarily upsetting, particularly in the wake of how the purported investigation was handled." She told Gallo that all of her concerns were detailed in her email, but that she would connect with him should things change. She also made it clear that she believed it would be futile to meet with Gallo to repeat the same issues. Moreover, the content of that email expressed the very concern that HR's failure to adequately investigate her claims caused her to lose any confidence she had in its complaint procedure. Gallo did not respond to this email.

189.    On November 8, 2016, Ms. Lawrence met with Green to discuss HR's mishandling of her sexual harassment complaint. **Rather than engage in any sort of fact-finding or initiate corrective action, Green warned Ms. Lawrence to not "keep this alive."** Green also told Ms. Lawrence about a previous employee who complained to HR about an employee placing a flyer with disparaging information about the concerned employee in mailboxes in an ESPN mailroom. The concerned employee did not believe HR took action to stop this treatment and insisted that something be done. According to Green, the pursuit ended up "derailing" the employee's career.

190.    In addition, Green told Ms. Lawrence that she was a lock for a permanent position, that she was doing extremely well, and so she should just "let it go" to not derail her career at ESPN. When Ms. Lawrence explained that HR's purported investigation and response were

50

unacceptable, Green appeared taken aback and said that she would speak to Gallo about Ms. Lawrence's concerns, but Ms. Lawrence never received any confirmation that this was done.

191.    Weeks went by and Ms. Lawrence heard nothing from HR. Knowing that ESPN was dismissive of her concerns and that it helped conceal Buccigross's sexual misconduct made Ms. Lawrence feel uncomfortable on campus. Once it became known that Ms. Lawrence had reported Buccigross to HR, many of her colleagues began further isolating her.

192.    It was evident that Ms. Lawrence had violated an unspoken, longstanding rule for women at ESPN to never report a male employee's sexual misconduct. Ms. Lawrence withdrew from social settings on campus, stayed away from the cafe, and avoided professional engagements.

193.    On December 4, 2016, Ms. Lawrence had still heard nothing from Gallo about HR's investigation and was feeling increasingly marginalized, so she followed up on the status of the investigation, reiterated the information she had provided to Hricisko, and outlined the discrepancies in Hricisko's account of her conversation with Buccigross and her response:

> As such, despite being aware that a man attempted to extort a romantic relationship from a vulnerable underling via an abuse of power and willfully ignored said underling's repeated requests for solely a mentorship relationship, **your team failed to conduct a proper inquiry** into whether that man sought to conceal his misbehavior and feed his ego by way of telling their colleagues that they were dating, harming her credibility in the eyes of her peers and jeopardizing her chances of professional advancement.

194.    On December 6, 2016, Gallo responded that HR had "considered this matter closed" after Ms. Lawrence's November 4, 2016 email declining to meet with him in person, claiming that Ms. Lawrence did not provide copies of the inappropriate text messages and photographs for Hricisko to review or name "witnesses" for Hricisko to interview. But neither Gallo nor Hricisko requested such information, nor did they ask Ms. Lawrence how she learned of the rumor. They also never advised that the lack of such information would lead to the matter being closed. Gallo also claimed that Hricisko spoke with Buccigross by phone rather than in person due

to "conflicting schedules," in clear contradiction of Hricisko's prior statements that she did not want Buccigross to "feel uncomfortable" while waiting for an in-person meeting despite the fact that he was on campus at least three of the five business days of the week.

195.    Gallo also claimed that Hricisko had informed Ms. Lawrence that she "could not conclude that Buccigross was the source of the rumors," even though she had not conveyed this conclusion to Ms. Lawrence. Gallo further informed Ms. Lawrence that he had met in person with Buccigross to review ESPN's sexual harassment and retaliation policies and that Buccigross stated that "he would act professionally in any and all future interactions," after which Gallo concluded no further action was necessary.

196.    Finally, Gallo offered to meet with Ms. Lawrence to discuss her remaining concerns and afford her an opportunity to share her observations of ESPN's work environment.

197.    In his December 6, 2016 email to Ms. Lawrence, Gallo never: (i) denied that Hricisko had a personal relationship with, and was biased in favor of, Buccigross; (ii) denied Buccigross's history of disseminating similar sexual rumors about women at ESPN in the past; (iii) denied Hricisko's directive to "get used" to being involved in such rumors; and (iv) explained why it is acceptable for a male mentor to send shirtless photos of himself to a female "mentee."

198.    Shortly after receiving Gallo's email, Ms. Lawrence replied and explained that much of the information he shared conflicted with what Hricisko told her, emphasizing:

> [M]y concern was less with Donna [Hricisko]'s conclusion but the manner by which she came to it. Hence, the process was the problem, particularly the things she said to me, which I thoroughly outlined in my Nov. 4 email.

199.    Ms. Lawrence was "not fixed on a particular outcome," but rather "expectant of a professional and unbiased process." She accepted Gallo's offer to meet to discuss how the HR complaint process could improve, so they scheduled a meeting on December 14, 2016. Ms.

Lawrence was not feeling well that day, so she called Gallo. He asked whether she had anything further to report and she told him that she did not feel comfortable speaking to Gallo's department about her concerns given Hricisko's clear bias in favor of and collusion with Buccigross, and Gallo's failure to address either. In response, Gallo told her to instead speak with Green, who had already warned Ms. Lawrence to "let it go."

200.    On December 9, 2016, Obringer and Ms. Lawrence met in his office and he told her that he was concerned about her. *He noted that she had been losing weight and appeared unhappy and he believed it was due to the situation with Buccigross.* Ms. Lawrence explained to Obringer what Hriscko had told her on November 3, 2016, and further noted that she was very disturbed that a man at ESPN could claim a right to a woman's body at her place of employment and that her employer would work to help him cover up his harassment.

201.    *Ms. Lawrence further noted how disturbing it was that, even when a woman tells HR that a man made her uncomfortable and sent suggestive text messages with half-naked photos of himself and heart-faced emoticons, HR would dismiss it as a "mentorship" relationship simply because the man said it was.*

202.    In response, Obringer threatened to call Green, who had already "warned" her about the career-derailing consequences employees faced when they did not let things go. Obringer suggested that Ms. Lawrence take time off from work. Fearing she would lose her on-air opportunities, she said she was okay.

