## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ADRIENNE J. LAWRENCE,<br><br>                     Plaintiff,<br><br>       -against-<br><br>ESPN, INC., MARGARET GREEN, in her individual and professional capacities, DONNA HRICISKO, in her individual and professional capacities, ROBERT GALLO, in his individual and professional capacities, and JOHN OBRINGER, in his individual and professional capacities,<br><br>                     Defendants. | Case No.: 3:18-CV-00383-SRU |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO ESPN, INC.'S SPECIAL MOTION TO DISMISS PLAINTIFF'S NINTH CAUSE OF ACTION PURSUANT TO CONN. GEN. STAT. § 52-196a

| **LACHTMAN COHEN P.C.** | **YANKWITT LLP** |
|---|---|
| Brian S. Cohen, Esq. | Russell M. Yankwitt, Esq. |
| Bar No.: CT18878 | Bar No.: CT29945 |
| 500 West Putnam Avenue, Suite 400 | 140 Grand Street, Suite 705 |
| Greenwich, CT 06830 | White Plains, NY 10601 |
| Telephone: (203) 404-4960 | Telephone: (914) 686-1500 |

-and-

15 West 47th Street, Suite 1009
New York, NY 10036
Telephone: (646) 838-0275

*Attorneys for Plaintiff*

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

FACTUAL ALLEGATIONS RELEVANT TO THIS MOTION ..................................3

ARGUMENT .............................................................................................................6

I.   Connecticut's Anti-SLAPP Statute Is a Procedural Statute That is Not
     Applicable in Federal Court ...........................................................................6

     A.  Connecticut's Anti-SLAPP Statute ..........................................................6

     B.  Connecticut's Anti-SLAPP Statute is a State Procedural Law ...................7

     C.  Connecticut's Anti-SLAPP Statute is a State Procedural Law
         That Directly Conflicts with the Federal Rules of Civil Procedure ............8

         1.  Applicable Legal Principles .............................................................8

         2.  This Court Should Join the Emerging Trend Among Federal Courts
             and Hold That Connecticut's Anti-SLAPP Statute Is Procedural
             and Inapplicable in Federal Court ...................................................11

         3.  Decisions of Federal Courts That Have Applied State Anti-SLAPP
             Pre-Trial Dismissal Provisions Do Not Warrant a Different Result ....14

II.  ESPN Is Not Entitled to Anti-SLAPP Protection ..........................................16

     A.  The Fake Texts Do Not Relate to a Matter of Public Concern ..................17

         1.  Ms. Lawrence Was Not a Public Figure .......................................... 17

         2.  ESPN's Fake Texts Were Not Published in Connection With a
             Matter of Public Concern and Were Not Related to Community
             Well-Being or Public Health or Safety ............................................20

     B.  ESPN's Fake Texts Are Not Protected by its Right to Petition the Government ........22

III. Ms. Lawrence Demonstrates That There Is Probable Cause That She Will
     Prevail on the Merits of Her False Light Claim ..............................................24

     A.  Applicable Legal Principles ....................................................................24

     B.  ESPN's Publication of the Fake Texts Constitutes the Public Dissemination
         of a Falsehood .......................................................................................25

C.   ESPN's Publication of the Fake Texts Was Directed to the Public ............................29

D.   ESPN's Publication of the Fake Texts Would Be Highly Offensive To a Reasonable Person .............................................................................................29

E.   ESPN Intentionally Published the Fake Texts ............................................31

F.   In This Case, ESPN Was Not Acting as a Media Company .......................................32

G.   ESPN Misconstrues the Allegations Concerning the Third-Party Tweets .................33

CONCLUSION ....................................................................................................................34

## TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
   783 F.3d 1328 (D.C. Cir. 2015) ............................................................. 12, 13, 14, 15

*Agosto v. Correctional Officers Benevolent Ass'n*,
   107 F. Supp. 2d 294 (S.D.N.Y. 2000)...................................................................... 21

*Allder v. American Airlines, Inc.*,
   No., H 81-915, 1982 U.S. Dist. LEXIS 14613 (D. Conn. Aug. 24, 1982) ............... 10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................. 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................. 9

*Backman v. Hibernia Holdings*,
   96 Civ. 9590 (LAP), 1998 U.S. Dist. LEXIS 11571 (S.D.N.Y. Jul. 27, 1998) .......... 8

*Barth v. Mokena*,
   No. 03-C-6677, 2004 U.S. Dist. LEXIS 2789 (N.D. Ill. Feb. 24, 2004) ............ 20, 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................. 9

*Blanchard v. Steward Carney Hosp., Inc.*,
   477 Mass. 141 (2017) ............................................................................................. 24

*Block v. Tanenhaus*,
   867 F.3d 585 (5th Cir. 2017) ................................................................................... 15

*Brown v. Office of State Comptroller*,
   211 F. Supp. 3d 455 (D. Conn. 2016)....................................................................... 9

*Burke v. Also Cornerstone*,
   3:07-CV-889 (MRK), 2007 U.S. Dist. LEXIS 76662 (D. Conn. 2007) ................... 22

*Burlington N. R.R. Co. v. Woods*,
   480 U.S. 1 (1987)...................................................................................................... 8

*Button v. Kibby-Brown*,
   146 F.3d 526 (7th Cir. 1998) ................................................................................... 21

*Chenensky v. New York Life Ins. Co.*,
   07-CV-11504, 2012 U.S. Dist. LEXIS 8986 (S.D.N.Y. Jan. 10, 2012) ...................................... 7

*Contemporary Mission, Inc. v. New York Times Co.*,
   842 F.2d 612 (2d Cir. 1988) .................................................................................................... 19

*Corrado v. New York State Unified Court Sys.*,
   2014 U.S. Dist. LEXIS 130453 (E.D.N.Y. Sep. 15, 2014) ...................................................... 20

*Decker v. Martin*,
   No. MMXCV096000884S, 2010 Conn. Super. LEXIS 168 (Conn. Super. Ct. Jan. 19, 2010). 28

*Deutsch v. Backus Corp.*,
   No. CV106004265, 2011 Conn. Super. LEXIS 70 (Conn. Super. Ct. Jan. 14, 2011) .............. 28

*Duryea v. Guarnieri*,
   564 U.S. 379 (2011) ................................................................................................................. 23

*Erie R.R. Co. v. Thompkins*,
   304 U.S. 64 (1938) ..................................................................................................................... 7

*Ernst v. Carrigan*,
   814 F.3d 116 (2d Cir. 2016) .................................................................................................... 16

*Ernst v. Kauffman*,
   50 F. Supp. 3d 553 (D. Vt. 2014) ............................................................................................ 16

*Fabbrini v. City of Dunsmuir*,
   544 F. Supp. 2d 1044 (E.D. Cal. 2008) ................................................................................... 23

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................................................................................ 18, 19

*Godin v. Schencks*,
   629 F.3d 79 (1st Cir. 2010) ........................................................................................... 14, 15, 16

*Goodrich v. Waterbury Republican-Am., Inc.*,
   188 Conn. 107 (1982) ..................................................................................................... 24, 30, 31

*Hammond v Lovings*, 5:15-CV-00579-RP,
   2016 U.S. Dist. LEXIS 187597 (W.D. Tex. May 25, 2016) .................................................... 21

*Handler v. Arends*,
   No. 0527732 S, 1995 Conn. Super. LEXIS 660 (Conn. Super. Ct. Mar. 1, 1995) .................. 25

*Hanna v. Plumer*,
   380 U.S. 460 (1965) ............................................................................................................... 7, 8

*Haywood v. St. Michael's Coll.,*
  536 F. App'x 123 (2d Cir. 2013) ................................................................. 15, 16

*Henry v. Lack Charles American Press, LLC,*
  566 F.3d 164 (5th Cir. 2009) ............................................................... 14, 15, 16

*In re Gawker Media LLC,*
  571 B.R. 612 (S.D.N.Y. Aug. 21, 2017)................................................................. 13

*Intercon Solutions, Inc. v. Basel Action Network,*
  791 F.3d 729 (7th Cir. 2015) ..................................................................... 8, 12

*Jenkins v. Miller*,
  No. 2:12-cv-184, 2017 U.S. Dist. LEXIS 160793 (D. Vt. Sep. 29, 2017) ............................... 16

*Kelly v. Schmidberger,*
  806 F.2d 44 (2d Cir. 1980)........................................................................ 10

*Leeds v. Meltz,*
  85 F.3d 51 (2d Cir. 1996)......................................................................... 9

*Lennon v. Dolce Vida Med. Spa,*
  2015 Conn. Super. LEXIS 294 (Conn. Super. Ct. Feb. 10, 2015)........................................ 22

*Lerman v. Flynt Distributing Co.,*
  745 F.2d 123 (2d Cir. 1984)....................................................................... 18

*Liberty Synergistics Inc. v. Microflo Ltd.,*
  718 F.3d 138 (2d Cir. 2013)................................................................... 15, 16

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.,*
  885 F.3d 659 (10th Cir. 2018) .................................................................... 11