203.    Over the next few months, however, Ms. Lawrence would proceed to raise the matter and her displeasure with the outcome with several department managers.

### III.   ESPN RETALIATES AGAINST MS. LAWRENCE

204.   In early 2016, in an effort to guide Ms. Lawrence, ESPN NFL Live host and reporter Dianna Russini cautioned Ms. Lawrence to not show any displeasure or complain about sexism or mistreatment because, as Russini had learned, it was ESPN's practice to take away opportunities from women who speak up. *See supra*.

205.   Russini was right. After complaining about Buccigross's misconduct and raising concerns about HR's lack of an impartial and thorough investigation, Ms. Lawrence's superiors marginalized her and limited her opportunities. Despite Ms. Lawrence's continued stellar work performance and positive feedback, the marginalization and retaliation culminated in ESPN's decision to not offer her a permanent position at the conclusion of her Fellowship.

#### A.   ESPN Denies Ms. Lawrence the Derrick Rose Trial Assignment

206.   Before Ms. Lawrence reported Buccigross's sexual harassment, she was the only ESPN analyst covering Derrick Rose's civil rape trial. Given her knowledge of the case and coverage, on or around September 28, 2016, Ms. Lawrence emailed Obringer to ask if she could go to Los Angeles to cover the trial, noting that she had practiced as an attorney before the same judge and had expertise in matters involving sexual violence. Obringer refused, telling her that ESPN would not cover the trial but that McQuade had her request on his radar.

207.   In the meantime, on October 4, 2016, Ms. Lawrence authored an article for ESPN.com about the Rose trial and on October 5, 2016, she appeared as a legal analyst on *SportsCenter* to discuss the trial. Two weeks later, she wrote a second article for ESPNW about the trial.

208.   On October 18, 2016 – the day after Ms. Lawrence reported Buccigross's harassment to Obringer – Obringer sent another reporter to cover the trial despite his representation

that ESPN would not cover it. That day, Ms. Lawrence raised the issue with Obringer and he said it was "a last-minute decision."

### B.   ESPN Reduces Ms. Lawrence's Shifts

209.   Ms. Lawrence had worked feverishly to become the main anchor for the 1:00-4:00 p.m. *SportsCenter* Updates shift on ESPNNEWS. In the wake of Ms. Lawrence's sexual harassment complaint, however, ESPN assigned her fewer on-air *SportsCenter* Updates shifts. In November 2016, she had 14 shifts. In December 2016, after Ms. Lawrence made it clear that she was not going to heed Green's warning and drop the matter, ESPN assigned her to just five shifts. Obringer assigned another colleague who worked in the Digital Department to what would be Ms. Lawrence's typical shifts.

210.   In the days after their December 9, 2016 meeting, Ms. Lawrence reiterated to Obringer several times that she did not want to take time off and wanted to contribute. After multiple requests to Obringer, he finally returned four of her shifts from December 27-30, 2016.

### C.   ESPN.com Editor Jason Schwartz Refuses To Publish Ms. Lawrence's Articles

211.   During the week of December 26, 2016, now-former ESPN.com editor Jason Schwartz was on vacation, so Ms. Lawrence asked who she could speak to about the publication of an article that she had written, which had to be published that week. Schwartz refused to direct her to anyone in the office and refused to publish the article with no explanation.

212.   Because this was not the first time that Schwartz refused to publish Ms. Lawrence's articles and she was concerned about discriminatory treatment given that he readily published articles written by male contributors, she emailed Christopher Buckle ("Buckle"), the senior editor who had assigned them to work together, requesting that he meet with them to discuss these issues and editing and publishing procedures, believing this could facilitate a working relationship. Ms.

Lawrence wanted to have Buckle present because Schwartz had previously treated her in a contemptuous manner when they spoke privately. But Buckle did not respond.

213.    The next week, Schwartz emailed Ms. Lawrence and asked to meet without Buckle, to which she responded that she preferred to have Buckle present. She again emailed Buckle but received no response. Schwartz again insisted on meeting with Ms. Lawrence privately while Buckle was incommunicado. Ms. Lawrence responded to Schwartz, copying Buckle, stating that she was "extremely uncomfortable" and wanted a "third party" present.

214.    This email prompted a response from Buckle, who responded with an email that appeared to have been drafted by HR, in which he agreed to meet with them.

215.    Within an hour of Buckle's email and without offering any explanation, Connor Schell, then-Senior Vice President and Executive Producer of ESPN Original Content, canceled an unrelated meeting that he and Ms. Lawrence had scheduled to take place in February to discuss professional opportunities within the Features Department. Schell did not offer to reschedule and never met with Ms. Lawrence or provided her with opportunities. By objecting to Schwartz's mistreatment and standing up for herself through a simple request to have a third-party present to ensure that Schwartz treated her professionally, Ms. Lawrence became a topic of conversation.

216.    In the aftermath, male managers and Green were united in their actions to deny Ms. Lawrence further professional opportunities as a result.

217.    Notably, when Buckle, Schwartz, and Ms. Lawrence met on Friday, January 6, 2017, Schwartz disparaged the female staff at ESPNW for their willingness to publish Ms. Lawrence's articles. Despite Buckle's presence, Schwartz treated Ms. Lawrence in the contemptuous manner she had previously raised concerns about. He spoke to her condescendingly,

rolled his eyes at her, and made noises of disgust when she spoke, during which Buckle sat and did nothing.

**D.  Ms. Lawrence's Sports Knowledge is Randomly Questioned**

218.  On January 5, 2017, Obringer told Ms. Lawrence during a check-in meeting that her performance on-air had been very good but that he was concerned about her "historical sports knowledge" – an excuse that Ms. Lawrence had been told by colleagues was commonly used at ESPN to justify excluding women. After months of being on-air and anchoring over 400 digital sports segments, Ms. Lawrence had never before been given such a critique.

219.  Obringer did not provide Ms. Lawrence with an example to support his sudden "concern" about her alleged lack of historical sports knowledge.

220.  Obringer asked Ms. Lawrence how she was doing otherwise, and she stated that she was disappointed and that she wanted to work in an environment where she did not have to fear being sexualized by her male colleagues. Ms. Lawrence recounted how earlier in the day she tried to network with *SportsCenter* producer Chika Okafor after meeting him at a networking event, but he seemed more inclined to pursue her romantically, asking her personal questions when she was talking about her professional experience and asking for her phone number. Mr. Obringer said nothing in response.