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
  No. 15-CV-0547, 2016 U.S. Dist. LEXIS 193460 (D.N.M. Feb. 17, 2016) ............................... 15

*Lozovyy v. Kurtz,*
  813 F.3d 576 (5th Cir. 2015) ..................................................................... 15

*Maietta v. Constr., Inc. v. Wainwright,*
  2004 ME 53 (2004)................................................................................. 23

*Makaeff v. Trump Univ., LLC,*
  715 F.3d 254 (9th Cir. 2013) ................................................................... 7, 14

*Makaeff v. Trump Univ., LLC,*
  736 F.3d 1180 (9th Cir. 2013) .................................................................... 14

*Martin v. Hearst Corp.*,

   777 F.3d 546 (2d Cir. 2015)...................................................................................... 25

*Mathiew v. Subsea 7 (US) LLC*,

   No. 4:17-CV-3140, 2018 U.S. Dist. LEXIS 50647 (S.D. Tex. Mar. 9, 2018 ........................... 13

*McDonald v. Smith*,

   472 U.S. 479 (1985)................................................................................................ 23

*McKee v. Cosby*,

   874 F. 3d 54 (1st Cir. 2017) ..................................................................................... 19

*Norton v. Breslin*,

   565 F. App'x 31 (2d Cir. 2014) ................................................................................. 20

*Packingham v. North Carolina*,

   137 S. Ct. 1730 (2017)............................................................................................. 17

*Perks v. Town of Huntington*,

   251 F. Supp. 2d 1143 (E.D.N.Y. 2003) .................................................................... 19

*Piscottano v. Town of Somers*,

   396 F. Supp. 2d 187 fn. 13 (D. Conn. 2005) .............................................................. 6

*Rudkin v. Roger Beasley Imports, Inc.*,

  No. A-17-CV-849-LY, 2017 U.S. Dist. LEXIS 212419 (W.D. Tex. Dec. 28, 2017.......... 13, 15

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,

   559 U.S. 393 (2010)................................................................................. 8, 11, 12, 14

*Strada v. Connecticut Newspapers, Inc.*,

   193 Conn. 313 (1984) .............................................................................................. 25

*Tiltti v. Weise*,

   155 F.3d 596 (2d Cir. 1998)..................................................................................... 20

*Time, Inc. v. Firestone*,

   424 U.S. 448 (1975) ................................................................................................ 18

*United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*,

   190 F.3d 963 (9th Cir. 1999) ..................................................................... 13, 14, 15, 16

*Unity Healthcare, Inc. v. County of Hennepin*,

   308 F.R.D. 537 (D. Minn. 2015)........................................................................... 13, 14

*Wolston v. Reader's Digest Assn., Inc.*,

   443 U.S. 157 (1979) ................................................................................................ 18

## Statutes

42 U.S. Code § 2000e–8(b) ........................................................................ 22

Conn. Gen. Stat. § 52-196a ..................................................................... 1, 6

Conn. Gen. Stat. § 52-196a(a)(2) ............................................................ 17

Conn. Gen. Stat. § 52-196a(b) .................................................................. 22

Conn. Gen. Stat. § 52-196a(b)(e)(3) ........................................................... 6

Conn. Gen. Stat. § 52-196a(e)(2) ............................................................. 11

Conn. Gen. Stat. § 52-196a(h) .................................................................... 8

## Rules

Fed. R. Civ. P. 8 .................................................................................. 9, 10

Fed. R. Civ. P. 9(b) ................................................................................. 10

Fed. R. Civ. P. 12 ........................................................................ 12, 13, 14

Fed. R. Civ. P. 12(b)(6) ....................................................................... 9, 14

Fed. R. Civ. P. 56 ........................................................................ 11, 13, 15

Fed. R. Civ. P. 56(a) ............................................................................... 11

N.Y. C.P.L.R. § 3213 ............................................................................... 8

## Regulations

29 CFR 1601.76 ...................................................................................... 23

29 CFR 1601.77 ...................................................................................... 22

## PRELIMINARY STATEMENT

Plaintiff Adrienne Lawrence is a former ESPN anchor and legal analyst who worked for the company from August 2015 to August 2017. In this action, Ms. Lawrence alleges that throughout her tenure with ESPN, she was subjected to misogynistic treatment, a hostile work environment, and sexual harassment by male colleagues, including John Buccigross. The senior *SportsCenter* anchor pursued Ms. Lawrence romantically under the guise of mentorship before sending her inappropriate text messages and unsolicited half-naked photos of himself.

After Ms. Lawrence tactfully rejected Buccigross's advances, he "marked his territory" by spreading a false rumor throughout ESPN that they were intimate, suggesting she was "sleeping her way to the top" and that her advancement was based on a sexual relationship with a senior anchor. Unwilling to stand by silently, Ms. Lawrence reported Buccigross's misconduct to her supervisors and Human Resources. But instead of investigating the matter, ESPN retaliated against Ms. Lawrence by marginalizing her, denying her career opportunities, and terminating her employment.

Shortly thereafter, Ms. Lawrence filed a discrimination charge against ESPN with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO"). On December 5, 2017, the CHRO issued a Release of Jurisdiction, and because the CHRO is an EEOC-classified Fair Employment Practices Agency and Ms. Lawrence's discrimination claims were within the EEOC's purview, *on that date*, the CHRO adjudicated the claims for both agencies, the proceeding was terminated, and Ms. Lawrence's administrative remedies were exhausted.

On December 14, 2017, the BOSTON GLOBE released an exposé on ESPN's misogynistic culture and cited several women's accounts, including the allegations in Ms. Lawrence's CHRO charge about Buccigross and the subsequent retaliation. The exposé included ESPN's and

Buccigross's denials of her CHRO charge, but that evening, ESPN went out of its way to attack solely Ms. Lawrence by publishing, on its public relations website, strategically-altered text messages between Ms. Lawrence and Buccigross that substantially omitted material texts supporting Ms. Lawrence's CHRO charge, including the unwanted topless photos sent by Buccigross, to make it falsely appear that *Ms. Lawrence* hounded and pursued *Buccigross* and had lied to support her CHRO charge ("Fake Texts"). ESPN's attempt to place Ms. Lawrence in a false light was successful; it provoked hatred toward her and garnered support for Buccigross, and indeed, the public's reaction to Ms. Lawrence was punitive.

The following evening, the BOSTON GLOBE published the complete set of texts in chronological order. CNN, YAHOO SPORTS and AWFUL ANNOUNCING also noted that ESPN omitted material texts, but it was too late, as the damage to Ms. Lawrence's reputation was done.

The foregoing allegations give rise to Ms. Lawrence's Ninth Cause of Action (False Light), which ESPN seeks to dismiss pursuant to Connecticut's anti-SLAPP law – a statute that provides a procedure for quickly ending costly, speech-chilling litigation brought by private interests against citizens who attempt to participate in matters of public concern (*i.e.*, Strategic Litigation Against Public Participation).

ESPN's motion should be denied for several reasons:

***First***, as a threshold matter, Connecticut's anti-SLAPP law is inapplicable in federal court because the statute is procedural and directly conflicts with the Federal Rules of Civil Procedure. The Court should follow the majority of federal courts that have adjudicated these motions, hold that Connecticut's statute is not applicable in this Court, and deny this motion without further inquiry.

*Second*, even if the Court holds that Connecticut's anti-SLAPP law applies, ESPN's motion should still be denied. ESPN cannot show by a preponderance of the evidence that Ms. Lawrence's false light claim arises from ESPN's exercise of its right to free speech or to petition the government in connection with a matter of public concern because: (i) Ms. Lawrence was not a public figure; (ii) the Fake Texts were not published in connection with a matter of public concern because they were not related to community well-being or public health and safety; and (iii) the Fake Texts were not protected by ESPN's right to petition the government because when the Fake Texts were published, the CHRO proceeding had been terminated.

*Third*, Ms. Lawrence can demonstrate probable cause that she will prevail on the merits, as ESPN's publication of the Fake Texts constitutes the intentional dissemination of a falsehood, to the public, that portrayed Ms. Lawrence in a highly offensive manner.

Accordingly, for the reasons set forth below, ESPN's motion should be denied.

## FACTUAL ALLEGATIONS RELEVANT TO THIS MOTION

In August 2017, based on Defendants' alleged sexual harassment and retaliation against her, Ms. Lawrence filed a charge of discrimination ("Charge") with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO"), a federally recognized Fair Employment Practice Agency. Pursuant to its Worksharing Agreement with the EEOC, the Charge was dual-filed with the EEOC. ¶ 34. In that proceeding, Ms. Lawrence made allegations concerning the unlawful treatment to which *only she* was subject at ESPN, providing details concerning only her experience with John Buccigross, a senior *SportsCenter* anchor. *See* Declaration of Brian S. Cohen ("Cohen Decl.") Exh. 1 (Charge).