221.  Later that week, Green reiterated the same concern to Ms. Lawrence about her sports knowledge, tracking Obringer's comments almost verbatim. Green also discouraged Ms. Lawrence from writing legal articles or providing legal analysis for the Company – tasks that she had performed well and which gave her important visibility.

222.  On January 10, 2017, Ms. Lawrence emailed Obringer for clarification about what he meant and requested specific directives for how to improve her supposed lack of historical

sports knowledge. Obringer responded that he was concerned about her ability to provide deeper or historical context on unscripted segments because she spent "many years immersed" in law, saying: *"In no way should you infer that I think your sports knowledge is substandard. I truly don't rvrn [sic] know the length and breadth of your knowledge."*

223.     When Ms. Lawrence and Obringer met on February 1, 2017, Obringer said that he meant that she should continue studying sports like everyone else at ESPN because it was a continually developing craft. Ms. Lawrence later spoke with Green and questioned her about the concerns she allegedly had about Ms. Lawrence's sports knowledge. As with Obringer, Green similarly walked back her baseless claim.

### E.     EVP Dave Roberts Limits Ms. Lawrence's Opportunities in Radio

224.     After Ms. Lawrence declined to meet with him off-campus, Roberts had been less receptive of Ms. Lawrence. But after it had become well-known that she reported Buccigross to HR, Mr. Roberts all out distanced himself from her and refused her potential career opportunities in Radio. When Ms. Lawrence emailed him requesting an opportunity to contribute to one of the shows Roberts oversaw, he did not respond. She attempted to follow-up in person when she saw him in the Café the next day but when Ms. Lawrence approached Roberts, he avoided eye contact and rushed away.

### F.     Ms. Lawrence's Legal Analysis Was Further Discouraged

225.     While Ms. Lawrence followed Green's direction to focus on *The Russillo Show* (known as *Russillo & Kanell* until April 26, 2017, when it became *The Russillo Show*) Updates in Radio, she was concerned that Green's directive was intended to reduce her range of contribution and exposure across the network to justify not offering Ms. Lawrence permanent employment.

226.    After several months had passed, Ms. Lawrence saw the opportunity to bring attention to two important legal issues in sports. On March 8, 2017, working with her editor at ESPNW, Ms. Lawrence published two articles that generated high traffic on ESPN's website with significant response from readers. Ms. Lawrence's articles formed the bases for segments across ESPN and received high praise, particularly from John Kosner, then-Executive Vice President, Digital & Print Media, who said the next day in a meeting with the editors that Ms. Lawrence's articles *"are the types of pieces [ESPN.com and ESPNW] need to be writing more of."*

227.    On the afternoon of March 10, 2017, after Ms. Lawrence's articles received high praise and considerable response, Green asked Ms. Lawrence to come to her office. Green asked Ms. Lawrence how *The Russillo Show* Updates were going and Ms. Lawrence said that she was comfortable with the Updates, and had also written two articles that were well-received. Green responded in a condescending tone: "You want to do intellectual things, don't you?"

228.    After Ms. Lawrence reported Buccigross to HR, *SportsCenter* and other shows stopped calling her to provide legal coverage. In 2016, she made more legal-related appearances and wrote more legal-related articles than any other legal analyst at ESPN. She made at least 12 appearances providing legal analysis on-air and authored at least 12 articles for ESPN websites. She had become ESPN's primary legal analyst, receiving high praise across the network from Obringer, producers, and executives, and her analysis was well-received on social media.

229.    Once Ms. Lawrence reported Buccigross and refused to let the matter go as Green had warned her to do, ESPN began using ABC Reporter Ryan Smith ("Smith") for legal analysis, despite having barely relied on him for legal coverage in 2016. Even when Ms. Lawrence offered to provide legal analysis, she was denied the opportunity.

230.    For example, on April 14, 2017, Ms. Lawrence offered to provide *SportsCenter* with legal analysis on Eli Manning's fraud memorabilia case while she was in the newsroom and camera-ready. ESPN denied her this opportunity with no explanation. Subsequently, ESPN invited Smith to provide the analysis.

231.    Despite the roadblocks that management erected, Ms. Lawrence continued to work hard and create opportunities to contribute to ESPN's success. For example, on April 19, 2017, since she was basically banned from writing articles for ESPN.com, Ms. Lawrence self-published a post on Instagram providing legal analysis of Aaron Hernandez's death. Her insight was well-received and she appeared on *The Russillo Show* to discuss her views. Ms. Lawrence's appearance was also used in other ESPN shows and her analysis was picked up by NBC and Fox Sports outlets. Her written post received significant web traffic of over 11,000 link clicks in one day.

232.    Despite this positive reception, on April 25, 2017, Green tried to reinforce her roadblocks by questioning Ms. Lawrence if her "legal take" posts were vetted through the news desk or ESPN.com, as a breaking news post would need to be. Until then, Ms. Lawrence had been posting footage of her legal analysis on Instagram for over a year and legal takes on Instagram for nearly two months, and this was the first time that Green had taken issue with it. Ms. Lawrence explained that her legal takes were not vetted because she was not breaking news, and that the opinions were like other opinionated social media posts published by herself and her colleagues without vetting. Green responded that she believed a legal perspective was different from an "everyday opinion," but conceded that there was no official management directive on the issue.

233.    The exchange was clearly intended to discourage Ms. Lawrence from posting her legal perspective – a niche that she had spent the duration of her Fellowship carving out, and which raised her profile with other networks.

### G.     ESPN Refuses to Consider Ms. Lawrence for Employment

234.    On April 26, 2017, ESPN laid off over 100 employees, who were mostly on-air talent.[41] Skipper stated that the Company was looking to tailor its staffing to individuals who could perform across a variety of platforms, *i.e.*, writing, hosting, and analyzing. Indeed, to develop such versatility was one of the promoted hallmarks of Ms. Lawrence's Fellowship position, which offered hands-on training in multiple areas of sports media and broadcasting.