On December 5, 2017, CHRO issued a Release of Jurisdiction. In January 2018, the EEOC issued a Right to Sue Letter (¶¶ 35-36), but as explained below, when CHRO issued a

Release of Jurisdiction, the EEOC considered it final and the administrative proceedings were concluded. *See infra* at 21-24.

On December 14, 2017 – *after* the CHRO proceeding had concluded – the BOSTON GLOBE released an exposé providing several women's accounts of ESPN's culture of misogyny, including a range of experiences from sexual harassment to pregnancy discrimination ("Globe Report"). ¶ 271 (citing ¶¶ 18-21, 57, 94-95). *See* Cohen Decl. Exh. 2 (Globe Report). The Globe Report also covered Ms. Lawrence's Charge, including the alleged harassment by Buccigross and ESPN's subsequent retaliation. *See id.*

That evening, ESPN completely departed from its prior statement that Buccigross was only providing "mentorship" and attempted to romanticize his association with Ms. Lawrence. ¶ 272. ESPN attacked Ms. Lawrence by substantially altering and materially omitting texts Buccigross sent her to make it falsely appear that *she* pursued and hounded *him*, that they were romantically involved, and that he did not send her unsolicited half-naked photos of himself, as the Globe Report had said. *Id.* Cohen Decl. Exh. 3 ("Fake Texts"). The Fake Texts appear to have been cut-and-pasted and copied to look like an unedited stream. *Id.* But in reality, the discourse portrayed differed substantially from the correct copy of Buccigross's texts with Ms. Lawrence ("Real Texts") (Cohen Decl. Exh. 4).

For example, as the Real Texts show, the Fake Texts omit, among others: (i) Buccigross conceding his misconduct and saying he will stop harassing Ms. Lawrence; (ii) Buccigross sending a topless photo of himself to Ms. Lawrence, being told he needs to wear clothes, and then sending *another* even more revealing topless photo; (iii) Buccigross extracting photos of Ms. Lawrence from her social media accounts and resending them to her with heart-faced emoji's; (iv) requests by Buccigross to get together outside of work; (v) Buccigross telling Ms.

Lawrence he was fantasizing about her; (vi) Buccigross referring to Ms. Lawrence as "doll" and "beauty"; and (vii) Buccigross referring to himself as a "white boy" who is "jacked" and a "blue eyed hunk" and offering to oil himself up like the "flag bearer from Tonga." *Id.*

After intentionally omitting these material communications, ESPN published the Fake Texts via its corporate public relations website, ESPN Media Zone, as opposed to ESPN.com, on which it reports news. ¶ 273. ESPN first placed a link reading "attached portions of text messages" that led to a .pdf of the Fake Texts and then below placed a link reading "Text Messages" suggesting that said link directed users to the complete text exchange. But *both* links directed users to the exact same document – the Fake Texts. ¶¶ 273-74. Cohen Decl. Exh. 5 (ESPN MediaZone).

In addition, ESPN subsequently took advantage of the fake social media accounts and bots it allegedly uses to promote its shows and on-air talent ("Fake Accounts") to provoke hatred toward Ms. Lawrence and to garner support for Buccigross. ¶¶ 275-76. Some of the Fake Accounts were created the same day that ESPN's Fake Texts were published, and they tweeted only at Ms. Lawrence. Cohen Decl. Exh. 6 (Fake Accounts). As a result, Ms. Lawrence received a barrage of threats and attacks on social media and friends and colleagues distanced themselves from her personally and professionally. ¶ 277.

On the evening of December 15, 2017, the BOSTON GLOBE published the Real Texts, but the damage was already done. ¶ 278. Ms. Lawrence continued to receive threats in reaction to ESPN's Fake Texts that placed her in a false light. ¶¶ 278-80.

Ms. Lawrence continues to receive threats and has also lost professional and other business opportunities as a result. ¶ 281.

## ARGUMENT

I.   **Connecticut's Anti-SLAPP Statute Is a Procedural Statute
     That is Not Applicable in Federal Court**

    A.    **Connecticut's Anti-SLAPP Statute**

A Strategic Lawsuit Against Public Participation ("SLAPP") is "brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff." *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 198 fn. 13 (D. Conn. 2005). SLAPP suits are "typically filed to delay and to punish activists by imposing litigation costs on them for exercising their constitutional right to speak and petition the government for redress of grievances, rather than to prevail on the suit." *Id. See also* George W. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 Pace Envt'l L. Rev., 3, 5-6, 8 (1989) ("[W]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPPs are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.").

Many states, most recently Connecticut, have enacted anti-SLAPP laws to provide a remedy from, and an early resolution of, SLAPP suits. Effective January 1, 2018, pursuant to Conn. Gen. Stat. § 52-196a, a defendant may make a "special motion to dismiss" claims that are subject to the statute's coverage. The motion automatically stays discovery and shall be granted if: (i) the movant makes an initial showing, by a preponderance of evidence, that the claim arises from its exercise of its right to free speech or petition the government in connection with a matter of public concern; *and* (ii) the party asserting the claim fails to demonstrate that there is probable cause that it will prevail on the merits of the claims. § 52-196a(b)(e)(3). *See* Cohen Decl. Exh. 7 (Connecticut's anti-SLAPP statute).

As shown below, Connecticut's anti-SLAPP statute is a procedural law that directly conflicts with the Federal Rules of Civil Procedure. This Court should follow the majority of federal courts faced with a special motion to dismiss under state anti-SLAPP law, hold that Connecticut's statute is not applicable in federal court, and deny ESPN's motion.

### B.    Connecticut's Anti-SLAPP Statute is a State Procedural Law

The *Erie* doctrine requires federal courts sitting in diversity to apply federal procedural law and state substantive law. *See Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938). *See also Hanna v. Plumer*, 380 U.S. 460, 473 (1965) ("*Erie* and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules."). Where there is a valid and relevant Federal Rule available, "[f]ederal courts must ignore state rules of procedure because it is Congress that has plenary authority over the procedures employed in federal court, and this power cannot be trenched upon by the states." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 275 (9th Cir. 2013) (citing *Erie*, 304 U.S. at 78).

Further, *Erie* applies equally to courts, like this one, exercising supplemental jurisdiction over state law claims in a federal question case. *See Chenensky v. New York Life Ins. Co.,* 07-CV-11504, 2012 U.S. Dist. LEXIS 8986, *6 (S.D.N.Y. Jan. 10, 2012) ("The *Erie* analysis … applies to courts exercising supplemental jurisdiction as well as those exercising diversity jurisdiction.").

Connecticut's anti-SLAPP statute is incontrovertibly a procedural device both in *form*, as the legislature itself labeled the statute a "Court procedure" and it is codified as a subsection of Connecticut's "Court Practice and Procedure," and in *substance*, as the statute:

- enables a party to file a pre-trial motion to dismiss claims subject to its coverage;

- establishes time limits for the filing of and a hearing on such motions;

- mandates a stay of discovery upon the filing of a special motion to dismiss;

- sets pleading standards governing the motion;

- provides sanctions for parties who bring a frivolous claim or motion; and

- provides that the Court's findings or determinations "shall not be admitted into evidence at any later stage of the proceeding or in any subsequent action."

The statute further provides that it "shall not … affect the substantive law governing any asserted claim" or "create a private right of action." *See* § 52-196a(h). It creates no substantive rule of Connecticut law and its sole purpose is to provide a procedural mechanism for vindicating existing rights.

In sum, in this Court, the applicability of Connecticut's anti-SLAPP law is governed by *Erie* and its progeny. For the reasons set forth below, the statute directly conflicts with the Federal Rules and cannot form the basis of a motion to dismiss in federal court.

### C.   Connecticut's Anti-SLAPP Statute is a State Procedural Law That Directly Conflicts with the Federal Rules of Civil Procedure

#### 1.   Applicable Legal Principles

When a Federal Rule and a state law both appear to govern a question in federal court, the Court must determine if the state procedure "answers the same question" as the Federal Rule. *See Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987); *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 398-99 (2010) (citing *Hanna*, 380 U.S. at 463-64).

If they do, "[f]ederal rules prevail in federal court." *Intercon Solutions, Inc. v. Basel Action Network*, 791 F.3d 729, 731-32 (7th Cir. 2015) (citations omitted). *See Backman v. Hibernia Holdings*, 96 Civ. 9590 (LAP), 1998 U.S. Dist. LEXIS 11571, *12 n.5 (S.D.N.Y. Jul.

27, 1998) ("A [N.Y. C.P.L.R. §] 3213 motion is obviously unavailable in federal court, where the Federal Rules of Civil Procedure govern procedural matters such as motion practice.").

Here, Connecticut's anti-SLAPP statute, which mandates the application of different pleading standards and different procedures for discovery and disposing of an action before trial, directly conflicts with Federal Rules 8, 12, and 56. Accordingly, the Federal Rules must govern in this federal action and the anti-SLAPP cannot be applied.

Federal Rules 8 and 12 govern the pre-discovery standards for testing the legal sufficiency of a pleading. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Under Rule 8, a plaintiff only has to demonstrate a *plausible* claim for relief to survive dismissal, and this "plausibility" standard "does not impose a probability requirement." *Id.* at 556.