235.    Despite the fact that Ms. Lawrence had developed into a cross-platform versatile talent, and despite ESPN's stated goals of retaining talent after the Fellowship and assurances that Ms. Lawrence would be retained, on April 28, 2017, Green informed Ms. Lawrence that ESPN would not renew her contract at the conclusion of her Fellowship. Green said that the inability to find permanent placement came as a result of the reduction in staff rather than any shortcoming in Ms. Lawrence's performance. Green later emailed Ms. Lawrence to reiterate her outstanding performance, stating: "You have done a remarkable job throughout this fellowship." Green then told Ms. Lawrence that she could leave ESPN anytime.

236.    In an email to Green on April 29, 2017, Ms. Lawrence asked what positions ESPN considered her for placement in. On April 30, 2017, Green did not answer, but responded with general assertions about what conditions would need to be met to consider her for such placements, indicating that Ms. Lawrence had not been considered for any such positions.

237.    On May 2, 2017, Green sent Ms. Lawrence a text message asking how she was feeling, noting that she had always been a "ray of sunshine" around ESPN.  In response to this and

---

[41] In the April 26, 2017 press release, John Skipper stated, in part: "Dynamic change demands an increased focus on versatility and value, and as a result, we have been engaged in the challenging process of determining the talent – anchors, analysts, reporters, writers and those who handle play-by-play – necessary to meet those demands." *John Skipper Message to ESPN Employees*, ESPN MEDIA ZONE, http://espnmediazone.com/us/john-skipper-message-espn-employees.

her previous email, she emailed Green to share her concerns that ESPN's failure to offer her a permanent position was in retaliation for reporting sexual harassment and complaining about HR's inadequate handling of her complaint:

> I'm very uncomfortable with the network's sudden decision that there is no place for me, especially given what I've been told during my time here, my degree of contributions to the network, the investments I've made in uprooting my life, and the unprofessional and degrading behavior I've had to tolerate here.

238.   Ms. Lawrence pointed out that she knew ESPN planned to offer Buccigross a multi-year deal despite his inappropriate conduct, HR's collusion with Buccigross, and his history of sexual harassment as openly admitted by HR. Green responded that Ms. Lawrence would need to meet with HR and the Legal Department ("Legal") to further discuss the matter.

239.   On May 4, 2017, after Ms. Lawrence provided the availability and contact information of her attorney, Vice President of Talent Rob Savinelli told her that Green was mistaken in that there was no need to meet with Legal. Savinelli also stated that ESPN had not considered her for any permanent positions whatsoever, contrary to ESPN's stated purpose of the Fellowship program, and that ESPN had eliminated the Legal Analyst position.

240.   In its Position Statement before the CHRO, ***ESPN admitted that it lied to Ms. Lawrence in May 2017 when it claimed that the Legal Analyst position had been eliminated.*** ESPN admitted it signed a legal analyst, Smith, three months before lying to Ms. Lawrence.

241.   On May 5, 2017, Ms. Lawrence emailed Green to inform her that any correspondence about the issues she raised would need to be directed to her attorney, who she said was expecting to hear from Green or someone from Legal to set up a meeting. But no one followed up to have a meeting with Ms. Lawrence or her counsel to discuss Ms. Lawrence's concerns that the Company refused to find a permanent position for her in retaliation for her complaints about sexual harassment and HR's poor handling of her complaint.

### H.   ESPN Falsely Tells Ms. Lawrence That Her Position Was Eliminated

242.   After Ms. Lawrence expressed concerns about retaliation, ESPN assigned her to graveyard shifts in Digital before she completed her scheduled six-month assignment in Radio.

243.   On May 15, 2017, Radio supervisor Pete Ciccone told Ms. Lawrence she would be moved to Digital at Green's request. When she asked why, Ciccone said he thought it was "business needs." She told Ciccone that she had already worked in Digital for over six months and had not finished her rotation in Radio, which was to conclude her term in the Fellowship. Ciccone said he would speak to Justin Craig, the Senior Director of Network Audio Content.

244.   But on May 19, 2017, after speaking with management, Ciccone changed his explanation and told Ms. Lawrence that Green did not know about the reassignment, despite being her direct supervisor. He now asserted that the decision was made by Obringer. Ciccone said that Obringer was having Ms. Lawrence reassigned because ESPN was eliminating *The Russillo Show* Updates, to which she had been assigned since starting in Radio in January 2017 and that Obringer said they were transitioning the Updates to be handled by the TV/Studio Department.

245.   Obringer emailed Ms. Lawrence about the change. Ms. Lawrence replied and reiterated her preference to remain in Radio. Green also told Ms. Lawrence that Ciccone "just" told her about the changes to Radio, which would alter her schedule. On May 20, 2017, Ms. Lawrence responded to Green and reiterated her concern that the reassignment was retaliatory:

> On May 15, 2017, Pete Ciccone told me that I would be moved to the digital department at your request. Pete said you two had spoken about it sometime in the past week, which would have been after I'd voiced my belief to you that my contract wasn't being renewed as retaliation.

246.   On May 23, 2017, Ms. Lawrence met with Green about the new schedule proposed by Obringer that would remove her from Radio and included shifts in Digital. Ms. Lawrence

explained that the new schedule afforded her fewer on-air opportunities and reduced her from a minimum sixteen on-air appearances per week to a maximum seven per week.

247.    Ms. Lawrence also noted that, since she reported the retaliation, co-Fellow Scales was given a much more favorable schedule that included hosting *SportsCenter*. She asked Green why she was not afforded the same opportunities and Green did not answer but said that her work had been "fantastic" and that she had "carried herself beautifully" throughout the Fellowship. Ms. Lawrence reiterated her concerns with HR's mishandling of her complaint against Buccigross.

248.    On May 25, 2017, Ms. Lawrence emailed Green to ask if there had been any developments on her new schedule and reiterated the concerns with the schedule and retaliation raised in their last meeting, outlining how she had received many on-air opportunities, favorable schedules, and the promise of permanent employment until she reported sexual harassment.

249.    On May 26, 2017, Green said that Ciccone had an opportunity for her to anchor the radio show *First and Last* from 3 a.m. to 6 p.m., which would allow her to remain in Radio. Green also denied that the scheduling was retaliatory, asserting that it was based in part on "business needs." Green also denied her previous statements telling Ms. Lawrence not to pursue her sexual harassment complaint and claimed that the decision not to renew her contract was part of "the larger Talent review process." As to Green's other remarks, Ms. Lawrence maintained her position as initially stated in her May 25, 2017 email. May 26, 2017 was Ms. Lawrence's last day as the anchor for *The Russillo Show* Updates, a position she had held since January 3, 2017 and in which she was supposed to remain until the end of her Fellowship on August 9, 2017.