If a defendant believes that the plaintiff fails to meet this requirement, it may move to dismiss for failure to state a claim pursuant to Rule 12(b)(6). This rule is designed "merely to assess the legal feasibility of a complaint, ***not to assay the weight of evidence*** which might be offered in support thereof." *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 460 (D. Conn. 2016) (Underhill, J.) (quotation omitted) (emphasis added). When deciding a 12(b)(6) motion, "the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief." *Brown,* 211 F. Supp. 3d at 460-61 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Twombly*, 550 U.S. at 555-56; *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)).

Further, "[u]nder *Twombly*, '[f]actual allegations must be enough to raise a right to relief above the speculative level,' and assert a cause of action with enough heft to show entitlement to

relief and 'enough facts to state a claim to relief that is plausible on its face.'" *Brown*, 211 F. Supp. 3d at 461 (quoting *Twombly*, 550 U.S. at 570; citing *Iqbal*, 556 U.S. at 679).

Against this backdrop, Connecticut's anti-SLAPP statute directly collides with the Federal Rules in several respects:

***First***, it directs that, when ruling on a special motion to dismiss, the Court "shall" go outside the pleadings and consider "supporting and opposing affidavits of the parties attesting to the facts upon which liability or a defense, as the case may be, is based." § 52-196a(e)(2).

***Second***, it sets a higher pleading standard than Rule 12(b)(6), as it requires the plaintiff to "demonstrate[] to the court that there is *probable cause*, considering all valid defenses, *that the party will prevail on the merits* of the complaint, counterclaim or cross claim." § 52-196a(e)(3) (emphasis added).

***Third***, it also heightens the pleading standard for defamation and false light claims. Under the statute, a plaintiff must "set[] forth *with particularity* the circumstances giving rise to [the claim]." § 52-196a(e)(3) (emphasis added). In other words, the statute subjects these claims to the heightened pleading requirements of Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

In federal court, however, "the mode of pleading defamation is governed by Rule 8, Fed. R. Civ. P., which requires only that plaintiff's charges be set forth in a short and concise statement, detailed only to the extent necessary to enable defendant to respond and to raise the defense of res judicata if appropriate. The pleading of additional evidence is not only unnecessary, but in contravention of proper pleading procedure." *Allder v. American Airlines, Inc.*, No. H 81-915, 1982 U.S. Dist. LEXIS 14613, *3 (D. Conn. Aug. 24, 1982) (citations

omitted). *Accord Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1980) ("Because in federal diversity cases such as this, procedural matters are governed by the Federal Rules of Civil Procedure, 'the mode of pleading defamation is governed by [Rule 8].'") (citation omitted).

*Fourth*, the statute conflicts with Rule 56, which sets the standard for resolving a case on the merits, but only where there exists "no genuine issue of material fact." Fed. R. Civ. P. 56(a). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained that the ability to conduct discovery prior to a Rule 56 motion is presumed, noting that "summary judgment [must] be refused where the non-moving party has not had the opportunity to discover information that is essential to his opposition." *Id.* at 250 n.5. *See Shady Grove*, 559 U.S. at 404 (pleading standards and rules governing summary judgment are "addressed to procedure.").

By contrast, Connecticut's anti-SLAPP law stays discovery until a decision on the motion is finalized (*see* § 52-196a(d)), yet the Court "shall consider pleadings and supporting and opposing affidavits of the parties attesting to the facts upon which liability or a defense … is based" (*see* § 52-196a(e)(2)). This would force plaintiffs to prove the merits of their claims without "the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250.

Accordingly, since the procedural mechanisms of Connecticut's anti-SLAPP statute's special motion to dismiss directly collide with Rules 8, 12 and 56, this Court should not apply it and ESPN's special motion to dismiss should be denied.

### 2. This Court Should Join the Emerging Trend Among Federal Courts and Hold That Connecticut's Anti-SLAPP Statute Is Procedural and Inapplicable in Federal Court

Since *Shady Grove*, numerous federal courts have held that state anti-SLAPP statutes and are inapplicable in federal court because they conflict with the Federal Rules.

11

For example, in *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659 (10th Cir. 2018), the Tenth Circuit affirmed a district court's decision denying the application of New Mexico anti-SLAPP law where "[t]he plain language of the New Mexico anti-SLAPP statute reveals the law is nothing more than a *procedural* mechanism designed to expedite the disposal of frivolous lawsuits aimed at threatening free speech rights." *Id.* at 668-73 (emphasis in original). Like the Connecticut law, the New Mexico law "sets forth no rule(s) of substantive law," but rather, demands expedited procedures for these cases and provides procedural fee shifting. *See id.*

Likewise, in *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015), the D.C. Circuit ruled that the D.C.'s anti-SLAPP law's special motion to dismiss conflicts with and 56 and does not apply in federal court under *Shady Grove*. *Id.* at 1334. The court's reasoning, which has been adopted by several federal courts, is highly instructive:

> Federal Rules of Civil Procedure 12 and 56 "answer the same question" about the circumstances under which a court must dismiss a case before trial. And those Federal Rules answer that question differently: They do not require a plaintiff to show a likelihood of success on the merits. That difference matters. Under the Federal Rules, a plaintiff is entitled to trial if he or she meets the Rules 12 and 56 standards to overcome a motion to dismiss or for summary judgment. But the D.C. Anti-SLAPP Act nullifies that entitlement in certain cases. Under the D.C. Anti-SLAPP Act, the plaintiff is *not* able to get to trial just by meeting those Rules 12 and 56 standards. The D.C. Anti-SLAPP Act, in other words, conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial.

*Id.* at 1333-34 (disagreeing with decisions that applied state anti-SLAPP acts' pretrial dismissal provisions to state law claims in federal court pre-*Shady Grove*) (emphasis in original).

Here, the Connecticut statute also sets up "an additional hurdle" to get to trial.

Similarly, in *Intercon Solutions, Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015), the Seventh Circuit held that Washington State's anti-SLAPP law was inapplicable in

federal court after that state's highest court interpreted that law as going beyond the summary judgment procedure and violating the right to a jury trial by requiring a judge to make factual findings. *See id.* at 731-32.

Indeed, numerous federal district courts have joined the emerging jurisprudential trend.

For example, in *Mathiew v. Subsea 7 (US) LLC*, No. 4:17-CV-3140, 2018 U.S. Dist. LEXIS 50647 (S.D. Tex. Mar. 9, 2018), the Southern District of Texas held that Texas's anti-SLAPP statute's "procedural mechanisms … must yield to the Federal Rules of Civil Procedure" where the statute's "preponderance of the evidence" standard and provision allowing the court to look beyond the pleadings and consider affidavits conflicts with Rules 12(b)(6) and 56. *See id.* at \*18-21. *See also Rudkin v. Roger Beasley Imports, Inc.,* No. A-17-CV-849-LY, 2017 U.S. Dist. LEXIS 212419, \*15-16 (W.D. Tex. Dec. 28, 2017) (Texas's anti-SLAPP statute "is a procedural statute and thus not applicable in federal court.").

And in *Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537, 541-43 (D. Minn. 2015), the District of Minnesota denied a special motion to dismiss because Minnesota's anti-SLAPP law and Rule 56 "collide[] head-on" and "cannot be brought into harmony." *Id.* at 541-42. The court held that "Minnesota's anti-SLAPP law turns judges into pre-trial factfinders who must decide factual disputes by assessing credibility and weighing evidence" and that "they must do so without drawing inferences in favor of the nonmoving party" – a standard that "is anathema to the standard under Rule 56." *Id.* at 542 (citing *Abbas*, 783 F.3d at 1334). *Accord In re Gawker Media LLC*, 571 B.R. 612, 632-33 (S.D.N.Y. Aug. 21, 2017) (holding that even if California's anti-SLAPP law is deemed substantive, it is inapplicable in federal court because special motion procedures conflict with Rules 12 and 56).

### 3. Decisions of Federal Courts That Have Applied State Anti-SLAPP Pre-Trial Dismissal Provisions Do Not Warrant a Different Result

A few circuit courts have held that a state's anti-SLAPP law applies in federal court in diversity cases. But those rulings have been highly criticized and deemed not persuasive by other federal courts. For example, in *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999), the Ninth Circuit held that California's anti-SLAPP law applies in federal court, reasoning that "[the statute] and Rules 8, 12, and 56 'can exist side by side ... each controlling its own intended sphere of coverage without conflict.'" *Id.* at 973 (citation omitted).