250.    Ms. Lawrence's reassignment to *First and Last* was retaliatory. As the Updates anchor, Ms. Lawrence was not afforded meaningful opportunities to contribute, despite what she

had been told, because management assigned anchor responsibilities to the co-hosts and the producer played an active role contributing to the show, leaving no room for Ms. Lawrence.

251.    On June 9, 2017, after her first eight shows, Ms. Lawrence emailed Green calling attention to this "bait and switch" and to the known deficiencies of her new position:

> As you and management are well-aware, under this new schedule, I wake up around 2 am ET, the news cycle doesn't change much that early in the morning nearly eliminating opportunity for me to contribute to ESPN's broadcast, there are fewer listeners, very little social media engagement, and the show isn't simulcast, which means there is less opportunity for professional growth during the First & Last updates as compared to *The Russillo Show* updates.

252.    ***Ms. Lawrence expressed concern about her removal from The Russillo Show Updates when the position had not been eliminated.*** As early as May 15, 2017, Green and Obringer made it seem imperative that Ms. Lawrence's schedule change immediately, claiming her position was being eliminated. Yet a month later, the position remained open and Ms. Lawrence's colleagues were being assigned to the position. In fact, no plans had been made to eliminate her previous position as *The Russillo Show* Updates anchor, so she asked Green:

> [W]hy did I need to be removed from The Russillo Show updates on May 26 if they weren't being moved to the studio/tv department for at least more than three weeks thereafter? Said another way, why couldn't – and can't – I continue on The Russillo Show updates up to and until the studio/tv department actually takes over those updates, a date which doesn't appear to be determined?

253.    Green neither answered Ms. Lawrence nor explained why she and Obringer insisted that Ms. Lawrence be removed from *The Russillo Show* after Ms. Lawrence raised concerns about retaliation. Later in the afternoon, after not hearing from Green, Ms. Lawrence reached out to Ciccone to raise her concerns and request that her position as *The Russillo Show* Updates anchor be reinstated. Ciccone granted the request and stated that there was no plan to eliminate *The Russillo Show* Updates after all, as Obringer had stated as the reason for reassigning Ms. Lawrence.

254.    In the studio on June 12, 2017, Ciccone told Ms. Lawrence that Obringer told him on June 9, 2017 that he suddenly decided not to eliminate her position on *The Russillo Show* until late summer, which would be after Ms. Lawrence's two-year contract ended on August 9, 2017.

255.    On June 13, 2017, Green acknowledged that Ciccone had approved Ms. Lawrence's request to be reinstated to *The Russillo Show* Updates but did not explain why she had to be removed when there was no plan to eliminate the position.

256.    As of at least the date of filing this Complaint (March 4, 2018), ESPN had not eliminated Ms. Lawrence's previous position where she performed *The Russillo Show* Updates (now the *Will Cain Show* Updates).

## I.    Additional Efforts to Retaliate Against Ms. Lawrence

257.    On July 19, 2017, Green suddenly informed Ms. Lawrence that she needed to enter into a computer system all of the time off she had taken since the beginning of the year – something she had never before been asked to do. This task was onerous for Ms. Lawrence because she did not have a record of every day she took off in the last seven months and had difficulty reconstructing whether days she had been traveling were work-related. Green also advised that time off to pursue future employment would come out of her vacation days, contrary to Green's previous representations.

258.    On July 20, 2017, Ms. Lawrence arrived at the entrance of ESPN's main campus to find that her employee badge did not work and she could not enter the property. As her coworkers passed her to gain entry, security held Ms. Lawrence while several phone calls were made to verify her privileges. After she was allowed to enter, Ms. Lawrence was offered no explanation as to why her badge suddenly stopped working after near two years without issue.

259.    Later that day, ESPN passed over Ms. Lawrence for an assignment to provide on-air coverage of the O.J. Simpson parole hearing, choosing less qualified personalities with no legal background or experience in domestic violence counseling. As Ms. Lawrence had created a niche as a legal analyst on hot-button issues concerning athletes and sports, she was a better fit for Simpson's parole hearing based on her background, that she is a woman and a person of color.

260.    Indeed, several of Ms. Lawrence's colleagues told her that she was better qualified to provide on-air coverage of Simpson's hearing, including *ESPN The Magazine* writer Howard Bryant (who was selected to provide analysis on the coverage) and *NFL Live* host and reporter Dianna Russini. Several well-known personalities, including Russini, promoted Ms. Lawrence's Twitter commentary on the hearing. Russini also said that she relied on Ms. Lawrence's commentary in her own coverage on *NFL Live*.

261.    This illustrates ESPN's concerted efforts to damage Ms. Lawrence's career by sidelining her from opportunities despite her eminent qualifications, which are recognized by her other colleagues. Such retaliatory harassment and marginalization was designed to further isolate and punish Ms. Lawrence for complaining about sexual harassment and retaliation.

**J.      ESPN Hired Ms. Lawrence's Co-Fellow, Treavor Scales**

262.    Even after telling Ms. Lawrence on April 28 that she wouldn't be retained due to the layoffs and the need to downsize, Green told Ms. Lawrence and others that ESPN would continue hiring through the Fellowship program.

263.    ESPN hired the other fellow in the program, Scales, who had less on-air experience, did not write any articles, did not receive awards in the community or represent ESPN on any boards, and did not garner as much praise for his on-air contributions as Ms. Lawrence. Indeed,

Scales's background as a "crewing coordinator" – a logistics background job that has nothing to do with sports or on-air work – is completely unrelated to what ESPN has hired him to do.

264.    ESPN tried to downplay Scales's hiring by characterizing it as a "part-time" on-air position. The network omitted that his "part-time" position pays $80,000, which is more than Ms. Lawrence made working full-time for ESPN.