But since then, then-Chief Judge Kozinski has urged the Ninth Circuit to abandon *Newsham*, calling the decision "a big mistake" and reasoning that "[f]ederal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules, our jurisdictional statutes and Supreme Court interpretations thereof." *Makaeff*, 715 F.3d at 275 (Kozinski, C.J., concurring). Judge Kozinski further reasoned: "Two other circuits [the First in *Godin, infra,* and the Fifth in *Henry, infra*] have foolishly followed [*Newsham*]. I've read their opinions and find them no more persuasive than *Newsham* itself. It's time we led the way back out of the wilderness." *Id. See also Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing *en banc*) ("[Rules 12 and 56] establish the exclusive criteria for testing the legal and factual sufficiency of a claim in federal court … California's anti-SLAPP statute impermissibly supplements the Federal Rules' criteria for pre-trial dismissal of an action.") (citation omitted).

Further, in *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010), the First Circuit held that Maine's anti-SLAPP law applies in federal court, reasoning that "Rules 12 (particularly Rule 12(b)(6)) and 56 do not control" motions under the anti-SLAPP law and that "the dual purposes

14

of *Erie* are best served by enforcement of Section 556 in federal court." *Id.* at 86-87. But since then, numerous courts have followed Judge Kozinski's reasoning and rejected *Godin*. *See, e.g., Unity Healthcare, Inc.,* 308 F.R.D. at 551 ("This Court concludes that the conclusion in *Godin* is based on a misapplication of *Shady Grove*."); *Abbas*, 783 F.3d at 1335-36 ("[W]e agree with Judge Kozinski and Judge Watford that [*Godin*, *Henry*, and *Newsham*] are ultimately not persuasive.") (citations omitted); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, No. 15-CV-0547, 2016 U.S. Dist. LEXIS 193460, *7-11 (D.N.M. Feb. 17, 2016) (rejecting *Newsham* and *Godin*).

Likewise, the Fifth Circuit's decision in *Henry v. Lack Charles American Press, LLC*, 566 F.3d 164 (5th Cir. 2009), is not persuasive. In *Henry*, the court stated, without explanation or analysis, that "Louisiana law, including the nominally-procedural Article 971, governs this diversity case." *Id.* at 168-69. Subsequently, other Fifth Circuit panels have questioned *Henry*. *See, e.g., Block v. Tanenhaus,* 867 F.3d 585, 589 (5th Cir. 2017) ("[t]he applicability of state anti-SLAPP statutes in federal court is an important and unresolved issue in this circuit"); *Lozovyy v. Kurtz*, 813 F.3d 576, 582-83 (5th Cir. 2015) (*Henry* merely assumed application of Louisiana statute in federal court and failed to address potential conflict with Rule 56; decision granting motion to strike under anti-SLAPP statute reversed). *See also Abbas*, 783 F.3d at 1335-36 (rejecting *Henry*); *Rudkin,* 2017 U.S. Dist. LEXIS 212419 at *9 fn.1 (Texas's anti-SLAPP law "is a procedural statute and thus not applicable in federal court.").

As Judge Kozinski noted, the First and Fifth Circuits "foolishly" followed *Newsham*.

Finally, ESPN's reliance upon certain cases, erroneously referred to as "the majority rule" (Br. at 6), is misplaced. In *Haywood v. St. Michael's Coll.*, 536 F. App'x 123 (2d Cir. 2013), the Court held that "we need not consider, *inter alia*, whether the district court properly

applied the anti-SLAPP, as Haywood has waived any arguments on appeal relating to that issue." *Id.* at 124. *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013), is also inapplicable because the Second Circuit subsequently "emphasized the narrowness of [its] *Liberty Synergistics* decision" as "it is 'concerned only with the immediate appealability of an order that a state anti-SLAPP statute does not apply at all to a federal diversity case where the suit is transferred to a federal court in another state and the cause of action is governed by that other state's law.'" *Ernst v. Carrigan*, 814 F.3d 116, 122 (2d Cir. 2016) (citing *Liberty Synergistics*, 718 F.3d at 150 n. 11).

And with *Ernst v. Kauffman*, 50 F. Supp. 3d 553 (D. Vt. 2014), ESPN fares no better. In a later decision by the District of Vermont, the court noted that in *Kauffman* and *Haywood*, it applied Vermont's anti-SLAPP law's procedural scheme to state law claims in federal court but held that "Plaintiff provide[d] persuasive arguments for reconsidering that tradition in this District." *Jenkins v. Miller*, No. 2:12-cv-184, 2017 U.S. Dist. LEXIS 160793, *107 (D. Vt. Sep. 29, 2017) (denying motion because defendants failed to show that anti-SLAPP law applied to plaintiff's claim).

This Court should join the emerging trend, reject *Newsham*, *Godin*, and *Henry,* and hold that Connecticut's anti-SLAPP law is inapplicable in federal court and runs afoul of *Erie* because it is procedural and conflicts with the Federal Rules.

Accordingly, ESPN's anti-SLAPP motion is not properly before this Court and should be denied without further inquiry.

## II.    ESPN Is Not Entitled to Anti-SLAPP Protection

Even if the Court holds that Connecticut's anti-SLAPP law could be applied in federal court, ESPN's motion should still be denied because ESPN cannot show, by a preponderance of

evidence, that Ms. Lawrence's claim arises from ESPN's exercise of its right to free speech or to petition the government in connection with a matter of public concern. And even if ESPN could meet its burden, its motion should also be denied because Ms. Lawrence can demonstrate probable cause that she will prevail on her false light claim, as ESPN's publication of the Fake Texts constitutes the intentional dissemination of a falsehood, to the public, that portrayed Ms. Lawrence in a highly offensive manner.

### A.    The Fake Texts Do Not Relate to a Matter of Public Concern

Communications made "in a public forum on a matter of public concern" may qualify as protected speech under Connecticut anti-SLAPP. Conn. Gen. Stat. § 52-196a(a)(2). ESPN's Fake Texts do not qualify as such under any circumstances. In addition, ESPN does not satisfy the "public forum" requirement. ESPN posted its Fake Texts on ESPN Media Zone, a corporate, public relations website ESPN created on which only ESPN can share its thoughts. This website does not allow for the exchange of ideas – a quintessential element of a public forum. *See Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) (likening Facebook, Twitter, LinkedIn to a traditional public forum because users could interact and debate issues on their platforms).

### 1.    Ms. Lawrence Was Not a Public Figure

By ESPN's admission, Ms. Lawrence was not a public figure. In defending the CHRO proceeding, ESPN made the following statements about Ms. Lawrence: (i) "Lawrence's performance, minimal experience, and moderate expertise in a niche that ESPN ultimately deemed redundant did not entitle her to a position at the Company." (Cohen Decl. Exh. 8 (ESPN CHRO Position Statement) at 1); (ii) "ESPN adamantly disputes Lawrence's contention that she was ESPN's primary legal analyst. She was merely a participant in a Fellowship Program." (*Id.* at 12, n.46); (iii) "Lawrence was an inexperienced Project Hire participating in a Fellowship

Program through which she sometimes provided legal analysis when ESPN deemed fit." (*Id.* at 13); and (iv) "In October 2016, before Lawrence decided to threaten to sue ESPN, she acknowledged that she had far less experience than most of her co-workers: 'Sports anchoring, however, is still new to me and the learning curve is steep. Fortunately, I'm surrounded by some of the best in the business and feel insanely blessed to learn from them.'" (*Id.* at 18) (quoting *Insider Access: ESPN's Adrienne Lawrence*, Front Office Sports (Oct. 12, 2016)).

Ms. Lawrence practiced law as an associate in law firms before transitioning to become a broadcaster and legal analyst. ¶¶ 107, 114. This does not render her a "public figure." *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351-53 (1974) (holding that lawyer was not public figure as he had not achieved "general fame or notoriety in the community"). ESPN tries to mislead this Court by claiming that Ms. Lawrence "identifies herself as a *distinguished* anchor, journalist, and legal analyst" (Br. at 9) (emphasis added) (citing ¶ 114). But that paragraph *actually* states that Ms. Lawrence "quickly *distinguished herself* as an anchor." *Id.*

Moreover, Ms. Lawrence is also not a limited-purpose public figure and she did not become one by filing a discrimination charge with the CHRO or being quoted in the BOSTON GLOBE as stating that "ESPN has failed to address its deeply ingrained culture of sexism and hostile treatment of women." Cohen Decl. Exh. 2. *See Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 136 (2d Cir. 1984) ("[seeking] redress through a court proceeding is not the kind of voluntary act or assumption of prominence in the resolution of public questions as to render her a 'public figure'") (quoting *Time, Inc. v. Firestone,* 424 U.S. 448, 454-55 (1975)). *See also Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 167 (1979) ("[T]he simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or

associated with a matter that attracts public attention."). Indeed, Ms. Lawrence's 16-word quote was eclipsed by many of ESPN's quotes in the 2,566-word Globe Report. *See* Cohen Decl. Exh. 2 (incl. quotes by Buccigross, Katina Arnold, and Sara Spain).

Further, Ms. Lawrence could not have sought to influence the outcome of the Charge with her statement to the BOSTON GLOBE, as the Globe Report was published *after* the CHRO proceeding had been terminated. ¶¶ 18, 35. *See Gertz*, 418 U.S. at 351 (lawyer not limited public figure as he did not "engage the public's attention in an attempt to influence its outcome").