**K.    ESPN Continues Hiring, Including Less Experienced Broadcasters**

265.    Since telling Ms. Lawrence on April 28, 2017 that she could not be retained due to hiring reductions, the Company has hired on-air talent, including individuals with no on-air experience (*e.g.*, Jac Collinsworth, Chiney Ogwumike). Also contrary to ESPN's claims that it did not have any open positions for which to consider Ms. Lawrence, in August 2017 the Company was actively looking to hire a woman to be an on-air host and personality for its new show in New York with Mike Greenberg.

266.    On July 12, 2017, executive producer Bill Wolfe told Ms. Lawrence's agent that ESPN was looking for an intelligent woman, not just a 'pretty face' who can go toe-to-toe with male hosts. Ms. Lawrence's stellar performance at ESPN, strong knowledge base, and consistently positive reviews from supervisors and viewers prove that she was an ideal fit.

**L.    ESPN Knew About the Layoffs Well in Advance of Hiring and Intending to Retain Ms. Lawrence**

267.    ESPN hired Ms. Lawrence in August 2015 for the Fellowship, which by ESPN's very description "retention" program focused on training her to be multi-faceted and a long-time employee.

268.    In September 2015, less than a month after she joined ESPN, it became publicly known that "Disney ha[d] notified ESPN to trim $100 million from the 2016 budget and $250 million in 2017" and that ESPN would be achieving that through layoffs.[42]

269.    In October 2015, ESPN laid off more than 300 employees to trim the 2016 budget, and then in April 2016 more than 100 to trim the 2017 budget. To believe that ESPN had no idea it would be conducting layoffs in 2015, 2016, and 2017, before hiring Ms. Lawrence in August 2015, is disingenuous.

## IV.    ESPN DEFAMES MS. LAWRENCE IN THE MEDIA

### A.    ESPN Falsifies Text Messages Between Ms. Lawrence and Buccigross, Publishing Them to Portray Her in a False Light

270.    On December 13, 2017, ESPN hosted a town hall, inviting all of the network's forward-facing talent to Bristol for a meeting with then-President John Skipper. At the meeting, Skipper stated that sexual harassment was not a major concern at ESPN.

271.    On December 14, 2017, the BOSTON GLOBE released the Globe Report providing Ms. Lawrence's and several other women's accounts of ESPN's culture of sexual harassment and mistreatment of women. *See supra* at ¶¶ 18-21, 57, 94-95.

272.    Taking a significant departure from their previous recorded statements that Buccigross was only providing "mentorship," both Buccigross and ESPN attempted to romanticize his association with Ms. Lawrence. ESPN attacked Ms. Lawrence by fraudulently redacting and rearranging the text messages she exchanged with Buccigross to make it appear as though Ms. Lawrence pursued and hounded him.

---

[42] *See* Layoffs Are Coming to ESPN, *Big Lead*, http://thebiglead.com/2015/09/21/layoffs-are-coming-to-espn/ (Sept. 21, 2015).

273.    On the evening of Thursday, December 14, 2017, ESPN published the fraudulent text messages via ESPN Media Zone, its public relations website, where ESPN first placed a link reading "attached portions of text messages" that led to a .pdf of the fraudulent text messages, and below that ESPN placed a link reading "Text Messages" suggesting that said link directed users to the complete text message exchange (**Screenshot B**). Instead, both links directed users to the exact same document – *i.e.*, the fraudulent text messages ESPN created.

**Screenshot B:**

---

Additionally, if you consider the attached portions of text messages exchanged between Ms. Lawrence (in blue) and Mr. Buccigross, it's clear that they had a consensual, personal friendship that spanned months.

Text Messages

274.    ESPN intentionally and maliciously published these fraudulent text messages online in an attempt to discredit Ms. Lawrence and to fuel hatred and disdain toward her.

**B.    ESPN Uses Bots and Fake Accounts on Social Media to Incite and Promote Hatred Toward Ms. Lawrence and Support for Buccigross**

275.    ESPN regularly uses bots and fake social media accounts to promote its shows, reports and on-air talent.

276.    As such, across social media platforms, ESPN used bots and fake social media accounts to promote the fraudulent text messages, to attack Ms. Lawrence and spread vile commentary about her, to encourage users who expressed hatred and disdain for Ms. Lawrence, to condemn users who supported Ms. Lawrence, and to manufacture and encourage support for Buccigross. Examples are provided below:











LogicSome
@LogicSome
Joined December 2017

Tweets 10   Following 146   Followers 1   Likes 3

Follow

**Tweets**   Tweets & replies

LogicSome @LogicSome · Jan 30
Replying to @DetrickManning @Walmart
Its all about loss prevention. Which products are being stolen the most? Lock those up. Now can you explain why these products have higher theft rates?

LogicSome @LogicSome · Jan 30
Replying to @DetrickManning @Walmart
Do you want to explain why only those products are the ones always getting stolen?

Who to follow · Refresh · View all
Aaron Nagler @AaronNa...
Followed by Amy Trask and others
Follow

C.C. @TheActualCC
Followed by DUBBY and others
Follow

Big Gene @GeneWilly
Followed by Echo Fox Joke and others

1,139 Tweets
**JaVale McGee**

© 2018 Twitter   Ab
Privacy policy   Co

LogicSome @LogicSome · 15 Dec 2017
Replying to @AdrienneLaw
like honesty? Which you seem to lack!

1

LogicSome @LogicSome · 15 Dec 2017
Replying to @AdrienneLaw
and you are guilty of lying. but who's counting?

LogicSome @LogicSome · 15 Dec 2017
Replying to @AdrienneLaw @BostonGlobe
Seriously? I saw the texts released by ESPN. Looks @AdrienneLaw was trying to use her stunning beauty to entice a guy into helping her get promoted. Disgraceful. You cheapen the real victims out there!

LogicSome @LogicSome · 13 Dec 2017
#AlabamaSenateElection thanks for not electing that pedophile piece of shit

2

Back to top ⌃

73

277.    As a consequence, Ms. Lawrence received a barrage of hundreds of threats and attacks on social media. Individuals that she considered friends and colleagues distanced themselves from her personally and professionally.

278.    On the afternoon of Friday, December 15, 2017, the BOSTON GLOBE published the then-known to be accurate text message exchange between Buccigross and Ms. Lawrence. Subsequently, that evening CNN, YAHOO SPORTS and AWFUL ANNOUNCING published pieces addressing the discrepancy between the texts ESPN published and the true texts. But Ms. Lawrence continued to receive threats and attacks on social media that were consistent with the fraudulent text messages ESPN published.