In addition, ESPN provides no support for its representation that Ms. Lawrence gave the BOSTON GLOBE a copy of her Charge and permission to use her photo (Br. at 10), and in fact, both were public record or in the public domain. In that regard, the cases relied upon by ESPN (Br. at 10) are inapposite and readily distinguishable. *See McKee v. Cosby*, 874 F. 3d 54, 62 (1st Cir. 2017) (McKee injected herself into existing controversy when she "came forward after more than twenty other women had leveled highly publicized sexual assault accusations against Cosby" and detailed her rape accusation against "America's Dad"); *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) (plaintiff, who "participated in more than one press conference" and "agreed to be interviewed by several reporters," was limited public figure).

And even if Ms. Lawrence had somehow authored the Globe Report, she did not assume a position of prominence in it, nor could she, as the exposé addressed *numerous* aspects of ESPN's culture and history, including pregnancy discrimination, sexual harassment, retaliation, retention and acquisition of persons known to sexually harass and disparage women. *See* Cohen Decl. Exh. 2. Also, of the five other women who spoke out about discrimination at ESPN *and* had the courage to be identified by name, Ms. Lawrence was the least experienced and known in

broadcast media, and the BOSTON GLOBE coverage of her Charge represented less than 200 of the 2,566 words (7%) comprising the Globe Report. *See* Cohen Decl. Exh. 2. Accordingly, ESPN cannot demonstrate that Ms. Lawrence is a limited public figure. *See Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988) (listing four required elements in order to find plaintiff was limited purpose public figure.

In sum, ESPN's attempt to deem Ms. Lawrence a "public figure" notwithstanding its prior description of her as an unknown and unremarkable "inexperienced Project Hire" with "minimal experience" is not credible and should be afforded no weight by this Court.

### 2.    ESPN's Fake Texts Were Not Published in Connection With a Matter of Public Concern and Were Not Related to Community Well-Being or Public Health or Safety

ESPN's argument to the contrary notwithstanding, an individual "expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern." *Tiltti v. Weise*, 155 F.3d 596, 603 (2d Cir. 1998). With respect to Ms. Lawrence, the Globe Report addressed only her experience with Buccigross and ESPN's retaliation against her. *See* Cohen Decl. Exh. 2. Thus, when ESPN published the Fake Texts – which it had *never* submitted to the CHRO – this was not a matter of public concern. *See Norton v. Breslin*, 565 F. App'x 31, 34 (2d Cir. 2014) (complaints of personal discrimination not connected to broader policy or practice are not of public concern). *See also Corrado v. New York State Unified Court Sys.*, 2014 U.S. Dist. LEXIS 130453, *25 (E.D.N.Y. Sep. 15, 2014) (plaintiff's charges filed with EEOC concerning sexual harassment and retaliation directed towards her rather than system-wide discrimination not matter of public concern) (citations omitted).

Further, Ms. Lawrence's only statement in the Globe Report was, "ESPN has failed to address its deeply ingrained culture of sexism and hostile treatment of women" (Cohen Decl.

Exh. 2) – *nothing more*. But even if Ms. Lawrence had made broader accusations in the Globe Report, ESPN does not and cannot demonstrate that the Fake Texts – which were correspondence between two people – related to *any* matter of public concern. *See, e.g., Barth v. Mokena*, No. 03-C-6677, 2004 U.S. Dist. LEXIS 2789, *7 (N.D. Ill. Feb. 24, 2004) (holding complaints of sexual harassment and discrimination do not address a matter of public concern if it "'concerns a subject of public interest but the expression addresses only the personal effect upon the employee.'") (quoting *Button v. Kibby-Brown*, 146 F.3d 526, 529-30 (7th Cir. 1998)).

ESPN argues that its publication of the Fake Texts was related to health and safety. Br. at 13. As courts have held, however, complaints of harassment and discrimination that only concern the employee's personal experiences do not relate to public safety and do not touch upon a matter of public concern. *See, e.g., Barth v. Mokena*, No. 03-C-6677, 2004 U.S. Dist. LEXIS 2789, *7 (N.D. Ill. Feb. 24, 2004) (holding same; plaintiff only "complained to her supervisors about her own experiences in an effort to get the harassment and discrimination against her to stop").

The cases cited by ESPN do not warrant a different conclusion. In *Agosto v. Correctional Officers Benevolent Ass'n*, 107 F. Supp. 2d 294 (S.D.N.Y. 2000), the court merely observed that "pervasive sexual harassment *may* become a health or safety issue, as is amply illustrated by Agosto's evidence that her fellow officers would not come to her aid when an inmate threatened to attack her." *Id.* at 306 (emphasis added). ESPN's reliance upon *Hammond v Lovings*, 5:15-CV-00579-RP, 2016 U.S. Dist. LEXIS 187597 (W.D. Tex. May 25, 2016), is also misplaced, as that case involved sexual harassment alleged to have occurred in a *government* workplace that implicated health and safety. *See id.* at *7.

Accordingly, the Fake Texts were not related to matters of public concern.

**B.**   **ESPN's Fake Texts Are Not Protected by its Right to Petition the Government**

ESPN argues that its publication of the Fake Texts was protected by its right to petition the government. Br. at 13-16. This argument is without merit for several reasons:

*First*, ESPN's contention that the anti-SLAPP law "protects parties' rights to petition the government" and "shields from liability any 'communication in connection with an issue under consideration or review by a[n] … administrative, judicial, or other governmental body" (Br. at 13), is incorrect. The statute does not provide substantive rights or a shield from liability. Rather, a claim's connection to the right to petition the government merely permits a party to make a special motion to dismiss, nothing more. Conn. Gen. Stat. § 52-196a(b).

*Second*, ESPN's assertion that Ms. Lawrence's claims were being considered by an administrative body when it published the Fake Texts is wrong.

As a part of its Congressional mandate "to establish an integrated system for a more expeditious resolution of employment discrimination charges[,]" the EEOC contracted out to CHRO its authority for the "processing and resolving" of Title VII charges. *See* 42 U.S. Code § 2000e–8(b) ("[T]he Commission may enter into written agreements with such State or local agencies and such agreements may include provisions under which the Commission shall refrain from processing a charge in any cases[.]"); EEOC Contract #EECCN130009 (https://www.eeoc.gov/eeoc/doingbusiness/contracts/upload/eeccn130009.pdf) ("EEOC-CHRO Contract"). Of course, this agreement covered Ms. Lawrence's CHRO Charge.

Here, Ms. Lawrence's claims before the CHRO were adjudicated on December 5, 2017 – *before* ESPN published the Fake Texts. ¶¶ 18, 35. And on that date, when the CHRO granted Ms. Lawrence a release of jurisdiction, the EEOC considered it final and the administrative proceedings were concluded. *See* 29 CFR 1601.77 ("After a designated FEP agency has been

22

certified, the Commission shall accept the findings and resolutions of that agency as final in regard to all cases processed under contract with the Commission[.]"). Thus, the fact that the EEOC did not formally issue a release of jurisdiction until January 29, 2018 is irrelevant. *See id. See also Lennon v. Dolce Vida Med. Spa*, 2015 Conn. Super. LEXIS 294, at *17 (Conn. Super. Ct. Feb. 10, 2015) (not necessary for plaintiff who has release from CHRO to obtain right-to-sue notice from EEOC) (citing *Burke v. Also Cornerstone*, 3:07-CV-889 (MRK), 2007 U.S. Dist. LEXIS 76662, *5 (D. Conn. 2007) (same)). Also, the EEOC would have reviewed Ms. Lawrence's CHRO Charge only if she or ESPN requested a review within 15 days of CHRO's release of jurisdiction, which neither did. *See* 29 CFR 1601.76; Compl. Exh. B.

**Third**, by publishing the Fake Texts, ESPN was not petitioning the government to redress a grievance, not only because the administrative proceedings had already been terminated (*see supra*), but because the First Amendment's Petition Clause – which provides that "Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances" (U.S. Const., Amdt. 1) – does not protect defamatory statements. *See McDonald v. Smith*, 472 U.S. 479, 485 (1985) ("[there is] no sound basis for granting greater constitutional protection to statements made in a petition … than other First Amendment expressions."); *Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011) ("*McDonald* held only that speech contained within a petition is subject to the same standards for defamation and libel as speech outside a petition.").

As explained *infra* and as alleged in the Complaint, ESPN created the Fake Texts to place Ms. Lawrence in a false light. Thus, ESPN's conduct is not protected by the Petition Clause.

**Fourth**, CHRO already had complete copies of the text messages in connection with its investigation. Cohen Decl. Exh. 9 (Lawrence CHRO Reply). Thus, insofar as ESPN claims that

its publication of the Fake Texts was an attempt to influence the (already terminated) investigation, that argument fails.