279.    First thing Monday morning on December 17, 2017, with the Globe Report and ESPN's attack on Ms. Lawrence still dominating headlines, Skipper stepped down as ESPN's President, citing a substance abuse problem and effectively redirecting media attention to his departure and discouraging any other ESPN female employees from coming forward.

280.    ESPN tarnished Ms. Lawrence's reputation and placed in her a false light by intentionally and maliciously publishing the fraudulently edited text messages to deceive the public and defame her.

281.    Ms. Lawrence continues to receive threats and attacks to this day, causing her to suffer considerable distress, resulting in weight loss, headaches and sleeplessness. Ms. Lawrence has also lost professional and business opportunities and suffered other economic damages.

**FIRST CAUSE OF ACTION**
**(Sex Discrimination – Hostile Work Environment Sexual Harassment)**
**(Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e** *et seq.***)**
**<u>(Against ESPN)</u>**

282.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

283.    At all relevant times, ESPN was an employer within the meaning of Title VII.

284.    At all relevant times, Ms. Lawrence was an employee within the meaning of Title VII.

285.    Under Title VII, it is unlawful for an employer to discriminate against any employee with respect to sex.

286.    As alleged herein, throughout the course of her employment at ESPN, Plaintiff was subject to unwelcome sexual advances and other unlawful conduct of a sexual nature that was so severe or pervasive as to alter the conditions of Plaintiff's employment and create a hostile, intimidating, and/or abusive working environment.

287.    As a result, Plaintiff has suffered and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages, including, but not limited to, attorneys' fees, for which she is entitled to damages.

288.    As a result of ESPN's creation and maintenance of a hostile work environment, Plaintiff has suffered and continues to suffer emotional distress for which she is entitled to damages.

289.    ESPN's unlawful and discriminatory conduct was willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

### SECOND CAUSE OF ACTION
**(Sex Discrimination – *Quid Pro Quo* Sexual Harassment)**
**(Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e *et seq*.)**
**(Against ESPN)**

290.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

291.    At all relevant times, ESPN was an employer within the meaning of Title VII.

292.     At all relevant times, Ms. Lawrence was an employee within the meaning of Title VII.

293.     Under Title VII, it is unlawful for an employer to discriminate against any employee with respect to sex.

294.     ESPN's conduct constitutes *quid pro quo* sexual harassment in violation of Title VII in that, throughout the course of her employment at ESPN, Plaintiff was subjected to unwelcomed sexual advances by superiors and/or supervisors that were motivated by her gender.

295.     Plaintiff's rejection of the unwanted sexual advances served as the basis for ESPN's employment decisions concerning Plaintiff alleged herein.

296.     As a result, Plaintiff has suffered and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages, including, but not limited to, attorneys' fees, for which she is entitled to damages.

297.     As a result of ESPN's *quid pro quo* sexual harassment, Plaintiff has suffered and continues to suffer emotional distress for which she is entitled to damages.

298.     ESPN's unlawful and discriminatory conduct was willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

### THIRD CAUSE OF ACTION
### (Retaliation – Violation of Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.)
### (Against ESPN)

299.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

300.     At all relevant times, ESPN was an employer within the meaning of Title VII.

301.     At all relevant times, Ms. Lawrence was an employee within the meaning of Title VII.

302.    Under Title VII, it is unlawful for an employer to discriminate against any employee with respect to sex.

303.    As alleged herein, Plaintiff engaged in activities protected under Title VII when she objected to the unlawful, discriminatory conduct alleged herein and reported it to her supervisors.

304.    As alleged herein, ESPN, through itself and its agents, took adverse action and retaliated against Plaintiff subsequent to and in direct connection with her engaging in protected activities in violation of Title VII by, *inter alia,* making the adverse employment decisions concerning Plaintiff alleged herein.

305.    As a direct and proximate result of ESPN's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

306.    As a direct and proximate result of ESPN's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

307.    ESPN's unlawful and retaliatory conduct was intentional, willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

## FOURTH CAUSE OF ACTION
### (Sex Discrimination – Hostile Work Environment Sexual Harassment)
### (Violation of Conn. Gen. Stat. § 46a-60 *et seq*.)
### (Against ESPN)

308.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

309.     The Connecticut Fair Employment Practices Act ("CFEPA") expressly prohibits employers from engaging in sexual harassment, defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature.

310.     As alleged herein, throughout the course of her employment, ESPN was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment and create a hostile or abusive working environment.

311.     As a result of ESPN's sexual harassment, Plaintiff's employment was terminated and she has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

312.     As a result, Plaintiff has suffered and continues to suffer emotional distress for which she is entitled to compensatory damages.

313.     ESPN's unlawful and retaliatory conduct was intentional, willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

### FIFTH CAUSE OF ACTION
### (Sex Discrimination – *Quid Pro Quo* Sexual Harassment)
### (Violation of Conn. Gen. Stat. § 46a-60 *et seq.*)
### (Against ESPN)

314.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

315.     Defendants' conduct constitutes *quid pro quo* sexual harassment in violation of CFEPA in that, as alleged herein, Plaintiff's supervisors linked tangible job benefits to the acceptance or rejection of sexual advances.

316.     Such unwelcomed sexual advances were unlawfully offered with the promise of mentorship and career advancement.

317.    Plaintiff's rejection of the unwanted sexual advances served as the basis for ESPN's adverse employment decisions concerning Plaintiff alleged herein.

318.    As a result, Plaintiff has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

319.    As a result of ESPN's *quid pro quo* sexual harassment, Plaintiff has suffered and continues to suffer emotional distress for which she is entitled to damages.

320.    ESPN's unlawful and retaliatory conduct was intentional, willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation – Violation of Conn. Gen. Stat. § 46a-60 *et seq*.)
### (Against All Defendants)

321.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

322.    At all relevant times, ESPN was an employer within the meaning of CFEPA.

323.    Under CFEPA, it is unlawful for an employer to discriminate against any employee with respect to sex.

324.    CFEPA prohibits an employer from expelling or otherwise discriminating against any person because such person has opposed any discriminatory employment practice.