Finally, the cases cited by ESPN are inapposite. For example, in *Maietta v. Constr., Inc. v. Wainwright*, 2004 ME 53 (2004), the party "[wrote letters] to the City Council and the Mayor" and "made [statements] to the newspapers" (*id.* at ¶ 7), which is in stark contrast to this case, in which ESPN published the Fake Texts on its own corporate, public relations website, ESPN Media Zone. In *Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044 (E.D. Cal. 2008), the plaintiff did not oppose the anti-SLAPP motion and agreed to dismiss the defamation claim, which concerned disbursement of public city funds. *See id.* at 1048, 1051. And *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141 (2017), is also inapposite because in that case, the administrative agency's investigation was ongoing, whereas in this case, when ESPN published the Fake Texts, the administrative proceedings had already been terminated.

Accordingly, because there was no issue under review, ESPN's publication of the Fake Texts was *not* related to its right to petition to the government.

## III.   Ms. Lawrence Demonstrates That There Is Probable Cause That She Will Prevail on the Merits of Her False Light Claim

ESPN's motion should also be denied based on the incontrovertible evidence that Ms. Lawrence has probable cause of prevailing on the merits. ESPN's publication of the Fake Texts in an attempt to fit its own concocted narrative of a "consensual, personal friendship" between Ms. Lawrence and Buccigross amounts to the intentional and malicious publication of falsehoods that materially misrepresent Ms. Lawrence in a highly offensive manner.

### A.   Applicable Legal Principles

To establish false light, Ms. Lawrence must show that (i) ESPN's publication of the Fake Texts placed her in a false light that would be highly offensive to a reasonable person, and (ii)

ESPN had knowledge of or acted in reckless disregard as to the falsity of the Fake Texts and the false light in which Ms. Lawrence would be placed. *See Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 131 (1982) (internal quotations and citations omitted). False light claims protect "one's interests in not being placed before the public in an objectionable false position," and the tort occurs when defendants publish matters about plaintiffs that are untrue and reflect a "major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [woman] in [her] position." *Id.*

Further, to the extent there is any truth to the Fake Texts, such truth is irrelevant if they gave a "false impression" to the public. *See id.* (defendant can be liable for false light "where it publishes highly offensive material without regard to its falsity, and to the false impression relayed to the public") (citation omitted). Likewise, a statement may be considered untrue when "innuendo or inference may result … from the failure to present the whole picture." *Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 322 (1984). *Accord Handler v. Arends*, No. 0527732 S, 1995 Conn. Super. LEXIS 660, *15 (Conn. Super. Ct. Mar. 1, 1995) (falsehood by omission may occur when although defendant's statement is technically true, defendant knows of additional material facts, reporting of which would have changed tone). *See Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015) ("in certain circumstances even a technically true statement can be so construed as to carry a false and defamatory meaning").

In this case, Ms. Lawrence unquestionably meets her burden.

**B.      ESPN's Publication of the Fake Texts Constitutes
          the Public Dissemination of a Falsehood**

ESPN's blatant omissions of material facts with the intention of misleading the public to believe its scripted conclusion, that Ms. Lawrence pursued and hounded Buccigross and welcomed his inappropriate text messages and half-naked photos, as opposed to the logical

conclusion that would have been reached had the actual truth been published, constitute false statements. A comparison of ESPN's Fake Texts and the Real Texts supports this conclusion. *Compare* Cohen Decl. Exhs. 3 and 4.

ESPN worked hard to prepare the Fake Texts to falsely portray a friendly relationship between Ms. Lawrence and Buccigross. The Fake Texts are manipulated to look like a complete, chronological thread, but when examined closely, ESPN selectively disclosed portions of the texts by cutting and pasting them, using a copier to combine pages, and whiting out shadowed lines. Cohen Decl. Exh. 3 (Fake Texts). Insofar as a reader of the Fake Texts *did* understand them to be only a portion of the conversation, the logical conclusion would be that any missing messages came before or after the Fake Texts due to their appearance as a continuous thread, when, in fact, material messages that fully supported Ms. Lawrence's sexual harassment claim were missing.

Moreover, while ESPN now contends that it did not suggest it was producing every single text between Ms. Lawrence and Buccigross (Br. at 20-21), it undertook extensive efforts to make it seem like it *was* by attaching two separate links to texts in its statement, titled "attached portions of text messages" and "Text Messages." *See* Cohen Decl. Exh. 5 (MediaZone Website). This deceived readers into believing that the Fake Texts were complete.

Further, ESPN tries to distort what is already a misrepresentation of the facts by submitting a "simple comparison of the texts … [that] shows that ESPN did not rearrange the text message excerpts." Br. at 20; Bertrand Decl. Ex D. ESPN's juxtaposition of the texts tries to distract the Court from the cut-and-paste job in its original publication, whereas a comparison shows that ESPN rearranged the messages. Rather than publishing the entire thread, which would have involved *significantly less effort* than its arts-and-crafts project, ESPN used the Fake

Texts to dupe the public into believing that the Lawrence-Buccigross relationship was a consensual friendship.

In addition, ESPN argues that its publication of the Fake Texts was "substantially true," but in fact, they were substantially *false*. *See* Cohen Decl. Exh. 10 (CNN Article). The Real Texts demonstrate that Buccigross abused his power as a mentor as he continuously harassed Ms. Lawrence while Ms. Lawrence attempted to remain cordial in the face of Buccigross's inappropriate conduct. *See* Cohen Decl. Exh. 4 (Real Texts); Exh. 10 (CNN Article). Indeed, the following is a sample of ESPN's material omissions:

- Buccigross sending Ms. Lawrence unsolicited, topless photos of himself;

- At least ten (10) instances of Buccigross referring to Ms. Lawrence as "doll," "beauty," or the like as well as Buccigross's sexually and racially charged comments as to his own physical features, referring to himself as a "white boy" who is "jacked" and a "blue eyed hunk," and offering to oil himself up like the "flag bearer from Tonga";

- Multiple instances of Buccigross stalking Ms. Lawrence's social media accounts, extracting pictures from them and resending them to her with heart-faced emoji's, which is creepy and offensive;

- Lawrence ignoring two requests by Buccigross to get together outside of work (on June 13, 2016);

- Buccigross enticing Ms. Lawrence with the promise of promotion, implying she could be his co-anchor (on June 17, 2016);

- Buccigross fantasizing about Ms. Lawrence looking great (on July 13, 2016);

- Buccigross becoming desperate about whether Ms. Lawrence forgot about him and stating he had canceled his plans in case of the off chance she agreed to see him socially (on August 13, 2016); and

- Buccigross expressing disappointment about not seeing Ms. Lawrence (on August 14, 2016).

Cohen Decl. Exh. 4 (Real Texts).

ESPN also fails to mention that it omitted texts in which Buccigross apologized, conceded his bad behavior, and indicated that he would stop harassing Ms. Lawrence: "[R]eally bummed I did/said something to turn you off. I'm sorry if I did. I won't bug you anymore." Cohen Decl. Exh. 4 (Real Texts) ("bug" is a synonym for "harass" http://www.thesaurus.com/browse/harass). And to stretch its false narrative, ESPN claims Ms. Lawrence sent Buccigross "a photo of herself" (Br. at 21), when it is clear that Ms. Lawrence is merely showing her new car and tersely responding to a question seeking information about her on-goings. *See* Cohen Decl. Exh. 4 (Real Texts).

These messages and others that ESPN omitted were material in that they supported Ms. Lawrence's claim of sexual harassment in the CHRO Charge covered by the Globe Report. Even various news outlets recognized ESPN's material omissions and that the Fake Texts were not "substantially true" as ESPN claims (Br. at 24). *See* Cohen Decl. Exhs. 10 (CNN Article), 11 (Yahoo Article), 12 (Awful Announcing).

Finally, ESPN characterizes its perpetration of falsehoods as providing factual support for its *opinion* that Ms. Lawrence's and Buccigross's relationship was consensual. But this argument fails because it is firmly established that:

> The distinction between fact and opinion cannot be made in a vacuum ... for although an opinion may appear to be in the form of a factual statement, it remains an opinion if it is clear from the *context* that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated ... Thus, while this distinction may be somewhat nebulous ... the important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.

*Deutsch v. Backus Corp.*, No. CV106004265, 2011 Conn. Super. LEXIS 70, *34 (Conn. Super. Ct. Jan. 14, 2011) (internal quotations and citations omitted) (emphasis in original).

Here, the only "opinion" expressed by ESPN is the false conclusion it induced readers to reach by misrepresenting the facts upon which said "opinion" was based. Indeed, if the "facts" would lead ordinary readers to reach their own conclusion as to the nature of Ms. Lawrence's and Buccigross's relationship, then ESPN would have published the Real Texts. The facts ESPN bases this "opinion" on, however, are the very falsehoods it published.

       **C.**    **ESPN's Publication of the Fake Texts Was Directed to the Public**

For false light claims to prevail, it must be shown that the publication was directed "to the public at large or to enough persons so that the false and defamatory statements must be substantially certain to become public knowledge." *Decker v. Martin*, No. MMXCV096000884S, 2010 Conn. Super. LEXIS 168, *23 (Conn. Super. Ct. Jan. 19, 2010). Here, as ESPN admits, the Fake Texts were published on ESPN's public relations website, which is accessible to anyone with an Internet connection. Br. at 8.