325.    As alleged herein, Plaintiff engaged in protected activities when she objected to the unlawful, discriminatory conduct alleged herein and reported it to her supervisors.

326.    As alleged herein, Defendants were aware of these activities.

327.     As alleged herein, Defendants took adverse action and retaliated against Plaintiff based on her protected activities in violation of CFEPA by, *inter alia,* making the adverse employment decisions concerning Plaintiff alleged herein.

328.     Subsequent to and in direct connection with Plaintiff's protected activities, Defendants took the adverse actions against Plaintiff alleged herein.

329.     A causal connection exists between the protected activities and the adverse actions alleged herein.

330.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of CFEPA, Plaintiff has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

331.     Defendants' unlawful and retaliatory conduct was intentional, willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

### SEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of Conn. Gen. Stat. § 46a-60 *et seq*.)
### (Against All Defendants)

332.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

333.     Under CFEPA, it shall be a discriminatory practice for any *person*, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so.

334.     Defendants knowingly and maliciously aided, abetted, and incited the unlawful employment practices, discrimination and/or retaliation committed against Plaintiff in violation of CFEPA.

335.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

336.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

337.     Defendants' unlawful and retaliatory conduct was intentional, willful, wanton, and malicious, for which Plaintiff is entitled to punitive damages.

### EIGHTH CAUSE OF ACTION
### (Negligent Supervision Under Connecticut Law)
### (Against Defendant ESPN)

338.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

339.     ESPN knew or reasonably should have known that certain agents and/or employees alleged herein have a propensity to engage in the type of sexual-related misconduct alleged herein. Thus, ESPN had a duty to supervise such agents and/or employees.

340.     ESPN failed to supervise certain agents and/or employees alleged herein whom it had a duty to supervise.

341.     Defendant further breached its duty of care by failing to take adequate corrective measures when it was informed that Plaintiff was being sexually harassed.

342.     As a direct and proximate result of ESPN's failure to supervise, Plaintiff has suffered, and continues to suffer, monetary harm including, but not limited to, lost wages, employment opportunities, and other pecuniary damages including, but not limited to, attorneys' fees, for which she is entitled to damages.

343.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

## NINTH CAUSE OF ACTION
### (False Light)
### (Against Defendant ESPN)

344.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

345.    By stating aloud or otherwise publishing statements to third parties that intentionally or recklessly impugned Plaintiff's character, judgment and integrity.

346.    ESPN made the implications and misleading statements about Plaintiff intentionally or with reckless disregard to its offensiveness.

347.    ESPN further acted maliciously in its manufacturing and publication of the misleading statements attributed to Plaintiff.

348.    By stating aloud or otherwise issuing the statements set forth above, ESPN attempted to destroy Plaintiff's reputation and future professional and/or business opportunities.

349.    Each of ESPN's statements was maliciously intended to cast Plaintiff in a negative light and is separately actionable.

350.    As a consequence of ESPN's defamatory actions, Plaintiff has suffered the loss of professional and business opportunities and other economic damages, as well as suffered considerable distress, causing weight loss, headaches and sleeplessness.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

(a)     On the First Cause of Action, awarding Plaintiff actual damages and punitive damages, in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(b)     On the Second Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(c)     On the Third Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(d)     On the Fourth Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(e)     On the Fifth Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(f)     On the Sixth Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(g)     On the Seventh Cause of Action, awarding Plaintiff actual damages and punitive damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(h)     On the Eighth Cause of Action, awarding Plaintiff actual damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(i)     On the Ninth Cause of Action, awarding Plaintiff actual damages in a sum which is not yet known but will be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(j)    Awarding Plaintiff's counsel's reasonable attorneys' fees and costs; and

(k)    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: Greenwich, CT
        March 4, 2018

**LACHTMAN COHEN P.C.**                    **YANKWITT LLP**


 _/s/ *Brian S. Cohen*_____       _/s/ *Russell M. Yankwitt*_____
Brian S. Cohen, Esq.                       Russell M. Yankwitt, Esq.
Bar No.: CT18878                           Bar No.: CT29945
500 West Putnam Avenue, Suite 400          140 Grand Street, Suite 705
Greenwich, CT 06830                        White Plains, NY 10601
Telephone: (203) 404-4960                  Telephone: (914) 686-1500
Email: bcohen@lcpclaw.com                  Email: russell@yankwitt.com

          -and-

15 West 47th Street, Suite 1009
New York, NY 10036
Telephone: (646) 838-0275

                    *Attorneys for Plaintiff*

**VERIFICATION**

STATE OF CALIFORNIA      )

                                   )

COUNTY OF LOS ANGELES    )

      ADRIENNE J. LAWRENCE, being duly sworn, deposes and says:

      I am the plaintiff in this action. I have read the annexed *Verified Complaint* and know the

contents thereof. As to the *Verified Complaint*, each of the allegations contained in the separately

numbered paragraphs therein are true based on my own personal knowledge, except as to matters

alleged upon information and belief, and as to those matters, I believe them to be true.



A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

_____

ADRIENNE J. LAWRENCE

Sworn to before me this

4 day of March 2018

_____

Notary Public

**Carina Perry, Notary Public**



CARINA PERRY
Notary Public - California
Los Angeles County
Commission # 2166011
My Comm. Expires Oct 26, 2020

# EXHIBIT A

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Adrienne Lawrence
COMPLAINANT

vs.

ESPN, Inc.
RESPONDENT

CHRO No. 1830078

EEOC No. 16A201701577

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE:** 12/5/2017

*Tanya A. Hughes*
Tanya A. Hughes, Executive Director

Service:
Complainant: adrienne.j.lawrence@gmail.com
Respondent: Raymond.Bertrand@paulhastings.com; alexmaturi@paulhastings.com

# EXHIBIT B

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Adrienne Lawrence<br>1176 Farmington Avenue<br>West Hartford, CT 06107 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2017-01577 | Amon L. Kinsey, Jr.,<br>Supervisory Investigator | (617) 565-3189 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [X] | Other (briefly state)          Charging Party is pursuing claims in another forum. |

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Kenneth An*

JAN 2 9 2018

Enclosures(s)

**Feng K. An,**
**Area Office Director**

(Date Mailed)

cc:

**ESPN INC**
**Wendi J. Kemp, Assistant General Counsel**
**Espn Plaza**
**Bristol, CT 06010**