       **D.**    **ESPN's Publication of the Fake Texts Would Be
Highly Offensive To a Reasonable Person**

ESPN's blatantly disseminated falsehoods about Ms. Lawrence (*i.e.*, Fake Texts) caused the public to see an incredibly distorted view of the true facts and Ms. Lawrence's justification for complaining about the harassment. A small sample of reactions to ESPN's publication of the Fake Texts shows how far ESPN's portrayal of Ms. Lawrence in a false light skewed the public reaction, confirming that a reasonable person would find the Fake Texts highly offensive:

- "you stalked him. Three texts without a reply and you kept at it";

- "sounds like [Ms. Lawrence] was VERY thirsty! I mean she text the man three times before he sent the first text!"

  - These tweets reacted to the Fake Texts purporting to show that Ms. Lawrence sent Buccigross three messages without getting a response, *but in truth*, Buccigross had actually sent *nine* messages before Ms. Lawrence sent her third. *Compare* Cohen Decl. Exh. 4 (RealTexts) with Exh. 3 (Fake Texts).

- "you … attempt[ed] to ruin [Buccigross'] life and take advantage of the real victims of sexual harassment. Shame on you";

- "if [the Fake Texts] ***are the extent of*** the 'sexual harassment' that you are claiming, then you should be ashamed of yourself" (emphasis added);

- "you are a prime example of what is wrong with our society";

- "I read the [Fake Texts]. You are a straight up liar.";

- "you should be prosecuted";

- "u are disgusting for trying to ruin a mans life for something he never did";

- "you lead this man on! You were the one that repeatedly asked him out …. There was nothing wrong with [the Fake Texts]";

- "after reading the [Fake Texts] it would appear that Buccigross was the victim" – followed by other tweets agreeing with this position;

- "I saw the [Fake Texts]. Looks [like Ms. Lawrence] was trying to use her stunning beauty to entice a guy into helping her get promoted. Disgraceful."

Cohen Decl. Exh. 13 (Tweet reactions).

   After ESPN published the Fake Texts, another tweeter stated:

- "if he sent shirtless pics then you'll have to provide evidence of those pics. It looks like he offered but didn't follow through when you declined."

*See id.* at 13 (Tweet reactions).

   These reactions show that ESPN successfully distorted the truth and placed Ms. Lawrence in a false light, as the Fake Texts make it appear that Buccigross offered to send topless pictures but withheld them when Ms. Lawrence declined. In fact, however, the Real Texts show that Buccigross first sent one topless photo, was asked to not do it again, and then sent another anyway.

   The complete reactions to ESPN's release of the Fake Texts are too voluminous (and abhorrent) to produce in their entirety but are available upon the Court's request. Nevertheless,

this small sample demonstrates that ESPN successfully placed Ms. Lawrence in a false light and that its misleading portrayal of Ms. Lawrence as having "pursued and hounded" Buccigross is ***not***, as ESPN contends, "Lawrence's interpretation alone." Br. at 21 fn. 16.

### E.    ESPN Intentionally Published the Fake Texts

To balance the tort of false light against the First Amendment, a plaintiff must demonstrate that a defendant's publication was made "with knowledge of its falsity or in reckless disregard of the truth." *Goodrich*, 188 Conn. at 129. Here, ESPN knew it was publishing falsities and did so intentionally, as it *admitted* that it "purposefully excluded" portions of the text messages. Cohen Decl. Exh. 10 (CNN Article). Indeed, the following shows that ESPN acted intentionally in using the fake texts to place Ms. Lawrence in a false light:

- ESPN had to go to great lengths to physically alter the text messages by copying them into one document that presented them as one continuous stream without a break to disguise the Fake Texts as complete (*Compare* Cohen Decl. Exh. 3 (Fake Texts) with Exh. 4 (Real Texts));

- ESPN omitted Buccigross's inappropriate texts and photos as well as Lawrence's objections to them, all of which support a claim of sexual harassment and were consistent with the Globe Report's interpretation of Ms. Lawrence's CHRO Charge (*id.*);

- ESPN published the Fake Texts on its MediaZone public relations website, where one would expect to find accurate and complete facts, and then used social media to direct individuals to them (Cohen Decl. Exh. 5 (MediaZone Website));

- ESPN's MediaZone website gave two links as sources to text messages, *both of which* led to the exact same Fake Texts (*id.*);

- ESPN's Fake Texts were showcased on a standalone document that gave no indication whatsoever that the messages were incomplete or that any texts had been removed (Cohen Decl. Exh. 3 (Fake Texts);

- Although five women shared their stories of discrimination with the BOSTON GLOBE, ESPN only publicly responded about Ms. Lawrence (Cohen Decl. Exh. 2 (Globe Report));

- During CHRO proceeding, ESPN maintained that the complete text messages were reflective of a "friendly" relationship, so creating the Fake Texts should not have been necessary (Cohen Decl. Exh. 8 (CHRO Response));

- ESPN admitted to CNN that it "purposefully excluded" Buccigross's half-naked photos and created the Fake Texts to show a "friendship" (Cohen Decl. Exh. 10 (CNN Article)); and

- ESPN never presented the Fake Texts to CHRO as evidence in its defense while that proceeding was pending (Cohen Decl. Exh. 8 at E (ESPN Position Statement)).

Accordingly, ESPN's publication of the Fake Texts was intentional and malicious.

### F.    In This Case, ESPN Was Not Acting as a Media Company

ESPN argues that, based on *Goodrich*, it is afforded additional protection under the First Amendment as a "media company." Br. at 18. But this assertion, and ESPN's reliance upon *Goodrich*, is misplaced. In *Goodrich,* the plaintiff brought a defamation action against a newspaper in connection with its publication of an article about a local real estate developer's spat with his town's planning and zoning commission. The story was a piece of journalism, written by a reporter assigned to the town in question. *See Goodrich,* 188 Conn. at 109.

Here, by contrast, ESPN was neither acting as a "media company" nor "reporting news" or engaging in journalism; indeed, ESPN's publication of the Fake Texts did not comport with journalistic ethics or standards. *See* https://www.spj.org/ethicscode.asp. Rather, the statements about Ms. Lawrence and the Fake Texts were statements by a vindictive former employer, published in a press release (with no bylines, sources or objective facts) on ESPN's press release website, ESPN Media Zone (***as opposed to ESPN's news reporting website: ESPN.com***) solely for the purpose of provoking public disdain for Ms. Lawrence and garnering support for Buccigross.

**G.     ESPN Misconstrues the Allegations Concerning the Third-Party Tweets**

As alleged, ESPN uses fake social media accounts and bots ("Fake Accounts") to promote its agenda. Here, evidence suggests that ESPN used Fake Accounts to further compound the falsities it published about Ms. Lawrence. For example, several of the alleged Fake Accounts *were created the very morning* ESPN released the Fake Texts and the Fake Accounts' tweets concern only Ms. Lawrence. *See* Cohen Decl. Exh. 6 (Fake Accounts). In any event, at this juncture, the Fake Accounts are superfluous because those allegations are not the *basis* for Ms. Lawrence's false light claim; the Fake Texts substantiate that claim.

Nevertheless, if, as ESPN contends, the tweets are protected speech and it did not create the Fake Accounts or any of the reactions to the Fake Texts, the tweets further highlight the negative the public reaction to ESPN's offensive portrayal of Ms. Lawrence. Thus, the Fake Accounts are a double-edged sword: either they were created by ESPN to harm Ms. Lawrence's reputation, or, they are strong evidence of the negative reaction to the Fake Texts and the detrimental impact they had on Ms. Lawrence's reputation.

## **CONCLUSION**

For all of the foregoing reasons, ESPN's special motion to dismiss should be denied.

Dated:  Greenwich, CT
       May 18, 2018

**LACHTMAN COHEN P.C.**                    **YANKWITT LLP**


*/s/ Brian S. Cohen*_____                */s/ Russell M. Yankwitt*_____
Brian S. Cohen, Esq.                        Russell M. Yankwitt, Esq.
Bar No.: CT18878                            Bar No.: CT29945
500 West Putnam Avenue                      140 Grand Street, Suite 705
Suite 400                                   White Plains, NY 10601
Greenwich, CT 06830                         Telephone: (914) 686-1500
Telephone: (203) 404-4960                   Email: russell@yankwitt.com
Email: bcohen@lcpclaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 18, 2018, a copy of the foregoing *Plaintiff's Memorandum of Law in Opposition to ESPN, Inc.'s Special Motion to Dismiss Plaintiff's Ninth Cause of Action Pursuant to Conn. Gen. Stat. § 52-196a* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Brian S. Cohen*
Brian S. Cohen, Esq. (CT18878)
LACHTMAN COHEN P.C.
500 West Putnam Avenue
Suite 400
Greenwich, CT 06830
Telephone: (203) 404-4960
Email: bcohen@lcpclaw.com